FILED

E-filing

1  JEFFREY R. CHANIN (CSB # 103649)
   KLAUS H. HAMM (CSB # 224905)
2  KEKER & VAN NEST, LLP
   710 Sansome Street
3  San Francisco, CA 94111
   Telephone:    (415) 391-5400
4  Facsimile:    (415) 397-7188
   Email: jchanin@kvn.com
5         khamm@kvn.com

6  LAUREN M. RULE (ISB # 6863), *pro hac vice* pending
   ADVOCATES FOR THE WEST
7  P.O. Box 1612
   Boise, ID 83701
8  Telephone:    (208) 342-7024
   Facsimile:    (208) 342-8286
9  Email: lrule@advocateswest.org

10  Attorneys for Plaintiffs

11

12              UNITED STATES DISTRICT COURT

13           FOR THE NORTHERN DISTRICT OF CALIFORNIA

14
                                          *PJH*
15  WESTERN WATERSHEDS PROJECT;     )  Case No.:
    NATURAL RESOURCES DEFENSE       )
16  COUNCIL; CENTER FOR BIOLOGICAL  )  08        1460
    DIVERSITY; CALIFORNIA TROUT;    )
17  ENVIRONMENTAL PROTECTION        )  **COMPLAINT FOR VIOLATIONS OF**
    INFORMATION CENTER; KLAMATH     )  **THE FISCAL YEAR 2005**
18  SISKIYOU WILDLANDS CENTER; LOS  )  **CONSOLIDATED APPROPRIATIONS**
    PADRES FOREST WATCH; SIERRA     )  **ACT, THE NATIONAL**
19  FOREST LEGACY; and SEQUOIA      )  **ENVIRONMENTAL POLICY ACT, AND**
    FORESTKEEPER,                   )  **THE APPEALS REFORM ACT**
20                                  )
                       Plaintiffs,  )  **[Administrative Procedure Act Case]**
21                                  )
         vs.                        )
22                                  )
    U.S. FOREST SERVICE,            )
23                                  )
                       Defendant.   )
24  _____  )

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1    **I.    INTRODUCTION**

2    1.    Plaintiffs challenge Defendant U.S. Forest Service's unlawful practice across

3    numerous forests in California of reauthorizing livestock grazing on federal land without

4    conducting the proper environmental review under the National Environmental Policy Act

5    ("NEPA").   The Forest Service has thereby eliminated meaningful public input and thorough

6    environmental analysis for decisions that adversely impact imperiled species, important fish and

7    wildlife habitat, wilderness areas, and other valuable natural resources.

8    2.    Livestock grazing adversely impacts ecological communities such as aquatic and

9    riparian areas, meadows, sagebrush ecosystems, aspen stands, and grass and forb communities,

10    all of which are critically important habitat for fish and wildlife.  Cows and sheep trample and

11    eat vegetation, compact soils and cause erosion, and degrade water quality.  When livestock

12    degrade this habitat, it impairs the ecological functioning or survival of many fish, wildlife and

13    plant species.

14    3.    Because grazing causes so many adverse environmental impacts, NEPA normally

15    requires the Forest Service to complete an environmental assessment ("EA") or environmental

16    impact statement ("EIS") before issuing or renewing ten-year grazing permits.  Such review

17    provides for a thorough examination of the impacts of livestock grazing on public land resources

18    as well as an opportunity for the public to comment on and appeal grazing decisions.

19    4.    At the behest of the Forest Service, however, Congress passed an appropriations

20    rider in 2005 that allows the agency categorically to exclude grazing reauthorizations from

21    NEPA review under certain narrow circumstances.  Specifically, the Forest Service may

22    categorically exclude a decision only if: (1) it does not increase grazing; (2) the Forest Service

23    has monitoring data showing that the grazing is meeting or satisfactorily moving toward

24    applicable ecological objectives; and (3) the Forest Service has demonstrated there will be no

25    significant impacts to certain special resources such as imperiled species, wetlands, and

26    wilderness areas.

27    5.    Yet the Forest Service has routinely and improperly used this rider as a blank

28    check, frequently relying on it to reauthorize grazing without any EA or EIS even when it has not

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1  met the rider's requirements, and in fact when grazing will cause further degradation of

2  resources. Plaintiffs challenge 25 decisions involving nine forests in California where the Forest

3  Service reauthorized grazing on 46 allotments based on an abuse of the appropriations rider.

4  There are clear patterns to these abuses. For instance, the Forest Service repeatedly has used the

5  categorical exclusion shortcut to "reauthorize" grazing where no grazing is taking place, or to

6  dramatically increase its intensity. The agency also has categorically excluded many grazing

7  allotment reauthorizations even in the complete absence of monitoring data to demonstrate that

8  grazing is not preventing the achievement of applicable ecological objectives—particularly data

9  about grazing's impact on sensitive and biologically rich areas and the species that depend on

10  them. And in numerous decisions the Forest Service acknowledged the presence of special

11  resources, such as endangered, threatened, or sensitive fish, wildlife, and plant species, but failed

12  to demonstrate that grazing is not harming these resources.

13       6.    Further, for many of the grazing allotments at issue, the Forest Service either has

14  never conducted any site-specific environmental analysis under NEPA to assess the impacts from

15  livestock grazing, or the only NEPA analysis completed is now 20 or more years old—well

16  before scientists recognized many of the adverse effects from grazing, including to species that

17  are now known to be imperiled. By using the rider quickly to renew grazing permits the Forest

18  Service is trying to escape in-depth environmental analysis and public comment on, or appeal of,

19  its decisions on these allotments, many of which are thousands of acres in size and suffer from

20  significant documented degradation. Because these decisions do not meet the requirements of

21  the rider, and will have significant adverse impacts on the environment, Defendant Forest

22  Service has violated NEPA by failing to conduct the appropriate environmental analysis.

23       7.    Plaintiffs thus seek judicial review and relief reversing and setting aside the

24  decisions challenged herein, and further declaratory and injunctive relief to prevent the Forest

25  Service from continuing to exempt from NEPA decisions that do not meet the requirements of

26  the appropriations rider.

27  ## II.    JURISDICTION AND VENUE

28       8.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action

2

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1   arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 et seq.; the

2   Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act,

3   28 U.S.C. § 2201 et seq.; the FY 2005 Consolidated Appropriations Act, Pub. L. No. 108-447,

4   Sec. 339; and the Equal Access to Justice Act, 28 U.S.C. § 2214 et seq.  An actual, justiciable

5   controversy now exists between Plaintiffs and Defendant, and the requested relief is therefore

6   proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

7        9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a

8   substantial part of the events or omissions giving rise to the claims herein occurred within this

9   judicial district, a substantial part of the public lands and resources at issue are located within

10  this district, and Plaintiffs California Trout and Environmental Protection Information Center

11  reside in this district.

12       10.     The Federal Government has waived sovereign immunity in this action pursuant

13  to 5 U.S.C. § 702.

14                        **III.    INTRADISTRICT ASSIGNMENT**

15       11.     Assignment of this case to the San Francisco or Oakland Division is proper

16  because a substantial part of the events or omissions that give rise to the claims herein occurred

17  in Lake County and a substantial part of the property at issue is located in Lake County.

18                              **IV.    PARTIES**

19       12.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional,

20  membership, not-for-profit conservation organization, dedicated to protecting and conserving the

21  public lands and natural resources of watersheds in the American West.  WWP has offices in

22  California and other western states and more than 1,300 members located throughout California

23  and the United States.  Through agency proceedings, public education, scientific studies, and

24  legal advocacy conducted by its staff, members, volunteers, and supporters, WWP is actively

25  engaged in protecting and improving riparian areas, water quality, fisheries, wildlife, and other

26  natural resources and ecological values of western watersheds.  WWP has participated in

27  decision-making processes for livestock grazing on Forest Service lands across the West,

28  including national forests in California.  WWP, and its staff and members, use and enjoy the

1    wildlife, public lands, and other natural resources on national forest lands, including the forests

2    at issue here, for many health, recreational, scientific, spiritual, educational, aesthetic, and other

3    purposes. WWP and its staff and members pursue activities such as hiking, fishing, hunting,

4    wildlife viewing, biological and botanical research, photography, and spiritual renewal on Forest

5    Service lands in California and throughout the West. Livestock grazing that degrades these lands

6    and their natural resources impairs the use and enjoyment of these forests by WWP staff and its

7    members.

8        13.    Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-

9    profit environmental organization that uses law and science to protect the earth's wildlife and

10    wild places and to ensure a healthy environment for all living things. NRDC has more than

11    530,700 members nationwide, including many members in California, and offices across the

12    country, with regional offices in San Francisco and Los Angeles, California. Through its

13    nationwide membership and staff of lawyers, scientists, and other environmental specialists,

14    NRDC takes a leading role on a diverse range of federal land and resource management issues,

15    including livestock grazing. NRDC has long been involved in efforts to improve the Forest

16    Service's management of livestock grazing on national forest lands across the West, including

17    the forests in California at issue here. NRDC's staff and members use and enjoy these forests

18    and their resources for many purposes, such as hiking, fishing, hunting, wildlife and nature

19    viewing, solitude, aesthetic appreciation, scientific study, photography, spiritual renewal, and

20    other similar purposes. Livestock grazing that degrades fish and wildlife habitat and other

21    natural resources on national forests in California impairs the use and enjoyment of these areas

22    by NRDC staff and its members.

23        14.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a non-profit

24    corporation dedicated to the preservation, protection, and restoration of biodiversity, native

25    species, ecosystems, and public lands throughout the United States. CBD has offices throughout

26    the United States, including multiple offices in California, and more than 40,000 members

27    nationwide, thousands of whom reside in California. CBD uses science, law, advocacy, and

28    public outreach and education to protect the lands, water, and climate that native species need to

413297.01

1  survive in order to protect biodiversity, particularly those species on the brink of extinction.

2  CBD actively engages in activities in California and elsewhere throughout the western United

3  States to protect native species and their habitat from livestock grazing. CBD staff and

4  individual members use and enjoy the national forests of California for hiking, biking, nature and

5  wildlife viewing, photography, spiritual renewal, solitude, and other recreational, educational,

6  aesthetic, and spiritual purposes. Livestock grazing that harms native species and their habitat

7  impairs the use and enjoyment of these forests by CBD staff and its members.

8      15.    Plaintiff CALIFORNIA TROUT ("CalTrout") is a non-profit conservation

9  organization whose mission is to protect and restore wild trout and steelhead and other native

10  fish species such as salmon by protecting the waters that nurture these fish species, throughout

11  the State of California. CalTrout is incorporated under the laws of the State of California with its

12  principal place of business in San Francisco, California. CalTrout has more than 7,000 members

13  across the State that regularly use the streams in California national forests, including the forests

14  at issue in this case, for fishing, photography, hiking, and to seek aesthetic relief. CalTrout

15  fulfills its mission by protecting freshwater wild trout habitat throughout California, and the

16  native biodiversity associated with this riparian habitat. CalTrout regularly participates in

17  restoration efforts, management activities, education, and legal advocacy to protect and restore

18  streams for native fishes throughout California, including on national forest land across the State.

19  Livestock grazing that harms native fishes by damaging riparian areas and streams impairs the

20  use and enjoyment of the national forests in California by CalTrout's staff and members.

21     16.    Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER

22  ("EPIC") is a 501(c)3 nonprofit public interest organization that works to protect the long-term

23  health of the ecosystems of Northern California. EPIC is dedicated to preserving, protecting, and

24  restoring biodiversity, native species, watersheds and ecosystems in Northern California. EPIC

25  is located in the State of California, with its main office in Humboldt County, and has

26  approximately 2,000 members. EPIC's staff and members use and enjoy the national forests of

27  Northern California, including the Mendocino National Forest, for recreational, scientific,

28  educational, and aesthetic purposes. EPIC has actively opposed livestock grazing that harms

5

413297.01

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1   watersheds and native species, such as salmon and steelhead. Grazing that degrades these

2   resources impairs the use and enjoyment of the forests of Northern California by EPIC's staff

3   and members.

4       17.    Plaintiff KLAMATH SISKIYOU WILDLANDS CENTER ("KS Wild") is a

5   non-profit public interest conservation organization based in Williams, Oregon and Ashland,

6   Oregon. KS Wild's organizational mission is to conserve the outstanding biological diversity of

7   the Klamath-Siskiyou region in Southern Oregon and Northern California. KS Wild and its staff

8   and members seek to protect the biological health and ecological resources of the region by

9   protecting and preserving the native habitat and hydrologic health of the Klamath-Siskiyou

10  ecoregion, including in the Klamath National Forest and Marble Mountain Wilderness. KS Wild

11  staff and members use and enjoy the national forests and wilderness areas within this region.

12  Livestock grazing that degrades these values and conflicts with the recreational use of the forests

13  and wilderness areas within this region impairs the use and enjoyment of these areas by KS Wild

14  staff and members.

15      18.    Plaintiff LOS PADRES FOREST WATCH is a non-profit conservation

16  organization dedicated to protecting and restoring public lands along California's central coast

17  using community involvement, scientific collaboration, innovative field work, and legal

18  advocacy. Los Padres Forest Watch acts as a citizen-supported watchdog group for the Los

19  Padres National Forest and has approximately 700 members, including members who reside

20  within Monterey and San Luis Obispo counties. Members of Los Padres Forest Watch include

21  outdoor enthusiasts, hikers, mountain bikers, biologists, horseback riders, river runners,

22  backcountry travelers, anglers, hunters, bird watchers, business leaders, and others who depend

23  on a healthy forest and seek to prevent environmental damage caused by the use of public lands

24  that are contrary to environmental protection laws. Los Padres Forest Watch staff and members

25  visit the Los Padres National Forest for recreation, scientific, and aesthetic purposes, and the

26  degradation of these lands by improperly managed livestock grazing impairs their use and

27  enjoyment of the forest.

28      19.    Plaintiff SIERRA FOREST LEGACY is a non-profit coalition of environmental

6

413297.01    COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1    groups which are dedicated to the conservation, enhancement, and protection of old-growth

2    forests, wildlands, at-risk species, rivers and streams and the ecological processes which shape

3    the forests of the Sierra Nevada. Sierra Forest Legacy is headquartered in Sacramento,

4    California. Its staff, members, and supporters use and enjoy the Sierra Nevada national forests,

5    including the Modoc, Lassen, Plumas, Inyo, Sierra, Stanislaus, and Sequoia National Forests, for

6    hiking, camping, fishing, wildlife viewing, photography, solitude, and other recreational,

7    scientific, aesthetic, and spiritual pursuits. Sierra Forest Legacy is concerned about proper

8    livestock grazing management on these forests, and has participated in grazing decision

9    processes. Livestock grazing that degrades the natural resources on these national forests

10    impairs their use and enjoyment by Sierra Forest Legacy staff and members.

11    20.    Plaintiff SEQUOIA FORESTKEEPER is a non-profit conservation corporation

12    whose mission is to protect and restore the ecosystems of the Southern Sierra Nevada including,

13    but not limited to, the Giant Sequoia National Monument and Sequoia National Forest through

14    monitoring, enforcement, education, and litigation. Sequoia ForestKeeper is based in Kernville,

15    California and its more than 800 members and supporters have vital interests in protecting

16    wildlife and imperiled species that occur on the public lands in the Sequoia National Forest.

17    Staff and members of Sequoia ForestKeeper use and enjoy the Sequoia National Forest,

18    including the Kiavah Wilderness, for recreation, aesthetic, spiritual, scientific, and educational

19    purposes. Livestock grazing that harms wildlife habitat, imperiled species, and wilderness

20    resources impairs their use and enjoyment of the Sequoia National Forest.

21    21.    Plaintiffs, both organizationally and on behalf of their staff, members, and

22    supporters, have deep and long-standing interests in the preservation and protection of the

23    national forests in California and their resources, which interests are directly harmed by

24    Defendant's actions challenged herein.

25    22.    Plaintiffs have been involved in many public and private efforts to protect these

26    national forests from harmful impacts of livestock grazing and to preserve or restore their special

27    resources, including endangered, threatened, and sensitive species. Plaintiffs' staff, members,

28    and supporters will continue frequently to visit these national forests in the future—to hike, hunt,

1  fish, camp, observe wildlife, take photographs and otherwise enjoy their natural and scenic

2  beauty and biodiversity.

3      23.    The above-described aesthetic, conservation, recreational, scientific and other

4  interests of Plaintiffs and their staff, members and supporters have been, are being, and, unless

5  the relief prayed for is granted, will continue to be adversely affected and irreparably injured by

6  Defendants' violations of law.  Plaintiffs have no adequate remedy at law, and thus the requested

7  relief is appropriate.

8      24.    Defendant UNITED STATES FOREST SERVICE is an agency or

9  instrumentality of the United States, and is charged with managing the public lands and

10  resources of the National Forests, in accordance and compliance with federal laws and

11  regulations.

12                        **V.    LEGAL BACKGROUND**

13  **A.    National Environmental Policy Act**

14      25.    As our nation's basic environmental charter, NEPA requires federal agencies to

15  undertake a thorough and public analysis of the environmental consequences of proposed federal

16  actions, including preparing a detailed EIS for all major Federal actions that may significantly

17  affect the quality of the human environment.  An EIS must consider a range of reasonable

18  alternative actions and assess site specific and cumulative impacts of these actions. 42 U.S.C. §

19  4332(2)(C). Cumulative impacts are the past, present, and reasonably foreseeable future actions

20  that must be assessed, in combination with the proposed action, to determine the potential for

21  significant impacts to the environment. 40 C.F.R. § 1508.7.

22      26.    Under federal regulations, agencies may prepare an EA to assist in the NEPA

23  process. 40 C.F.R. § 1508.9. An EA is a more limited review of environmental factors

24  associated with a federal action, performed to assist the agency in determining whether an EIS is

25  warranted.

26      27.    NEPA also provides for public input into the decision-making process, and Forest

27  Service regulations allow the public to appeal its final EA or EIS decisions. 40 C.F.R. §§

28  1503.1, 1506.6; 36 C.F.R. Part 215. As noted by the Supreme Court, NEPA requires an agency

1   to: (1) take a "hard look" at the environmental consequences of its proposed action before

2   proceeding with implementation of the action, and (2) encourage public involvement in the

3   decision-making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350

4   (1989).

5       28.    The issuance or renewal of a federal livestock grazing permit is a major federal

6   action that triggers NEPA review. *See, e.g., Natural Resources Defense Council v. Morton*, 388

7   F. Supp. 829 (D.D.C. 1974), *aff'd without opinion*, 527 F.2d 1386 (D.C. Cir. 1976); *Idaho*

8   *Watersheds Project v. Hahn*, 307 F. 3d 815 (9th Cir. 2002).

9   **B.    2005 Appropriations Rider**

10      29.    In the fiscal year 2005 appropriations bill, Congress passed a rider that allowed

11  the Forest Service categorically to exclude grazing reauthorizations in fiscal years 2005 through

12  2007 from documentation in an EA or EIS if: "(1) the decision continu*es current grazing*

13  *management*; (2) monitoring indicates that *current grazing management* is meeting, or

14  satisfactorily moving toward, objectives in the land and resource management plan, as

15  determined by the Secretary; and (3) the decision is consistent with agency policy concerning

16  extraordinary circumstances." FY 2005 Consolidated Appropriations Act, Sec. 339 (Pub. L.

17  108-447) (emphasis added). The total number of allotments authorized under this rider could not

18  exceed 900.

19      30.    The Forest Service used the rider to exclude hundreds of permit renewals from

20  environmental review under either an EA or an EIS, including dozens in the last month before

21  the rider expired. But, even with this last rush of excluded renewals, the Forest Service did not

22  reach its target of 900 allotments, and Congress extended the rider for fiscal year 2008. FY 2008

23  Consolidated Appropriations Act, Sec 421 (Pub. L. 110-161). Congress also added the

24  limitation that a categorical exclusion could not be used for any allotment within a federally

25  designated wilderness area.

26      31.    Under the rider's first requirement, the categorically excluded decision must

27  continue *current grazing management*. It cannot authorize more grazing or grazing under

28  different circumstances than what is presently taking place. The Forest Service's internal

1    guidelines interpret "current management" to mean the management that has been implemented

2    over the past three to five years. *See* Forest Service Handbook 2209.13, 92.31.

3    32.    The rider's second requirement ensures that a decision will be categorically

4    excluded only when the Forest Service has monitoring information showing that current grazing

5    management is meeting, or satisfactorily moving toward, land and resource management plan

6    objectives. Each forest or group of forests has its own Land and Resource Management Plan

7    ("Forest Plan"), which sets forth desired conditions, goals, standards and guidelines for various

8    resources on the forest such as fish and wildlife, vegetation, soils, water, recreation and cultural

9    resources.

10    33.    The rider's third requirement is that the categorically excluded decision must

11    comply with the Forest Service policy on extraordinary circumstances, which is found in the

12    Forest Service Handbook, chapter 1909.15.30.3.2. In determining whether extraordinary

13    circumstances exist, the Forest Service must first determine whether certain resource conditions

14    are present in the action area. Those resource conditions are:  a) federally listed threatened or

15    endangered species or designated critical habitat, species proposed for federal listing or proposed

16    critical habitat, or Forest Service sensitive species; b) flood plains, wetlands, or municipal

17    watersheds; c) congressionally designated areas, such as wilderness, wilderness study areas, or

18    national recreation areas; d) inventoried roadless areas; e) research natural areas; f) American

19    Indian and Alaska Native religious or cultural sites; or g) archaeological sites, or historic

20    properties or areas. Next, the Forest Service must assess the "degree of potential effect of the

21    proposed action on these resource conditions" to determine whether extraordinary circumstances

22    exist. The Forest Service must demonstrate that there will be no significant effects on any of

23    these special resource conditions to avoid preparing an EA or EIS.

24    **C.    Appeals Reform Act**

25    34.    The Appeals Reform Act (ARA) requires the Forest Service to establish a notice

26    and comment process, as well as appeal procedures, for all Forest Service projects and activities

27    that implement land and resource management plans. Pub. L. 102-381, Sec. 322 (codified at 16

28    U.S.C. § 1612 note).

1      35.      In promulgating regulations to implement this Act, the Forest Service attempted

2   to exclude from notice, comment, and appeal all its decisions that are categorically excluded

3   from NEPA documentation. 36 C.F.R. §§ 215.4(a), 215.12(f). The Ninth Circuit Court of

4   Appeals struck down these regulations as unlawful under the ARA in *Earth Island Institute v.*

5   *Ruthenbeck*, 490 F.3d 687, 698-99 (9th Cir. 2007) (petition for cert. granted Jan. 18, 2008).

6      36.      In addition, the Court of Appeals held that the Forest Service must provide

7   opportunities for administrative appeals of a range of agency actions and programs, including

8   "range management and improvements." *Id.* at 698. Each of the Forest Service grazing

9   decisions challenged here specifically declared that the public could not administratively appeal

10  the decision, in violation of the Court of Appeals ruling in *Ruthenbeck*.

11  **D.    Administrative Procedure Act**

12     37.      The APA provides for judicial review of agency actions, and calls for the

13  reviewing court to hold unlawful and set aside actions that are arbitrary, capricious, an abuse of

14  discretion, or otherwise not in accordance with law; or that are in excess of statutory authority; or

15  that were made without observance of procedure required by law. 5 U.S.C. § 706(2).

16     38.      As demonstrated below, the Forest Service has violated both Section 706(2) of

17  the APA by issuing the decisions challenged herein as categorical exclusions, when they do not

18  meet all of the requirements for exclusion set forth in the 2005 appropriations rider, and Section

19  322 of the ARA, by depriving the public of any right to appeal its decisions.

20                      **VI.    FACTUAL BACKGROUND**

21  **A.    Impacts of Livestock Grazing**

22     39.      Livestock grazing by cattle and sheep dramatically alters native ecological

23  communities and damages habitat for a multitude of fish, wildlife, and plant species. Grazing

24  harms both upland and riparian communities[1] by degrading vegetation, soils, and streams.

25

26

27  [1] Upland communities refer to dry plant communities that are not adjacent to water sources.
    Riparian communities refer to areas adjacent to water sources such as rivers, streams, ponds,
28  lakes, seeps, springs, bogs, fens, or wet meadows, which normally contain lush, highly
    productive vegetation.

                                         11

1    **1.    Impacts on upland communities**

2    40.    Upland plant communities impacted by grazing include meadows, aspen stands,

3    grasslands, tall forb communities (forbs are non-woody broad-leaved flowering plants –

4    commonly called wild flowers), sagebrush communities, and forests with undergrowths of grass,

5    forbs, and shrubs. Livestock consume large quantities of vegetation, impacting not only plant

6    growth, but also species diversity and composition, the seral state[2] and vigor of plants, and the

7    prevalence of weeds. Trampling of vegetation adds to the adverse impacts of grazing when

8    livestock crush and displace plants and damage woody shrubs.

9    41.    One of the primary adverse effects of livestock grazing is its alteration of plant

10   diversity and composition. Cows and sheep generally prefer to eat native grass and forb species.

11   By selectively grazing these plants and eating their seed heads and flowers, livestock reduce seed

12   production and regeneration of native plants. In turn, non-native invasive species quickly take

13   root and spread in their place. Many rangelands in the western United States are now in poor

14   ecological condition, because livestock grazing has eliminated the natural and healthy diversity

15   and abundance of native grasses, forbs, and shrubs, allowing invasive species to take over.

16   42.    Invasive species, such as cheatgrass, Kentucky bluegrass, crested wheatgrass, star

17   thistle, and other exotic weeds are often of lower value to watershed health and wildlife.

18   Furthermore, invasive plants can lead to increased use of herbicides, forest health problems, and

19   altered fire cycles. One dramatic example is the expansion of cheatgrass across the West, which

20   has increased wildfire frequency and intensity.

21   43.    Livestock also trample and break the branches off woody shrubs, reducing their

22   vigor and eliminating canopy cover on which many wildlife species depend. Heavy browse of

23   young shrubs and saplings prevents regeneration and recruitment of new woody shrubs, aspen,

24   and cottonwood, leaving only decadent stands of old shrubs and trees.[3]

25   44.    Further, grazing reduces the density and vigor of grasses and forbs in forested

26   ───────────────────────

27   [2] The seral state of a plant refers to its successional status—*i.e.*, whether it is an early colonizer of an area that was recently disturbed, or a "climax" plant that appears when a community has matured.

28   [3] A shrub or tree is decadent when it is in a state of decline.

413297.01    COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1  areas. By removing the herbaceous vegetation understory[4] that normally outcompetes tree

2  seedlings, grazing leads to thick stands of small trees that increase the risk of wildfire.

3      45.    Grazing also greatly impacts soil conditions, significantly altering biological

4  communities and the hydrology of watersheds. First, livestock deplete vegetation, leaving the

5  ground bare. Then they disturb the bare ground with their hooves, creating a bed ready-made for

6  the growth of quickly-spreading noxious weeds and other invasive species, the seeds of which

7  livestock carry in their hooves, guts, or hair.

8      46.    Second, increased bare ground, combined with livestock disturbance and

9  destruction of biological soil crusts, leads to erosion when loose soil is transported by wind, or

10  by overland water flows during rain events or snowmelt. This erosion causes rills (small rivulets

11  in the soil), gullies (channels in the soil formed by moving water), and pedestalling of plants (soil

12  loss around the base of plants, making them appear elevated).

13      47.    Further, livestock trampling compacts soils, reducing water infiltration and

14  increasing surface water run-off that carries away the topsoil no longer protected by soil crusts.

15  Often this topsoil ends up as sediment in streams.

16      48.    When less water permeates the soil due to compaction, water storage capacity is

17  reduced, which can be particularly stressful to plants and animals in times of drought. Soils dry

18  out faster, impairing plant productivity. Later in the summer, less groundwater is available,

19  causing stream flows to diminish or dry up completely.

20  **2.    Impacts on riparian communities**

21      49.    Although riparian areas, such as perennial streams, seeps, springs, intermittent

22  streams, wet meadows, bogs and fens, make up a tiny percentage of the rangelands of the West,

23  they provide critical habitat for fish, wildlife, and sensitive plant species. Riparian areas enjoy

24  greater biodiversity than any other plant community because of their rich, moist soils and multi-

25  layered vegetation. Unfortunately, because riparian areas provide water, food, and shade, they

26  also disproportionately attract livestock, especially cattle, which then damage these areas.

27      50.    As with upland communities, livestock deplete vegetation and alter plant

28

---

[4] Herbaceous vegetation are plants lacking a woody stem.

1    diversity and composition in riparian communities by selectively grazing native vegetation and

2    allowing less-desirable invasive species to spread.  Livestock also impact the survival and the

3    age-diversity of trees and woody shrubs in riparian areas, by browsing saplings and young

4    shrubs.  Furthermore, grazing and trampling increase bare ground and compact wet soils, causing

5    these sites to become drier, which in turn reduces plant productivity and converts species from

6    lush riparian vegetation to dry-site vegetation.

7    51.    The depletion of native riparian vegetation and compaction of wet soils also

8    reduces water infiltration, which decreases the water storage capacity of wet meadows, fens,

9    springs and seeps, and streamside riparian areas.  This loss of infiltration significantly impacts

10    the hydrology of a watershed, creating higher peak flows of surface run-off that scour stream

11    channels and erode streambanks during snowmelt and rain storms.  At the same time, the loss of

12    groundwater lowers the water table, which leads to dried up streams later in the season.

13    52.    The Forest Service's increasing reliance on water developments, which pipe

14    water from natural springs into troughs for livestock to drink, lowers the water table even more.

15    The drying out of riparian areas increases as livestock grazing impacts are added to the effects of

16    global warming, seriously altering the hydrologic regime of our western watersheds.

17    53.    Livestock also directly impact water quality when they walk in streams and graze

18    and trample streambanks.  Urine and manure deposited directly into streams or carried into

19    streams through run-off increase the bacterial and nutrient contents in the water, which in turn

20    reduces dissolved oxygen.  When livestock walk in streams, they also stir up the sediment of the

21    stream bed, creating higher turbidity levels.

22    54.    Trampling and grazing of streambanks lead to erosion and increased sediment.

23    Livestock destabilize banks when they trample them or eat riparian vegetation, which typically

24    have deep, stabilizing root systems.  Denuded and destabilized banks easily erode and deposit

25    sediment into stream channels.  Grazing of riparian vegetation also reduces its effectiveness at

26    trapping the sediment carried in overland run-off.  Increased sediment leads to shallower and

27    warmer streams, and reduces the frequency and quality of pools, while bank trampling and

28

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1 | sloughing[5] reduce undercut banks and meanders, creating wider, straighter streams with higher

2 | water velocity.

3 | **3.     Impacts on fish, wildlife and plant habitat**

4 | 55.     The adverse impacts of livestock grazing on upland and riparian communities

5 | described above have significant ramifications for the fish, wildlife, and plant species that inhabit

6 | these communities.

7 | 56.     Aspen stands, which often grow on the edge of meadows, are second only to

8 | riparian areas in their native biodiversity.  These stands provide habitat for migratory and

9 | resident birds, including sensitive species like goshawks and flammulated owls.  Livestock

10 | browse and kill young aspen stems, preventing them from regenerating or becoming overstory

11 | and causing significant decline of existing aspen stands.  In addition, when livestock graze the

12 | grass and forb understory and disturb the soil in these stands, conifer encroachment increases.

13 | Conifer stands have replaced aspen stands all across the West, causing a loss of important habitat

14 | for many wildlife species.

15 | 57.     The grazing of understory plants in forested areas, as well as in meadows and

16 | grasslands, also impairs the habitat of small mammals and invertebrates.  These species require

17 | tall grasses and forbs for protection and food, but livestock grazing reduces the value of these

18 | plants to wildlife and often converts native plant species to less valuable invasive species.

19 | Livestock also trample the nests and young of small mammals and compact the soil, making it

20 | more difficult for burrowing animals to survive.  Population declines of small mammals and

21 | invertebrates caused by livestock, in turn, adversely impact predatory species such as spotted

22 | owls, goshawks, great gray owls, bats, and lynx, all of which are now in decline.

23 | 58.     Similarly, livestock grazing of tall forbs impacts the species that rely on these

24 | plants. Many forbs produce flowers that provide food for pollinators like hummingbirds and

25 | bees.  When livestock eat these forbs, it eliminates pollinators' food source and impairs the

26 | productivity and reproduction of more forbs.  As the native forbs disappear, they are replaced by

27

28 | [5] Bank sloughing occurs when a part of the streambank breaks away and "sloughs" off, due to livestock walking along the edge of the bank.  These chunks of streambank then erode into the

1 | plants that do not support pollinators.

2 | 59. In recent years the sage-steppe ecosystem in the western United States has
3 | decreased dramatically. Most of what remains faces adverse impacts from livestock grazing.
4 | This ecosystem did not historically support herds of large, grazing ungulates and the native
5 | vegetation developed without significant grazing pressure, making it particularly sensitive to
6 | livestock grazing.

7 | 60. Sagebrush or sage-steppe communities provide habitat for many wildlife species
8 | such as sage-grouse. The sage-grouse is now in serious decline and is being considered for
9 | listing under the Endangered Species Act. Myriad other mammals, birds, and reptiles inhabit
10 | sage-steppe communities, including species of concern such as the pygmy rabbit, Brewer's
11 | sparrow, sage sparrow, sagebrush vole, and pronghorn antelope.

12 | 61. Grazing these sagebrush communities harms the species that depend on these
13 | shrubs, as well as the grass and forb understory beneath the sage shrubs, for cover and forage.
14 | Ground nesting birds such as sage-grouse or Brewer's sparrow rely on dense sagebrush canopy
15 | cover to protect their nests from avian predators. Similarly, pygmy rabbits use sagebrush to hide
16 | from predators by climbing up into the shrubs. Both sage-grouse and pygmy rabbits also rely
17 | exclusively on sagebrush for food in winter. Livestock damage sagebrush by breaking their
18 | branches, removing canopy cover and eliminating the brush as a food source for wildlife. They
19 | also trample and browse young shrubs, preventing regeneration. And, livestock graze the
20 | understory of tall grasses and forbs beneath shrubs, eliminating additional cover for nests as well
21 | as important summer forage for sage-grouse and other wildlife. By grazing this understory,
22 | livestock can convert the plants to invasive species that are less valuable for wildlife.

23 | 62. Livestock also trample nests, burrows, and even small creatures in shrub
24 | communities, and can disturb and displace wildlife from nesting, brooding, and over-wintering
25 | sites.

26 | 63. These impacts often occur near range "improvements," such as fences, corrals, or
27 | water developments that provide water from springs or stock ponds. The disturbance caused by

28 | 

stream channel.

16

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1   livestock is intense even a mile or more from these structures, interrupting and fragmenting

2   habitat for native birds and wildlife. In addition, fences needed for livestock management

3   provide perches for raptors that prey on sage-grouse and other birds. Fences also disrupt the

4   migration or food search of larger mammals, like deer, elk, and pronghorn.

5   64.    As noted above, riparian areas provide the greatest biodiversity of any

6   community, but receive disproportionately higher adverse impacts from livestock grazing.

7   Impacts to streams and their channels adversely affect fish, especially those species that require

8   clean, cold water for survival like salmon, steelhead, and native trout species. Many species of

9   salmon, steelhead, and trout are at risk because of habitat degradation. Livestock degrade fish

10  habitat when they trample spawning beds, reduce streamside vegetative cover and shade, and

11  cause increases of sediment and other pollutants, leading to higher water temperatures, algae

12  blooms, and fewer pools and undercut banks that provide cover and refuge for fish.

13  65.    Aquatic macroinvertebrates (insects), many of which also require cold water with

14  little sediment or pollutants, suffer from these same impacts. Moreover, both aquatic and

15  terrestrial insects rely on riparian plants for their food source. Grazing reduces the amount and

16  diversity of streamside vegetation, reducing this primary food source. Loss of invertebrate

17  abundance and diversity in turn affects fish that prey on these insects.

18  66.    Livestock grazing of streamside vegetation and woody shrubs also affects bird,

19  mammal, and amphibian species. Many birds, like the endangered willow flycatcher, and

20  mammals such as deer, elk, and Canada lynx, rely on the complex vegetative structure of riparian

21  areas for cover and food. By browsing and damaging woody shrubs and trees, particularly

22  willow and cottonwood, livestock reduce the amount and quality of cover and nesting sites for

23  these birds and mammals. Beaver cannot create water-conserving dams when livestock deplete

24  their food source (largely willows). The grazing and trampling of herbaceous vegetation reduces

25  cover for amphibians, and alters the plant diversity of the area by removing native species and

26  replacing them with less valuable invasive species.

27  67.    Other wetlands, such as seeps, springs, fens, and wet meadows, provide

28  specialized riparian habitat for many different plants and animals. Wetlands are habitat for

17

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1    aquatic species, a water source for terrestrial animals, and a source of food and cover for birds,

2    reptiles, amphibians, and mammals. Seeps and springs often support unique plant and animal

3    species. In fact, approximately 200 endemic vertebrate and invertebrate species as well as

4    hundreds of plants, many of which are designated as threatened or sensitive, occupy only these

5    habitats.

6        68.    Because wetlands are drying out or degraded, many of the plants, amphibians,

7    and macroinvertebrates that rely on them are now in decline. For example, large numbers of

8    frogs and toads are now listed as threatened or sensitive. Species that depend on these habitats at

9    certain times of the year are also adversely impacted, such as migratory birds and sage-grouse.

10    In late summer, after vegetation in their upland habitat has dried out, sage-grouse depend upon

11    forbs around seeps and springs for food during their late brood-rearing period.

12        69.    Livestock using these highly critical wetland areas not only step on nests and

13    small animals, they also destroy habitat by trampling and grazing the vegetation, compacting and

14    drying out soils, and impairing water infiltration, all of which reduces water storage and plant

15    productivity and converts wetlands into drier sites.

16        70.    Even fencing off springs and pumping water to upland troughs adversely impacts

17    wildlife because these water developments prevent large animals from accessing the vegetation

18    and water around springs, and remove water that would normally keep the soils moist, retain

19    high plant productivity, and later contribute to stream flows.

20        71.    Finally, grazing even harms large wildlife in various ways. Livestock compete

21    with deer and elk for forage. In addition, when livestock move to riparian areas and aspen stands

22    to graze, they often displace deer and elk which use these areas as their primary cover.

23        72.    Bighorn sheep compete with livestock for forage as well, but the bigger problem

24    for them is the transmission by domestic sheep of fatal respiratory disease. Contact between

25    domestic and bighorn sheep often causes pneumonia in bighorns, leading to large die-offs of

26    bighorn herds. Bighorn populations have declined dramatically from their historic numbers and

27    continue to struggle due in large part to disease caused by contact with domestic sheep.

28        73.    Even wolves and grizzly bears are indirectly impacted by livestock grazing

18

1  through policies of relocating or killing wolves or bears that kill domestic sheep or cows grazing

2  upon federal public lands. This policy has led to the killing of more than 600 gray wolves as

3  well as numerous grizzly bears since the mid-1990's because of conflicts with livestock on

4  public land. As wolves and grizzly bears expand their range, the conflicts with domestic

5  livestock will increase.

### 4.    Impacts on cultural resources

7  74.    National forest lands in the western United States contain many historic and

8  prehistoric sites from early white settlers and Native Americans, and the Forest Service is

9  charged with preserving and protecting these sites. These sites consist of artifacts or structural

10  remains from early homesteads; historic or prehistoric trails, roads, and inscriptions on trees and

11  rocks; as well as Native American artifacts, structures, lithic scatters, and sacred sites.

12  75.    Livestock trample and bed down on artifacts. They also disturb and erode soil

13  that covers artifacts, displace artifacts, and degrade sacred sites. These impacts are particularly

14  likely in heavy use areas such as salting or bedding grounds, trailing routes, water developments,

15  or along fencelines.

### 5.    Impacts on Wilderness

17  76.    Under the 1964 Wilderness Act, Congress has preserved more than 105 million

18  acres of land across the United States to protect some of the last remaining wild places in the

19  country. 16 U.S.C. §§ 1131-1136. The purpose of the Act was to preserve and protect Federal

20  lands in their natural condition, for future use and enjoyment *as wilderness*. *Id.* § 1131(a).

21  77.    The Wilderness Act defines wilderness as:

22  An area where the earth and its community of life are untrammeled
    by man;

23  An area of undeveloped Federal land retaining its primeval
    character and influence, without permanent improvements or
24  human habitation, which is protected and managed so as to
    preserve its natural conditions;
25
    An area that generally appears to have been affected primarily by
26  the forces of nature, with the imprint of man's work substantially
    unnoticeable; and
27
    An area that has outstanding opportunities for solitude or a
28  primitive and unconfined type of recreation.

19

1  *Id.* § 1131(c). Further, these areas shall be devoted to the public purposes of recreation, scenic,
2  scientific, educational, conservation, and historic use. *Id.* § 1133(b).

3  78.    The Act allows for the continuation of livestock grazing within wilderness areas
4  where that use was established prior to the designation of an area as wilderness, subject to
5  regulation by the Forest Service. *Id.* § 1133(d)(4)(2). Further Congressional guidance states that
6  the Forest Service will not curtail or phase-out grazing simply because of a wilderness
7  designation, but can adjust livestock numbers during its planning process to protect wilderness
8  resources from deterioration. Pub. L. No. 96-560, Sec. 108.

9  79.    Livestock undermine the natural conditions and primitive recreation value of
10  these wild places by degrading them as described above. Livestock also can turn hiking trails
11  into wide, muddy, manure-fouled avenues that are unappealing, prone to erosion, and infested
12  with noxious weeds. They also can ruin wilderness campsites. Wilderness users often camp
13  near lakes or streams, which are areas heavily used by livestock that foul the waters, deposit
14  manure, and trample the vegetation and soils at these sites.

15  80.    Livestock also graze and trample the open meadows and alpine areas sought after
16  by the public for their scenic beauty. The majority of recreational users dislike livestock in
17  wilderness areas, and signs of cattle or sheep reduce their feeling of solitude and their enjoyment
18  of wild scenic beauty.

19  81.    In sum, livestock grazing adversely impacts our natural resources in many
20  different ways. Yet, the Forest Service often has either never assessed these impacts, or has not
21  done so for more than twenty years. In the meantime, numerous native fish, wildlife, and plant
22  species have been in serious decline or face extinction, weeds have increased, riparian
23  destruction has increased, and global warming (to which cattle contribute) grows as a threat.
24  Now, the Forest Service is relying improperly on the 2005 appropriations rider to escape its
25  obligation under NEPA to conduct in-depth site-specific environmental analysis and involve the
26  public in ten-year-long grazing decisions on nearly a thousand grazing allotments covering
27  millions of acres of public lands in the western United States, lands that contain wilderness areas,
28  imperiled species, key wildlife habitat, and cultural resources. In many instances these easy

20

1   grazing reauthorizations do not meet the criteria of the rider and are unlawful.

2   **B.    Violations of the 2005 Appropriations Rider**

3          82.     The 2005 appropriations rider contains three requirements that the Forest Service

4   must satisfy to reauthorize grazing under a categorical exclusion ("CE"), as noted above.  Instead

5   of carefully picking grazing allotments that meet these requirements, the Forest Service is using

6   the rider to reauthorize grazing allotments wholesale in highly sensitive areas.

7          83.     The agency's violations of the rider fall into several patterns described below.

8          **1.    The rider's first requirement**

9          84.     Under the rider's first requirement, the CE decision must "continue current

10  grazing management."  Evidently, the Forest Service has interpreted this requirement to allow it

11  to authorize grazing at levels allowed under a previous permit even when *no grazing* has actually

12  taken place on the allotment for years.  Not only does this interpretation contradict the plain

13  meaning of "*current grazing management*," it also contradicts the Forest Service's own

14  handbook and policy guidance, which state that current management means the management

15  implemented *over the last three to five years* through Allotment Management Plans or Annual

16  Operating Instructions.

17         85.     Many of the challenged CE decisions authorize more grazing than what has

18  actually taken place during the past five years.  In some cases, the Forest Service has used the

19  rider to authorize grazing on allotments where no grazing has occurred for several years.  Other

20  CE decisions reauthorize levels stated in previous grazing permits, even though grazing levels

21  have decreased significantly in recent years.

22         86.     By using a CE to reauthorize grazing at levels much higher than the grazing

23  actually implemented over the last five years, the Forest Service is not continuing current grazing

24  management.  Moreover, any up-to-date monitoring of these grazing allotments is relevant only

25  to assess conditions under the recent grazing levels; such monitoring cannot provide meaningful

26  data to support increased levels.

27         **2.    The rider's second requirement**

28         87.     The second condition of the rider is that "monitoring [must] indicate[] that

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1  current grazing management is meeting, or satisfactorily moving toward, objectives in the land

2  and resource management plan." To satisfy this requirement, the Forest Service must actually

3  have monitoring data *and* this data must demonstrate that the *current grazing* is not unduly

4  harming resources on the grazing allotment at issue. Numerous CE decisions violate this

5  requirement because the Forest Service either lacks relevant monitoring data or the data shows

6  that conditions are degraded and are not getting better as a result of the current grazing levels

7  implemented.

8       88.    The referenced land and resource management plan objectives come from

9  individual or region-wide Forest Plans. These plans set forth desired conditions, goals, standards

10  and guidelines for maintaining or restoring properly functioning ecosystems; promoting

11  ecologically healthy and diverse vegetation, soils, water resources, and fish and wildlife habitat;

12  and protecting species of concern and cultural resources.

13      89.    The monitoring information needed to demonstrate that forests are meeting or

14  moving toward these objectives consists of information from studies of the effects of grazing on

15  upland communities, riparian communities, and fish and wildlife habitat. But, in many cases, the

16  Forest Service has assessed and continues to assess the impact of grazing simply by measuring

17  the amount of forage consumed by livestock. This limited focus offers little or no information

18  about the impact that grazing has on the health of rangelands and their associated wetlands,

19  habitat, and inhabitants, and thus cannot be used to demonstrate that current grazing management

20  is meeting or moving towards all land and resource management plan objectives.

21      90.    For example, to measure the impacts grazing has on upland plant communities,

22  monitoring must assess, among other things, plant diversity, composition, age-structure, and

23  vigor; presence and growth of invasive species or noxious weeds; condition and amount of

24  woody shrub cover; amount of bare ground; condition of microbiotic soil crusts; and the

25  presence of compacted soil or signs of erosion. Moreover, monitoring only one type of plant

26  community, which is frequently what the Forest Service does, is not sufficient to assess the

27  impact to all upland habitats. Monitoring one sagebrush community, for instance, does not

28  provide meaningful data about other types of shrub communities and certainly cannot provide

22

1    information about impacts to aspen or other forested areas, dry meadows and grasslands, or forb
2    communities. In some cases, the Forest Service has conducted the widespread monitoring
3    necessary to assess the impact of grazing on individual allotments. In many of the CE decisions
4    challenged here, however, such data is completely lacking.

5    91.    Similarly, because livestock spend so much time in riparian areas and impact
6    them so heavily, the Forest Service must monitor these areas when they are present in an
7    allotment area. Appropriate monitoring must analyze riparian vegetation condition, diversity,
8    and composition for herbaceous species and woody shrubs, as well as soil conditions. In
9    addition, because livestock erode streambanks, the monitoring must measure bank stability and
10   water quality. Nor can the monitoring focus solely on perennial streams, which are only one
11   kind of riparian habitat; it also must consider the effect of grazing on wet meadows, springs,
12   seeps, fens, and intermittent streams.

13   92.    Fish, wildlife, and plants have a variety of habitat needs distinct from those of
14   livestock and require additional monitoring to assess whether grazing is impairing those needs.
15   In upland sagebrush communities, monitoring must take into account wildlife needs such as
16   dense sagebrush stands with high canopy cover and tall residual native grasses and forbs under
17   shrubs. In aspen, meadow, and forb communities, the monitoring must track whether livestock
18   are preventing regeneration of key species or grazing and trampling herbaceous vegetation too
19   heavily to provide adequate protection and food for wildlife. Plants grazed to three to five inches
20   do not provide adequate cover for many wildlife species or flowers for pollinators.

21   93.    In riparian areas, it is crucial to assess livestock grazing impacts on the habitat of
22   fish, insects, migratory birds, amphibians, mammals, and sensitive plant species. To assess
23   conditions for fish and macroinvertebrates, instream monitoring must consider sediment and
24   other pollutant loads; water temperature; the presence of cover in the form of deep pools,
25   undercut banks, overhanging vegetation, and woody debris; width–to–depth ratios; and channel
26   substrate. For terrestrial species, monitoring must assess whether enough forage and cover exist
27   in the form of woody shrubs, trees, and herbaceous plants.

28   94.    The Forest Service generally recognizes the importance of this kind of

23

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1    monitoring, yet, in many instances it has not adequately completed it, or undertaken it at all. The
2    Forest Service often lacks any monitoring data for upland aspen, grass, or forb communities, and
3    the data it has collected in upland sage-steppe areas frequently focuses primarily on livestock
4    forage utilization levels.[6] Thus, the Forest Service lacks monitoring data for many conditions
5    that are essential to recognizing the degradation and decline of upland communities.

6        95.    Furthermore, when the Forest Service has collected information on bare ground
7    or plant species diversity, it often has collected this data only recently or sporadically, and thus
8    has no way of knowing whether livestock grazing is causing conditions to improve, remain
9    stable, or degrade over time.

10        96.    Second, monitoring for riparian areas is also inadequate for many CE decisions
11    because the Forest Service collects up-to-date information for only a small percentage of streams
12    covered under its decisions, and it has collected virtually no information on the conditions of
13    seeps, springs, wet meadows, or intermittent streams. Even for those areas that the Forest
14    Service has monitored, it has not collected data for many important riparian or instream
15    variables.

16        97.    Third, the Forest Service has issued CE decisions having very limited or no
17    information on fish, wildlife and plant species and their habitat. For many species, including
18    multiple sensitive species and Management Indicator Species,[7] the Forest Service has conducted
19    no surveys of grazing allotments to determine whether the species is present, its location, or its
20    population trend. Moreover, the Forest Service rarely has surveyed habitat conditions for fish,
21    wildlife, or plant species, despite acknowledging that suitable habitat for certain species exists on
22    the allotment and that livestock grazing can impact that habitat.

23        98.    Finally, some of the Forest Service's CE decisions do not comply with the rider's

24

---

[6] Livestock utilization is the proportion of current year's forage production that is consumed by
25    animals, and is typically determined at the end of the grazing season. The Forest Service uses a
variety of methods to measure utilization from "ocular estimates" to comparing height and
26    weight of plants from grazed and ungrazed sites.

27    [7] Management Indicator Species are species selected by the Forest Service to represent a suite of
species that all use similar habitat. By monitoring population trends and impacts to these
28    indicator species, the Forest Service presumes similar trends and impacts are occurring for other
species in that habitat.

24

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1    second requirement because the monitoring actually shows that livestock grazing is causing

2    serious damage. The agency has issued decisions even when its monitoring information

3    indicates degraded riparian conditions, excessive bare ground, noxious weeds, and damage to

4    shrubs caused by livestock grazing.

5    **3.    The rider's third requirement**

6    99.    Under the rider's final requirement, the Forest Service's CE decisions must be

7    consistent with the agency's policy on extraordinary circumstances. As discussed above, this

8    policy looks at whether certain resource conditions, including endangered, threatened, and

9    sensitive species, wetlands, cultural resources, and wilderness areas, are present and the degree

10   of potential effect on these resource conditions.

11   100.    Many of the allotments covered under CE decisions contain these special

12   resource conditions. Yet, for many of the challenged decisions, rather than analyze the impact of

13   continued grazing, the Forest Service has summarily concluded—with little or no analysis and

14   data whatsoever—that acknowledged impacts on these special resources do not amount to

15   extraordinary circumstances.

16   101.    For instance, multiple allotments occur in wilderness areas but the Forest Service

17   often does not discuss grazing impacts that are occurring to wilderness values.

18   102.    Similarly, the Forest Service decisions frequently cite evidence that grazing is

19   harming wetlands, cultural resources, and imperiled species. Still, in the face of this evidence,

20   the decisions simply assert the unsupported conclusion that continued grazing will not have

21   significant impacts.

22   103.    Moreover, the Forest Service has completely neglected to assess the cumulative

23   impacts of other CE decisions even when those decisions are in the same forest and sometimes

24   cover directly adjacent land. Thus, the Forest Service's assertion that a specific grazing decision

25   will not impact *overall* populations of sensitive species, or *overall* abundance of wetlands does

26   not take into account the cumulative impacts of the grazing authorized on thousands of additional

27   adjacent or near-by acres under other CE decisions.

28   104.    Because, in many instances, the Forest Service has not demonstrated the absence

25

413297.01    COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1 of extraordinary circumstances despite the presence of special resource conditions and yearly use

2 of those areas by livestock, it has not complied with the rider's third requirement.

3     105.   The above paragraphs describe the Forest Service's general abuse of the CE

4 rider. Specific CE decisions challenged by Plaintiffs are described below. These decisions

5 authorize grazing on different California forests and each violates the rider in one or more ways.

6 **C.   Unlawful CEs Issued In California Forests**

7     **1.   Los Padres National Forest**

8     106.   This Forest encompasses nearly two million acres of the central California

9 Coastal Mountain Range. Its ecosystems range from semi-desert in interior areas to redwood

10 forest on the coast, and they provide permanent or transitory refuge for approximately 468

11 species of fish and wildlife. The importance of the Los Padres Forest's habitat has increased as

12 habitat losses in the urban areas outside the Forest mount.

13     107.   On September 26, 2007, the Los Padres National Forest issued a CE decision

14 authorizing grazing on the 1,074 acre Sweetwater allotment in violation of the 2005

15 appropriations rider. The Sweetwater allotment is in the northern most part of the Forest, in the

16 Santa Lucia Mountains between the famed Big Sur coast and the Salinas River valley in

17 Monterey County. Part of the allotment lies within the Ventana Wilderness, an area with one of

18 the most diverse vegetative communities on the planet.

19     108.   This CE does not continue current grazing management, because it authorizes

20 grazing for the next ten years even though, at the time of the decision, no grazing had taken place

21 on the Sweetwater Allotment since 1998—well more than three to five years before the CE

22 decision.

23     109.   The Los Padres National Forest issued this CE decision even though it lacked

24 monitoring showing that current grazing management is meeting or satisfactorily moving toward

25 forest plan objectives. Among other reasons, the Forest Service had not monitored the allotment

26 for residual dry matter since 1998. Nor has the Forest Service monitored the effect that grazing

27 has on blue oak woodland within the allotment.

28     110.   This CE decision also violates Forest Service policy on extraordinary

26

1   circumstances. Among other reasons, continued grazing harms the South-central California
2   steelhead, which is a listed threatened fish species. These fish use a stretch of Vaquero Creek
3   that runs through the Sweetwater allotment to spawn, and the decision authorizes grazing during
4   their spawning season. Moreover, the Forest has not demonstrated that grazing has no
5   significant impacts to the Ventana Wilderness, which is another extraordinary resource
6   condition.

7   **2.      Mendocino National Forest**

8       111.    This one million-acre forest straddles the eastern spur of California's Coastal
9   Mountains to the northeast of the San Francisco Bay Area. It is the state's only national forest
10  not traversed by a paved road.

11      112.    On July 5, 2007, the Mendocino National Forest issued a CE decision authorizing
12  grazing on four allotments, in violation of the 2005 appropriations rider. The four allotments—
13  Pine Mountain, York Cabin, Middle Creek, and Elk Mountain—cover nearly 85,000 acres on the
14  west side of the Forest, six miles north of Upper Lake in Lake County, California.

15      113.    The Forest Service issued this CE decision despite its lack of monitoring
16  demonstrating that conditions on the allotments are in satisfactory condition or trending upward
17  in light of current grazing management. The Forest has not monitored the range condition or
18  trend on the Middle Creek allotment at all, and it has not measured them on the York Cabin
19  allotment since 1958. Also, on the York Cabin allotment, the Forest has collected very little
20  utilization data in recent years, and the data it has collected shows that its standards were not
21  met. Likewise, on the Pine Mountain allotment, the Forest has not measured range condition and
22  trend since 1961. Finally, on the Elk Mountain allotment, the Forest's range condition and trend
23  monitoring revealed the range to be in "fair" and "low" condition.

24      114.    This CE decision is inconsistent with the Forest Service's extraordinary
25  circumstances policy because continued grazing on these allotments threatens coho salmon and
26  steelhead, which are both endangered species. The Pine Mountain and York Cabin allotments
27  contain designated critical habit for coho salmon and habitat for steelhead, which will be
28  degraded by livestock.

27

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1

**3.    Klamath National Forest**

2        115.    This Forest covers 1.7 million acres on both sides of the California-Oregon

3    border.  The Klamaths are the oldest of the Pacific coastal mountains, dating back about 500

4    million years.

5        116.    On September 26, 2006 the Klamath National Forest issued four CE decisions

6    that violate the 2005 appropriations rider.  These decisions cover the Little North Fork allotment,

7    the Shelly Meadows allotment, the Big Ridge allotment, and the Big Meadows allotment.  The

8    allotments cover more than 64,000 acres in Siskiyou County, California.

9        117.    The Klamath National Forest lacked monitoring demonstrating that current

10    grazing management is meeting or moving toward forest plan objectives.  The Forest's

11    monitoring did not adequately measure the impact of grazing on streamside vegetation or other

12    riparian variables, even though some stream banks within the allotments are grazed by cattle.

13    Prior to issuing these decisions, the Forest did not monitor riparian vegetation composition or

14    diversity, woody species regeneration, streambank stability and disturbance, or residual dry

15    matter.  Nor did the Forest collect sufficient information on meadow conditions, despite the fact

16    that much of the grazing in these allotments occurs in wet and dry meadows.  Due to this lack of

17    monitoring, the Forest also lacked data on habitat conditions for various fish and wildlife species

18    that potentially use the riparian areas and meadows on the allotments.

19        118.    The CE decisions also violate Forest Service policy concerning extraordinary

20    circumstances.  For one, all four allotments lie within the Marble Mountain Wilderness and

21    continued grazing threatens wilderness resource conditions.  Second, habitat exists for numerous

22    sensitive species on the allotments, including goshawk, great gray owl, willow flycatcher,

23    yellow-legged frog, and cascade frog.  Yet despite acknowledging potential impacts to these

24    species from livestock grazing, the Forest has not surveyed for their presence or monitored this

25    habitat, and thus cannot demonstrate that grazing is not having any significant effect.

26

**4.    Modoc National Forest**

27        119.    One of California's most remote national forests, the nearly two million-acre

28    Modoc Forest lies in the shadow of the Warner Mountains in the far northeastern corner of the

1    State. The Forest consists of pine forests and meadows, lakes, streams, rugged canyons,

2    wetlands, lava beds and high desert plateaus. Plaintiffs challenge two 2007 CE decisions

3    covering five allotments in this Forest based on violations of the 2005 appropriations rider.

4        120.    The Forest Service issued a CE on March 20, 2007 for the 14,000 acre Mount

5    Dome allotment, located in the northeast corner of Siskiyou County, California. The allotment

6    borders the Lava Beds National Monument.

7        121.    The Forest issued this CE even though its monitoring did not show that current

8    grazing management is meeting or moving toward forest plan objectives. On the contrary, the

9    monitoring shows that grazing is causing severe damage to vernal pools,[8] including intense

10    trampling damage that has denuded the ground in many places and all but eliminated certain

11    native species. The harm includes damage to the watch list plant Newberry's Cinquefoil

12    (*Potentilla newberryi*) and to the habitat for Profuse-flowered Pogogyne (*Pogogyne floribunda*).

13    In addition, the Forest Service lacked other key monitoring information. It could not locate the

14    14,384 acre allotment's single condition and trend plot. And it has no information about the

15    effect grazing has had on the declining Mount Dome mule deer herd, even though mule deer is

16    one of the Forest's Management Indicator Species.

17        122.    This CE decision also is inconsistent with Forest Service policy regarding

18    extraordinary circumstances. Continued grazing on the allotment will harm archeological

19    resources. Although no acceptable archeological surveys have taken place on the allotment,

20    previous limited surveys have disclosed 10 archeological sites covering 110 acres that include

21    lithic scatters, temporary camps, and sites with complex rock features, such as hunting blinds,

22    rock rings, and rock stacks and alignments.

23        123.    The Modoc National Forest's September 13, 2007 CE decision authorized

24    grazing on four allotments in violation of the 2005 appropriations rider. The four allotments—

25    Beaver Dam, East Grizzlie, Timbered Mountain and Surveyors Valley—lie on the Devil's

26

27    [8] Vernal pools are seasonal depressional wetlands that are covered by shallow water for variable

28    periods from winter to spring. They are often isolated pools found in grasslands and provide unique habitat for numerous rare plants and animals.

413297.01   COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1  Garden Plateau between the Oregon border and Alturas in Modoc County, California and cover
2  more than 147,000 acres of plateau intersected with volcanic reefs.

3      124.    The CE for two of these allotments does not continue current grazing
4  management. No grazing took place on the Timbered Mountain allotment from 2002 to 2005
5  and no grazing took place on the Surveyors Valley allotment from 2001 to 2004. Yet the CE
6  decision authorizes grazing on these allotments at the level allowed under the previous permit,
7  which is much greater than the current use that has occurred over the past five years.

8      125.    This CE decision is not supported by monitoring data demonstrating that grazing
9  management is meeting or satisfactorily moving toward Forest objectives. Monitoring shows
10 that large sections of the four allotments were in unsatisfactory ecological condition when the CE
11 decision issued, and it does not show that conditions were improving. For example, even though
12 grazing had not taken place on the Timbered Mountain allotment for four years, in 2005,
13 according to the Forest Service's own data, only 60% of the allotment was in satisfactory
14 condition, meaning that 25,718 acres were in unsatisfactory ecological condition, including
15 wetlands, streamside vegetation, juniper, low sage, silver sage, big sage and mountain
16 mahogany. In addition, grazing is damaging the watch-list plants Profuse-flowered Pogogyne
17 (*Pogogyne floribunda*) and Baker's Globe Mallow (*Illimana bakeri*).

18     126.    The decision also is not consistent with Forest Service policy regarding
19 extraordinary circumstances. Among other reasons, all four allotments contain habitat for the
20 endangered Lost River sucker and short nose sucker. Grazing is causing significant harm to
21 these endangered fish species. Moreover, the Timbered Mountain and Surveyors Valley
22 allotments include proposed critical habitat for these species, a fact that the Forest Service did
23 not consider when it issued the CE decision. Grazing on the allotments also has damaged habitat
24 for Slender Orcutt Grass (*Orcuttia tenuis*), which is a federally listed threatened species. In
25 addition, continued grazing will damage cultural resources. Surveys to-date have disclosed more
26 than 375 archeological sites on the allotments. The Forest Service has not determined the effect
27 that grazing has on these sites, although it acknowledges that it should monitor them to find out
28 their significance and susceptibility to damage.

1

### 5. Lassen National Forest

2    127.    This 1.2 million acre forest surrounds the Lassen Volcanic National Park. Ishi,

3  the famed last survivor of the Yahi Yana Native American tribe, once lived in this Forest. With

4  361 animal species and 29 fish species, Lassen is home to a variety of wildlife and supporting

5  ecosystems. Plaintiffs challenge two 2006 CE decisions for this Forest, covering approximately

6  90,000 acres of Forest Service land in Lassen County.

7    128.    On July 12, 2006, the Lassen National Forest issued a CE decision authorizing

8  grazing on the Diamond Mountain allotment in violation of the 2005 appropriations rider. This

9  7,074 acre allotment lies on the north-facing slopes of the Diamond Mountain Ridge.

10    129.    The CE decision does not continue current grazing management but, rather,

11  increases it. No grazing took place on the allotment in four of the five years prior to the decision

12  yet the decision authorizes grazing at the previous permit levels for another ten years.

13    130.    The July 12, 2006 decision also violated the rider because the Forest lacked

14  monitoring about how grazing affects the allotment. No monitoring of the allotment had

15  occurred since 2002. Furthermore, this prior monitoring does not provide enough information to

16  determine whether Lassen Forest Plan objectives are being met; and to address this shortcoming

17  the CE decision itself requires more thorough monitoring in the future.

18    131.    Nor is the CE decision consistent with Forest Service policy concerning

19  extraordinary circumstances. Among other reasons, it ignores the harm that the decision will

20  have on archeological and historic sites within the allotment, including numerous aspen carvings

21  and a sparse lithic scatter. There are 21 known heritage sites in the allotment, including six in

22  the primary grazing range. The Forest Service acknowledges that the effect of grazing on these

23  sites is unknown, yet concludes without support that there are no extraordinary circumstances.

24    132.    On September 29, 2006, the Forest Service issued a CE decision authorizing

25  grazing on four other Lassen Forest allotments in violation of the 2005 appropriations rider—

26  Champs Flat, Gooch Valley, Lower Pine Creek and North Eagle Lake—which total 102,864

27  acres, including 19,386 privately owned acres.

28    133.    The Forest Service issued this decision even though monitoring shows that the

31

1   current grazing management is not meeting or moving toward the applicable forest plan

2   objectives. The four allotments are increasingly infested with noxious weeds that cattle can

3   spread. The allotments contain at least four different types of noxious weeds: Scotch thistle,

4   perennial pepperweed, medusahead, and bull thistle. Scotch thistle is the most harmful of the

5   four, and it has increased significantly over the past three years. In addition, monitoring shows

6   that cattle are damaging some of the more than 50 aspen and cottonwood stands in the

7   allotments, as well as some riparian areas.

8       134.    The CE decision also does not comply with Forest Service policy concerning

9   extraordinary circumstances. Among other reasons, continued grazing threatens prehistoric

10  archeological sites. The four allotments have 258 recorded heritage sites, all of which are

11  unfenced and open to grazing. Grazing has caused extensive damage to these resources.

12  Moreover, the spread of noxious weeds by cattle threatens sensitive plant species such as Baker's

13  globe mallow (*Iliamna bakeri*).

14      **6.    Plumas National Forest**

15      135.    This 1.1 million-acre National Forest sits at the northern end of the Sierra

16  Nevada, just south of the Cascade mountain range. The Forest includes foothills, timbered

17  slopes and rugged high country, and its lakes, streams and rivers include the federally designated

18  Feather River wild and scenic area.

19      136.    The Plumas National Forest has issued numerous CE decisions that violate the

20  2005 appropriations rider. These decisions include: (1) a November 20, 2006 decision

21  authorizing grazing on the Mount Haskell allotment; (2) a November 20, 2006 decision

22  authorizing grazing on the Snow Lake and Spring Creek allotments; (3) a November 20, 2006

23  decision authorizing grazing on the Trosi Canyon and Trosi-Galeppi allotments; (4) a March 14,

24  2007 decision authorizing grazing on the Thompson Valley, Dotta Neck, and Bacher allotments;

25  (5) a March 14, 2007 decision authorizing grazing on the Frenchman Lake allotment; (6) a

26  March 14, 2007 decision authorizing grazing on the Mercer allotment; (7) a September 17, 2007

27  decision authorizing grazing on the Bulson allotment; (8) a September 17, 2007 decision

28  authorizing grazing on the Ramelli and Hall allotments; (9) a September 17, 2007 decision

1  authorizing grazing on the Horton Canyon South and Horton Canyon East allotments; and (10) a

2  September 17, 2007 decision authorizing grazing on the Ramelli Ranch allotment. These 16

3  allotments cover more than 80,000 acres and lie within the Beckwourth Ranger District, which is

4  in the eastern part of the Forest and in Plumas County, California.

5    137.    Many of these decisions do not continue current grazing management. The

6  decisions authorize grazing on the Mount Haskell, Snow Lake, Spring Creek and Mercer

7  allotments at levels significantly exceeding the use that the allotments have received during the

8  past five years. The Ramelli, Hall, Horton Canyon South, and Horton Canyon East allotments

9  were vacant and no grazing has taken place on them for at least the past four years, yet the Forest

10  used these CEs to authorize grazing on them for the next ten years.

11    138.    The Forest Service issued the Plumas CE decisions listed above even though its

12  monitoring does not show that current grazing is meeting or moving toward Plumas Forest Plan

13  objectives. Among other reasons, the Forest Service has never monitored the effects of grazing

14  on the Mt. Haskell allotment. For the other CE decisions, the Forest Service did not consider the

15  effect that grazing has on Management Indicator Species. For example, the Forest did not

16  consider the impact of grazing on mule deer, even though this is one of the Forest's Management

17  Indicator Species, and the Doyle Deer herd range is found within many of these allotments.

18    139.    The CE decisions in the Plumas National Forest are also inconsistent with Forest

19  Service policy concerning extraordinary circumstances. Among other reasons, continued grazing

20  will harm several sensitive plant species. Most significantly, one perennial herb, the Lens-pod

21  milkvetch (*Astragalus lentiformis*), could see its numbers significantly reduced as a result of

22  these decisions. All known occurrences of this plant are in the Beckwourth Ranger District, and

23  half of them are in the allotments covered by these decisions. The CE decisions did not consider

24  the cumulative impact that grazing will have on this plant's survival. Sensitive animal species,

25  including the California spotted owl, American marten, and mule deer, are also at risk as a result

26  of these decisions. Finally, continued grazing on these allotments threatens archeological

27  resources. The allotments contain hundreds of archeological sites, including many highly

28  sensitive sites, and past grazing has damaged these sites.

1

**7.    Stanislaus National Forest**

2      140.    Created in 1897 and bordering Yosemite National Park, the Stanislaus National

3   Forest is one of the nation's oldest national forests. At the end of September, 2007, the Forest

4   Service issued a series of grazing decisions in violation of the 2005 appropriations rider. The

5   first decision authorized grazing on the Little Crane allotment, the second authorized grazing on

6   three allotments (Shotgun, Lower Blue and Mokelumne), and the third authorized grazing on the

7   Duckwall allotment.

8      141.    The September 29, 2007 CE decision authorizing grazing on the Little Crane

9   allotment does not continue current grazing management; instead, it increases it. No grazing

10   took place on the allotment during five of the six years preceding issuance of the CE, yet the

11   decision authorizes grazing for 10 years—through 2017.

12      142.    The Forest Service lacks monitoring showing that the current grazing

13   management on the Little Crane allotment is meeting or satisfactorily moving toward forest plan

14   objectives. Among other reasons, the Forest Service has not monitored the condition of springs

15   where grazing takes place.

16      143.    The Little Crane CE decision also violates Forest Service policy regarding

17   extraordinary circumstances. Among other reasons, the great gray owl, a sensitive species, has

18   been spotted near the allotment, and suitable habitat for threatened and sensitive amphibian

19   species exists on the allotment, yet the Forest Service has not conducted surveys to determine

20   whether these species inhabit the allotment.

21      144.    The Forest Service issued its September 30, 2007 decision authorizing grazing on

22   three allotments—Shotgun, Lower Blue and Mokelumne—even though it lacked monitoring

23   showing that current grazing management is consistent with Stanislaus Forest Plan objectives.

24   The Forest has not conducted upland range monitoring on these allotments for at least a decade,

25   and in fact does not even maintain range monitoring plots on these allotments, and thus lacks

26   data about the effect of current grazing management. In addition, grazing has damaged a spring

27   on the Lower Blue allotment, such that the spring is not in proper functioning condition, while

28   other springs and special aquatic features lack any monitoring.

34

1    145.    On September 30, 2007, the Forest Service issued a CE decision authorizing

2    grazing on the Duckwall allotment, even though monitoring shows that current grazing

3    management in the allotment is not satisfying Forest Plan objectives regarding riparian areas.

4    The Forest Service's monitoring shows that one spring in the allotment is in very poor condition

5    due to grazing. The Forest Service has not surveyed the other springs within the allotment.

6    Moreover, the Forest Service itself acknowledges that grazing has damaged Cottonwood Creek,

7    including by adding sediment to the Creek and preventing the bank from revegetating. This is

8    not compatible with the Stanislaus Forest Plan objectives.

9    146.    The decision to authorize grazing on the Duckwall allotment also is not consistent

10    with Forest Service policy regarding extraordinary circumstances. Among other reasons, the

11    allotment contains sensitive plant species Small's southern clarkia (*Clarkia australis*) and habitat

12    for the sensitive plant species Mariposa clarkia (*Clarkia biloba* ssp. *australis*). The Forest

13    Service's survey for these plants was inadequate as it took place before the plants were blooming

14    and did not survey all suitable habitat. The Forest Service also did not adequately assess impacts

15    to two sensitive wildlife species, the great gray owl and foothill yellow-legged frog. Moreover,

16    part of the proposed Clavey Wild and Scenic River Area is within the Duckwall allotment. Even

17    though Forest Service policy treats *proposed* Wild and Scenic River Areas the same as

18    *designated* Wild and Scenic River Areas, the Forest did not consider whether continued grazing

19    within the proposed Clavey Wild and Scenic River Area created an extraordinary circumstance.

20    **8.    Inyo National Forest**

21    147.    Located in the eastern Sierra Nevada, this more than two million acre forest is

22    home to Mt. Whitney, Mono Lake, Mammoth Lakes Basin, and the Ancient Bristlecone Pine

23    Forest, as well as seven Congressionally-designated Wildernesses.

24    148.    On November 14, 2005, the Forest Service issued a CE decision authorizing

25    grazing covering four desert allotments on the slopes of the eastern Sierra Nevada in violation of

26    the 2005 appropriations rider. The four Inyo allotments—Tunawee, Ash Creek, Alabama Hills

27    and George Creek—are located between Coso Junction and Independence in Inyo County,

28    California.

35

COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

1    149.    The CE decision authorizes increased grazing on the Tunawee allotment, rather

2    than continuing current management. It permits cattle grazing on this allotment through 2015,

3    even though no cattle grazing had taken place there for the four seasons prior to issuance of the

4    CE. Tunawee allotment is managed cooperatively with the Bureau of Land Management, which

5    has authorized only sheep grazing on the allotment since 1995.

6    150.    Moreover, this CE decision is inconsistent with Forest Service policy regarding

7    extraordinary circumstances. Among other reasons, it approves grazing in the Ash Creek

8    allotment, which lies partially within the Golden Trout Wilderness, without analyzing the impact

9    this grazing will have on wilderness resources. Also, the Forest acknowledges the harm that

10    grazing will inflict on prehistoric archeological sites within the four allotments, but instead of

11    analyzing these harmful effects as required by the rider, the Forest Service states only that a

12    sample survey of the sensitive areas is necessary.

13    **9.    Sequoia National Forest**

14    151.    Situated at the southern end of the Sierra Nevada, this Forest is home to the

15    world's largest trees, the Giant Sequoias. Elevations range from 1,000 feet in the foothill region

16    to peaks over 12,000 feet in the rugged high country.

17    152.    The Forest Service's September 26, 2007 decision authorizing grazing on two

18    allotments in Sequoia violated the 2005 appropriations rider. The two allotments, Smith Canyon

19    and Jacks Creek, are located in the northern portion of the Scodie Mountains in Kern County,

20    California.

21    153.    The decision does not continue current grazing management because both

22    allotments were vacant at the time of the decision and had not been grazed for years, yet the CE

23    decision authorizes grazing through 2017.

24    154.    The decision also violates the Forest Service's policy on extraordinary

25    circumstances. Both allotments lie entirely within the Kiavah Wilderness, and grazing would

26    damage the area's wilderness resources.

27

28

36

413297.01

1

**FIRST CLAIM FOR RELIEF**

2

**(FOR VIOLATIONS OF THE 2005 APPROPRIATIONS RIDER)**

3      155.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

4      156.    The Forest Service has violated section 339 of the FY 2005 Consolidated

5    Appropriations Act, Public Law Number 108-447, by authorizing livestock grazing using

6    categorical exclusions, where those authorizations do not meet the terms of this appropriations

7    rider.  Such violations include, but are not limited to:

8          a.    Authorizing grazing that is greater than or otherwise different from current

9                grazing management, in violation of the rider's first requirement;

10         b.    Authorizing grazing without having adequate monitoring information to

11               demonstrate that current grazing management is meeting or satisfactorily moving

12               toward Forest Plan objectives, or alternatively where monitoring information

13               shows that current grazing management actually is not meeting or satisfactorily

14               moving toward Forest Plan objectives, in violation of the rider's second

15               requirement; and

16         c.    Authorizing grazing that is not consistent with the Forest Service's policy on

17               extraordinary circumstances, in violation of the rider's third requirement.

18     157.    This claim is brought pursuant to the judicial review provisions of the APA, 5

19    U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

20     158.    The Forest Service's violations of the 2005 appropriations rider are arbitrary,

21    capricious, an abuse of discretion, and not in accordance with law under the APA, which has

22    caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

23

**SECOND CLAIM FOR RELIEF**

24

**(FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT)**

25     159.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

26     160.    The Forest Service has violated the National Environmental Policy Act, 42

27    U.S.C. § 4321 et seq., and NEPA's implementing regulations by authorizing livestock grazing

28    without first conducting the necessary environmental analysis of the impacts of such grazing in

37

413297.01

1 | an EA or EIS in light of the potentially significant impacts that each of the challenged CE
2 | grazing decisions will have.

3 | 161.    This claim is brought pursuant to the judicial review provisions of the APA, 5
4 | U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5 | 162.    The Forest Service's violations of NEPA are arbitrary, capricious, an abuse of
6 | discretion, and not in accordance with law under the APA, which has caused or threatens serious
7 | prejudice and injury to Plaintiffs' rights and interests.

8 | ### THIRD CLAIM FOR RELIEF

9 | ### (FOR VIOLATIONS OF THE APPEALS REFORM ACT)

10 | 163.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

11 | 164.    The Forest Service has violated the Appeals Reform Act, Public Law Number
12 | 102-381, Sec. 322 (codified at 16 U.S.C. § 1612 note) by issuing livestock grazing decisions that
13 | are subject to administrative review on appeal by the public pursuant to the Appeals Reform Act,
14 | but that the Forest Service wrongly contends are not subject to public administrative appeals.

15 | 165.    This claim is brought pursuant to the judicial review provisions of the APA, 5
16 | U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

17 | 166.    The Forest Service's violations of the Appeals Reform Act are arbitrary,
18 | capricious, an abuse of discretion, and not in accordance with law under the APA, which has
19 | caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

20 | ### PRAYER FOR RELIEF

21 | WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

22 | A.    Adjudge and declare that the Defendant Forest Service has violated the 2005
23 | appropriations rider; and reverse and set aside the grazing decisions challenged herein as being
24 | arbitrary, capricious, an abuse of discretion, and/or contrary to law, pursuant to the judicial
25 | review standards of the APA, 5 U.S.C. § 706(2);

26 | B.    Adjudge and declare that the Defendant Forest Service has violated NEPA; and
27 | order the Forest Service to conduct an appropriate environmental analysis in an EA or EIS for
28 | the decisions challenged herein.

1    C.    Permanently enjoin the Defendant Forest Service from proceeding to reauthorize

2   grazing under the terms of the 2005 appropriations rider, unless and until the Forest Service can

3   demonstrate compliance with the rider, specifically by showing that: (1) each decision does not

4   authorize grazing at levels greater than the average use from the previous three to five years; (2)

5   the agency has adequate current and long-term monitoring data for all ecosystems and

6   communities within an allotment that will be subject to livestock grazing and all fish and wildlife

7   habitat needs and resources impacted by livestock, and that data conclusively shows that all

8   affected resources are meeting or satisfactorily moving toward Forest Plan objectives; and (3) the

9   Forest Service has surveyed for all extraordinary circumstance resource conditions that

10   potentially could exist on the allotment, assessed the actual condition of the resources present

11   and the impacts of livestock upon them, and has determined that the individual and cumulative

12   impacts of the decision combined with other past, present, and future activities will have no

13   adverse impact on any resource conditions;

14    D.    Adjudge and declare that the Forest Service has violated the Appeals Reform Act,

15   and permanently enjoin Defendant from issuing grazing decisions that are not subject to

16   administrative appeal by the public;

17    E.    Enter such other declaratory relief, and temporary, preliminary, and/or permanent

18   injunctive relief, as may be prayed for hereafter by Plaintiffs;

19    F.    Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees

20   associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et

21   seq., and/or all other applicable authorities; and/or

22    G.    Grant such further relief as the Court deems just and proper in order to provide

23   Plaintiffs with relief and protect the public interest.

24

25

26

27

28

1    Dated this 14th day of March, 2008.

2

3                                                          By: _____

4

                                                          KEKER & VAN NEST
5                                                         Jeffrey R. Chanin
                                                          Klaus H. Hamm
6                                                         710 Sansome St.
                                                          San Francisco, CA 94111
7                                                         (415) 391-5400
                                                          (415) 397-7188
8                                                         jchanin@kvn.com
                                                          khh@kvn.com

9                                                         ADVOCATES FOR THE WEST
                                                          Lauren M. Rule
10                                                        P.O. Box 1612
                                                          Boise, ID 83701
11                                                        (208) 342-7024
                                                          (208) 342-8286 (fax)
12                                                        lrule@advocateswest.org

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

413297.01    COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT,
                                    THE NATIONAL ENVIRONMENTAL POLICY ACT, AND THE APPEALS REFORM ACT

E-filing

**JS 44** (Rev. 11/04) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

WESTERN WATERSHEDS PROJECT; NATURAL RESOURCES DEFENSE COUNCIL; CENTER FOR BIOLOGICAL DIVERSITY; CALIFORNIA TROUT; ENVIRONMENTAL PROTECTION CENTER; KLAMATH SISKIYOU WILDLANDS CENTER; LOS PADRES FOREST WATCH; SIERRA FOREST LEGACY; and SEQUOIA FOREST KEEPER

**DEFENDANTS**

U.S. FOREST SERVICE

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

See Attachment

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury - | Seizure of | | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | Property 21 USC 881 | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 630 Liquor Laws | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product Liability | [ ] 640 R.R. & Truck | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | | [ ] 650 Airline Regs. | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| Student Loans (Excl. Veterans) | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 660 Occupational | | [ ] 490 Cable/Sat TV |
| [ ] 153 Recovery of Overpayment | [ ] 345 Marine Product | [ ] 370 Other Fraud | Safety/Health | **SOCIAL SECURITY** | [ ] 810 Selective Service |
| of Veteran's Benefits | Liability | [ ] 371 Truth in Lending | [ ] 690 Other | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | | [ ] 862 Black Lung (923) | Exchange |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle | Property Damage | **LABOR** | [ ] 863 DIWC/DIWW | [ ] 875 Customer Challenge |
| [ ] 195 Contract Product Liability | Product Liability | [ ] 385 Property Damage | [ ] 710 Fair Labor | (405(g)) | 12 USC 3410 |
| [ ] 196 Franchise | [ ] 360 Other Personal Injury | Product Liability | Standards Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 720 Labor/Mgmt. Relations | [ ] 865 RSI (405(g)) | [X] 892 Economic Stabilization Act |
| | [ ] 441 Voting | [ ] 510 Motion to Vacate | [ ] 730 Labor/Mgmt. | **FEDERAL TAX SUITS** | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 442 Employment | Sentence | Reporting & | [ ] 870 Taxes (U.S. Plaintiff | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 443 Housing/ | **Habeas Corpus:** | Disclosure Act | or Defendant) | [ ] 895 Freedom of |
| [ ] 230 Rent Lease & Ejectment | Accommodations | [ ] 530 General | [ ] 740 Railway Labor Act | [ ] 871 IRS - Third Party | Information Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 790 Other Labor Litigation | 26 USC 7609 | [ ] 900 Appeal of Fee |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - | [ ] 540 Mandamus & | [ ] 791 Empl. Ret. Inc. | | Determination Under |
| [ ] 290 All Other Real Property | Employment | Other | Security Act | | Equal Access to Justice |
| | [ ] 446 Amer. w/Disabilities - | [ ] 550 Civil Rights | | | [ ] 950 Constitutionality of |
| | Other | [ ] 555 Prison Condition | | | State Statutes |
| | [ ] 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
5 U.S.C. Section 706; 42 U.S.C. Section 4321; 16 U.S.C. Section 1612

Brief description of cause: Violations of the Fisal Year 2005 Consolidated Appropriations Act, the Nat'l. Environ. Policy, and The Appeals Reform Act

**VII. REQUESTED IN COMPLAINT:**
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
- **DEMAND $** 0.00
- CHECK YES only if demanded in complaint:
- **JURY DEMAND:** [ ] Yes [X] No

**VIII. RELATED CASE(S) IF ANY**
(See instructions): JUDGE _____  DOCKET NUMBER _____

**DATE** March 14, 2008

**SIGNATURE OF ATTORNEY OF RECORD**

**FOR OFFICE USE ONLY**
RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

NDC-JS44

**ATTACHMENT**
to Civil Cover Sheet


1.(c)

KEKER & VAN NEST, LLP                    ADVOCATES FOR THE WEST
710 Sansome Street                       P. O. Box 1612
San Francisco, CA  94111-1704            Boise, ID  83701
Telephone: (415) 391-5400                Telephone:  (208) 342-7024
Jeffrey R. Chanin (CSB #103649)          Lauren M. Rule (ISB #6863)
Klaus H. Hamm   (CSB # 224905)

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611017019
Cashier ID: bucklee
Transaction Date: 03/14/2008
Payer Name: KEKER AND VAN NEST LLP

CIVIL FILING FEE
For: western watersheds
Case/Party: D-CAN-3-08-CV-001460-001
Amount:        $350.00

CHECK
Check/Money Order Num: 37839
Amt Tendered: $350.00

Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

pjh

Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it was drawn.