WILLIAM J. THOMAS, JR., Bar No. 67798
HEATHER C. BAUGH, Bar No. 244850
ANTHONY J. VAN RUITEN, Bar No. 256087
BEST BEST & KRIEGER LLP
400 Capitol Mall, Suite 1650
Sacramento, California 95814
Telephone: (916) 325-4000
Telecopier: (916) 325-4010

Attorneys for Intervenor
California Cattlemen's Association

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendants. | Case No.  08-CV-1460 PJH<br><br>COMPENDIUM OF AUTHORITIES<br><br>[Filed concurrently with:<br>1.  Reply to Motion for Leave to Intervene; and<br>2.  Declaration of Mike Byrne.]<br><br>Date:   July 23, 2008<br>Time:  9:00 a.m.<br>Ctrm:  3<br>Judge:  Honorable Phyllis J. Hamilton<br><br>Complaint filed: March 14, 2008 |
| CALIFORNIA CATTLEMEN'S ASSOCIATION,<br><br>Intervenor. | |

SACRAMENTO\HBAUGH\51862.1

COMPENDIUM OF AUTHORITIES

Proposed Intervenor California Cattlemen's Association submits the following authorities relied on in its Reply to Opposition to Motion for Leave to Intervene.

Authorities:

1.    CRS Report for Congress, The National Environmental Policy Act: Streamlining NEPA, dated January 9, 2007 ("CRS Report"). A true and correct copy of the CRS Report, dated January 9, 2007, is attached to this Compendium of Authorities as Exhibit "A."

2.    *Forest Guardians and Sinapu v. United States Forest Service*, United States District Court, District of New Mexico, Case Number 1:07-cv-01043-JB-ACT: Defendants-Intervenors, New Mexico Cattle Growers' Association, New Mexico Federal Lands Council, and the Coalition of Arizona/New Mexico Counties for Stable Economic Growth's, Motion to Intervene, filed on February 28, 2008. A true and correct copy of this Motion to Intervene, filed February 28, 2008, is attached to this Compendium of Authorities as Exhibit "B."

3.    *Forest Guardians and Sinapu v. United States Forest Service*, United States District Court, District of New Mexico, Case Number 1:07-cv-01043-JB-ACT: Clerk's Minutes dated April 30, 2008. A true and correct copy of the Clerk's Minutes granting the Motion to Intervene, dated April 30, 2008, is attached to this Compendium of Authorities as Exhibit "C."

4.    *The Lands Council, et al. v. Mcnair*, United States Court of Appeals, Case Number 07-35000: Opinion filed July 2, 2008. A true and correct copy of the Opinion, filed July 2, 2008, is attached to this Compendium of Authorities as Exhibit "D."

Dated: July 9, 2008                              BEST BEST & KRIEGER LLP


By:____/s/  William J. Thomas, Jr.
         William J. Thomas, Jr.
         Heather C. Baugh
         Anthony J. Van Ruiten
         Attorneys for Intervenor
         California Cattlemen's Association

SACRAMENTO\HBAUGH\51862.1

EXHIBIT "A"

Order Code RL33267

# CRS Report for Congress

## The National Environmental Policy Act: Streamlining NEPA

**Updated January 9, 2007**

Linda Luther
Analyst in Environmental Policy
Resources, Science, and Industry Division



**Congressional Research Service**

Prepared for Members and
Committees of Congress

# The National Environmental Policy Act: Streamlining NEPA

## Summary

In recent years, the time needed to comply with various environmental laws has been the subject of public scrutiny and debate in Congress. As a result, numerous administrative and legislative efforts (both proposed and enacted) have intended to expedite or *streamline* the environmental compliance process. Although methods to do so vary, streamlining measures are often proposed or implemented when the participation of multiple local, state, tribal, or federal agencies is necessary to comply with various environmental requirements. Streamlining measures may be applied to various environmental compliance processes, such as federal permitting or approvals.

A major focus of streamlining efforts has been the National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. §§ 4321, et seq.), the implementation of which is overseen by the Council on Environmental Quality (CEQ). Among other provisions, NEPA requires federal agencies to analyze environmental impacts and involve the public before proceeding with any major federal action significantly affecting the human environment.

Many agencies have implemented administrative and legislative streamlining actions, including the Department of Agriculture (USDA), Department of Transportation (DOT), Department of the Interior (DOI), Army Corps of Engineers, Department of Energy (DOE), and Federal Energy Regulatory Commission (FERC). Streamlining efforts vary from agency to agency but usually involve one or more of the following elements: designating a specific agency as the lead agency responsible for ensuring compliance with applicable requirements, directing the lead agency to develop a coordinated environmental review process, specifying certain lead agency authority (e.g., to establish project deadlines or develop dispute resolution procedures), codifying existing regulations, delegating specific federal authority to states, designating specific activities as being categorically excluded or exempt from certain elements of NEPA, and establishing limits on judicial review.

Streamlining proposals have generated a great deal of controversy. Proponents of such measures argue that streamlining efforts are needed to cut through the "bureaucratic red tape" often associated with federal project delivery. Others counter that such actions are an attempt to weaken environmental protection and lessen public participation in federal decision-making processes.

This report discusses elements of NEPA relevant to streamlining, issues associated with determining project delays attributed to NEPA, common streamlining methods, and recently proposed and enacted legislative and administrative streamlining activities. This report will be updated as warranted.

## Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Elements of NEPA Relevant to Streamlining . . . . . . . . . . . . . . . . . . . . . . . 3
   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   The NEPA Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Levels of NEPA Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Determining When an EIS Is Required . . . . . . . . . . . . . . . . . . . . 5
      Elements of an EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      Agency Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      NEPA as an "Umbrella" Statute . . . . . . . . . . . . . . . . . . . . . . . . . 7
   Issues in Attributing NEPA Implementation to Project Delays . . . . . . . . . . 8
      Determining Delays Related to NEPA Document Preparation . . . . . . 8
      The Role of Litigation in NEPA's Implementation . . . . . . . . . . . . . . 10
   Common Streamlining Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      Establishing a Coordinated Compliance Process . . . . . . . . . . . . . . . 11
      Codifying Existing Regulations in Law . . . . . . . . . . . . . . . . . . . . . 12
      Delineating Lead Agency Authority . . . . . . . . . . . . . . . . . . . . . . . 12
      Delegating Authority to States . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      Specifying Categorically Excluded or Exempt Projects . . . . . . . . . . . 13
      Establishing Limits on Judicial Review . . . . . . . . . . . . . . . . . . . . . 14

Overview of Existing Streamlining Activities . . . . . . . . . . . . . . . . . . . . . . . 15
   Legislation Enacted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      Healthy Forests Restoration Act . . . . . . . . . . . . . . . . . . . . . . . . . 16
      Vision 100-Century of Aviation Reauthorization Act . . . . . . . . . . . . 16
      SAFETEA-LU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      The Energy Policy Act of 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      Appropriations for the Department of the Interior and
         Related Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   Administrative Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      Forest Service and BLM Timber-Related Activities . . . . . . . . . . . . . 20
      FERC Liquified Natural Gas Facility Operations . . . . . . . . . . . . . . . 21
   NEPA Task Forces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      CEQ NEPA Task Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      Energy Task Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      Transportation Task Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      House Resources Committee NEPA Task Force . . . . . . . . . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

For Additional Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   The U.S. Department of Agriculture . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   The Department of Energy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   The Department of the Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   The Department of Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## List of Tables

Table 1.  The House Resources Committee NEPA Task Force
          Recommendations To Update NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# The National Environmental Policy Act: Streamlining NEPA

## Introduction

A multitude of factors can affect the timing of federal project delivery. Factors that may contribute to delays in a federal project include changes in the project planning and design process, changes in funding priorities, construction complexities, local controversy or community opposition to a project, and compliance with myriad local, state, tribal or federal laws. With regard to the latter, certain federal actions such as highway construction projects and permitting for mining operations, cattle grazing, forest thinning, and energy development projects may trigger compliance with literally dozens of statutory and regulatory requirements. These, in turn, may require the participation or input of possibly dozens of local, state, tribal, or federal agencies.

In recent years, the time it takes to comply with various environmental laws has been the subject of public scrutiny and debate in Congress. One law that has been the subject of particular scrutiny has been the National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. §§ 4321-4347).

Signed into law by President Nixon on January 1, 1970, NEPA declared a national policy to protect the environment and created a Council on Environmental Quality (CEQ) in the Executive Office of the President. To implement the national policy, NEPA requires that environmental factors be considered when federal agencies make decisions and that a detailed statement of environmental impacts be prepared for all major federal actions significantly affecting the human environment.

The "detailed statement" referenced in the law is now known as an environmental impact statement (EIS). CEQ regulations for implementing NEPA, among other provisions, introduced additional levels of environmental review — those for environmental assessments (EAs) and categorical exclusions. Generally, EAs are prepared to determine whether the impacts of a federal action will be "significant" under NEPA. An action is categorically excluded from the requirement to prepare an EIS or an EA if it is of a type or in a category known to have no significant environmental impacts. (For more detail on these requirements, see the discussion regarding "The NEPA Process" in the following section of this report; also see CRS Report RS20621, *Overview of NEPA Requirements*, by Pamela Baldwin, and CRS Report RL33152, *The National Environmental Policy Act: Background and Implementation*, by Linda Luther.)

The preparation of EISs is probably the best-known requirement of NEPA. However, projects requiring an EIS represent a small fraction of all federal actions.

CRS-2

For example, from 1984 to 2004, an average of 513 draft and final EISs were filed with EPA each year.[1] By comparison, in 1997, CEQ reported that federal agencies estimated that approximately 50,000 EAs were prepared annually.[2]

Determining the total number of federal actions subject to NEPA is difficult, as most agencies track only the number of actions requiring an EIS. One agency that has tracked *all* projects is the Department of Transportation's (DOT) Federal Highway Administration (FHWA). In 2005, FHWA reported that just over 84% of all highway projects were classified as categorical exclusions (representing just over 81.5% of FHWA project funding), 9% required an EA (5.5% of project funding), and approximately 7% required an EIS (13% of project funding).[3] Although they may be small in number compared with all federal actions, projects requiring an EIS do include some of those with the greatest impacts and highest stakeholder interest.

Stakeholders such as state and local project sponsors and industry representatives with an interest in the implementation of federal actions charge that meeting NEPA's environmental review requirements is sometimes done inefficiently and can be overly time-consuming. Such critics charge that the law creates a complicated array of regulations and logistical delays that stall agency action.

Environmental organizations look at the NEPA process as an essential tool to help agencies plan and manage federal actions in a responsible way by requiring policymakers and project sponsors to consider the environmental implications of their actions before decisions are made. They also view the NEPA process as an important mechanism in providing the public with an opportunity to be involved in agency planning efforts. They argue that expediting what is supposed to be a deliberative process is not necessarily in the best interest of the public or the environment. Further, they argue that blaming the environmental compliance process for project delays is misplaced. They contend that if federal projects are, in fact, delayed by the NEPA process, it is because agencies required to participate in the process are overburdened and insufficiently funded, staffed, or equipped to meet the demand.

As a result of the debate between stakeholders regarding NEPA's implementation, numerous administrative and legislative actions have been proposed to expedite compliance with NEPA. The activities associated with such proposals are often collectively referred to as *streamlining*. No regulatory or legislative definition of streamlining exists. It is defined differently by different stakeholders or agencies for different classes of projects. However, the term is often used to describe a process or procedures intended to accelerate decision making, especially when the input of multiple federal, state, tribal, or local agencies is required to

---

[1] CEQ's "Number of EISs Filed 1970 to 2004," available at [http://ceq.eh.doe.gov/nepa/nepanet.htm].

[2] Council on Environmental Quality, *The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years*, January 1997, p. 28, available at [http://ceq.eh.doe.gov/nepa/nepanet.htm].

[3] FHWA's Steamlining and Stewardship webpage "FHWA Projects by Class of Action," available at [http://www.environment.fhwa.dot.gov/strmlng/projectgraphs.asp].

CRS-3

comply with multiple environmental laws, regulations, or executive orders. For example, FHWA may propose a highway construction project that affects wetlands that are home to an endangered species. Within the context of conducting a review of the environmental impacts of the project under NEPA, FHWA may also be required to demonstrate compliance with elements of the Clean Water Act and the Endangered Species Act. As a result, the U.S. Environmental Protection Agency (EPA), the U.S. Army Corps of Engineers, and the Department of the Interior's Fish and Wildlife Service would have statutory obligations to participate in the proposed project. These agencies, with potentially conflicting missions (e.g., protecting endangered species or sensitive wetlands versus building a highway), are then required to work together to review various aspects of FHWA's proposed project. *Streamlining* efforts may be implemented with the intent of expediting the requirement of having these agencies work together.

Many of the issues leading to a call for streamlining, as well as challenges to implementing such actions, are summed up in the following excerpt from a report issued by the National Conference of State Legislatures:

> Regulators often lack guidance on how to successfully integrate the complicated requirements of state and federal environmental laws and regulations... Depending on the complexity of the issue and the priority given the issue by decision makers, decisions can be slow in coming, thus delaying progress. Another barrier is the fact that individual regulators tend to be experts in only one set of laws and regulations. This tends to create some resistance to proposals that coordinate or integrate the provisions of different laws. Regulators tend to be cautious about integrating the requirements of different laws unless they can define all possible regulatory and technical impacts.[4]

This statement recognizes that barriers to efficient decision making arise not from NEPA alone, but from the challenges of integrating compliance with a multitude of laws and regulations that may apply to a given federal action.

# Elements of NEPA Relevant to Streamlining

## Background

NEPA has been interpreted by the courts to be a procedural statute with two primary aims.[5] First, it obligates federal agencies to consider every significant aspect of the environmental impact of an action *before* proceeding with it. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process. In this capacity, NEPA has

---

[4] The National Conference of State Legislatures, Environment, Energy and Transportation Program, "Assessment of Regulatory and Administrative Streamlining at United States Department of Energy Cleanup Sites," August 1996. This report was available online on or around November 2004, but is no longer available.

[5] *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 100 (1983).

CRS-4

become one of the primary mechanisms through which the public is able to participate in the federal decision-making process.

As a procedural statute, the courts have ruled that NEPA does not require agencies to elevate environmental concerns above others. Instead, NEPA requires only that the agency assess the environmental consequences of an action and its alternatives before proceeding. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other benefits outweigh the environmental costs and moving forward with the action.

NEPA is a declaration of policy with action-forcing provisions, not a regulatory statute comparable to other environmental laws intended to protect air, water, wetlands, or endangered species. It establishes the basic framework for integrating environmental considerations into federal decision making. However, the law itself does not provide many details on how this process should be accomplished. For example, although NEPA gave CEQ a variety of duties, the authority to promulgate regulations implementing NEPA's environmental review requirements was not one.[6] That authority was ultimately given to CEQ by executive order in 1977,[7] but it did not include authority to *enforce* those regulations.[8]  A major impetus for CEQ's regulations was to reduce the time and paperwork required to prepare an EIS.

The CEQ regulations were intended to be generic in nature. Each federal agency was required to develop its own NEPA procedures that would be specific to typical classes of actions undertaken by that agency.[9]  Separately, CEQ regulations directed federal agencies to review their existing policies, procedures, and regulations to ensure that they were in full compliance with the intent of NEPA.[10]

---

[6] Before its regulations were promulgated, four United States Supreme Court decisions did determine that CEQ's interpretation of NEPA's requirements was owed "substantial deference" by courts.

[7] Executive Order 11991, *Relating to Protection and Enhancement of Environmental Quality*, signed by President Carter, May 24, 1977, 42 *Fed. Reg.* 26967. The final CEQ regulations were ultimately promulgated in 1978 and became effective in 1979 (see, 43 *Fed. Reg.* 55978, Nov. 28, 1978;  40 C.F.R. §§ 1500-1508). In addition to promulgating regulations, CEQ has provided support and informal guidance to federal agencies implementing NEPA's requirements. For example, in 1981, CEQ issued its "Forty Most Asked Questions Concerning CEQ's NEPA Regulations." That and other CEQ guidance are available at [http://ceq.eh.doe.gov/nepa/nepanet.htm].

[8] CEQ is charged with providing oversight and guidance to agencies with regard to EIS preparation. EPA is required to review and comment publicly on the environmental impacts of proposed federal activities, including those for which an EIS is prepared. EPA is also the official recipient of all EISs prepared by federal agencies. However, neither EPA nor CEQ has enforcement authority with regard to an agency's environmental review requirements.

[9] 40 C.F.R. § 1507.3.

[10] 40 C.F.R. § 1500.6.

CRS-5

## The NEPA Process

**Levels of NEPA Analysis.** Section 102(2)(C) of NEPA requires that all federal decisions include in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on the environmental impact of the proposed action."[11] The "detailed statement" is now referred to as an environmental impact statement (EIS).

Projects for which it is not initially clear whether impacts will be significant require the preparation of an environmental assessment (EA). If, at any time during the EA preparation, it is determined that a project's impacts *will* be significant, an EIS must be prepared. However, if in preparing the EA the agency determines that the project will have no significant environmental impact, a Finding of No Significant Impact (FONSI) will be issued by the lead agency. The FONSI must briefly present the reasons why the project will not have a significant effect on the environment.

If a project is of a type or in a category known to have no significant environmental impacts, it is categorically excluded from the requirement to prepare and EA or EIS. Individual agencies are required to specifically list, in their respective NEPA procedures, those projects that are likely to be considered categorical exclusions (CEs).[12] For example, DOT has identified the construction of bicycle and pedestrian lanes, landscaping, and the installation of traffic signals as actions that would generally be classified as categorical exclusions.[13]

Some agency NEPA procedures answer the question of whether or what types of documentation may be required to demonstrate that a project is categorically excluded, by focusing on whether the project involves "extraordinary circumstances" that may cause a normally excluded action to have a significant environmental effect.[14] An individual agency's NEPA requirements may also specify other criteria under which otherwise excluded actions may require documentation to prove that the CE determination is appropriate.

**Determining When an EIS Is Required.** Under NEPA, an EIS must be prepared for "every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." Interpretation of each element of this phrase has been the subject of myriad court decisions and guidance from CEQ. The CEQ regulations, at 40 C.F.R. § 1508.18, specify that the term "major" in the phrase "major federal action" reinforces but does not have meaning independent of "significantly." Therefore, in determining whether

---

[11] 42 U.S.C. § 4332(2)(C).

[12] 40 C.F.R. § 1507.3. Sometimes such actions are referred to as being categorically excluded or exempt from NEPA. However, NEPA *does* apply to such actions; they are excluded only from the requirement to prepare an EA or EIS.

[13] 23 C.F.R. § 771.117.

[14] 40 C.F.R. § 1508.4.

CRS-6

and how NEPA will apply to an action, it is necessary to determine whether an action is in fact a federal one and, if so, if its environmental impacts will be significant.

"Federal" actions include those that are potentially subject to federal control and responsibility. Such actions include "projects and programs entirely or partly funded, assisted, conducted, regulated, or approved by federal agencies."[15] Specifically, federal agency compliance with NEPA may be required for actions that require a federal permit or other regulatory decision to proceed.[16]

CEQ regulations require agencies to determine the significance of a project's impacts on a case-by-case basis, based on its context and intensity.[17] Because degrees of impact must be evaluated, such an evaluation may be highly subjective. Although court decisions have been rendered regarding most elements of NEPA implementation, few federal courts have attempted to specifically define "significance." Most often, a court will determine whether the evidence for a given project involved potentially significant environmental effects and then decide whether the agency's decision *not* to prepare an EIS was reasonable under circumstances specific to that project.[18]

**Elements of an EIS.** An EIS is a full-disclosure document that must include the following elements:

- **Purpose and Need Statement.** A brief statement, developed by the agency responsible for the action, specifying the underlying purpose of a project and the need to which the agency is responding.

- **Alternatives.** A description of all reasonable project alternatives to meet the stated project purpose and need. CEQ has interpreted "reasonable" alternatives to include those that are practical or feasible from the technical and economic standpoint and that use common sense, rather than simply desirable from the standpoint of the agency or a potentially affected stakeholder.[19] Consideration of a "no action" alternative is also required.[20]

---

[15] 40 C.F.R. § 1508.18(a).

[16] 40 C.F.R. § 1508.18(b)(4). Further, the term *federal agency* is defined as all agencies of the federal government, but does not mean the Congress, the Judiciary, or the President (40 C.F.R. § 1508.12).

[17] 40 C.F.R. § 1508.27.

[18] Dinah Bear, "NEPA at 19: A Primer on an 'Old' Law with Solutions to New Problems," *Environmental Law Review*, Feb. 1989, available online on the "CEQ Guidance" Web page at [http://ceq.eh.doe.gov/nepa/regs/guidance.html].

[19] Council on Environmental Quality, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, response to "Alternatives Outside the Capability of Applicant or Jurisdiction of Agency," available at [http://ceq.eh.doe.gov/nepa/regs/40/40P1.htm].

[20] 40 C.F.R. § 1508.25.

CRS-7

- **Affected Environment.** A succinct description of the environment affected by the alternatives under consideration (e.g., endangered species habitat, wetlands, historic sites).

- **Environmental Consequences.** An analysis of the impacts of each alternative on the affected environment, including a discussion of the probable beneficial and adverse social, economic, and environmental effects of each alternative. This section must also include, where applicable, a discussion of the direct, indirect, and cumulative effects of each alternative and the significance of those effects, a description of the measures proposed to mitigate adverse impacts, and methods of compliance with any applicable legal requirements.

Preparation of an EIS is done in two stages, resulting in a draft and final EIS. Once the final EIS is approved and the agency decides to take action, the lead agency must prepare a public record of decision (ROD). CEQ regulations specify that the ROD must include a statement of the final decision, all alternatives considered by the agency in reaching its decision, and whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted and, if not, why they were not.[21] Generally, a federal project cannot proceed (e.g., final design activities, property acquisition, or project construction) until a ROD for the final EIS is issued.[22] (For more information about the required elements of an EIS, see CRS Report RL33152, *The National Environmental Policy Act: Background and Implementation*, by Linda Luther.)

**Agency Participation.** The agency responsible for preparing the necessary NEPA documentation is the lead agency. In the appropriate NEPA documentation (e.g., EIS or EA), the lead agency must demonstrate that comments were solicited from relevant federal, state, and local agencies (referred to as "participating" agencies), as well as from the public. Relevant agencies obligated to provide comments are those with jurisdiction by law or special expertise with respect to any environmental issue associated with the project. For example, if a project alternative affects a historic site, the Advisory Council on Historic Preservation may be required to participate in the NEPA process as a "cooperating agency."[23] If impacts to wetlands are identified, the Corps may need to provide comments or issue a permit before a project may proceed.

**NEPA as an "Umbrella" Statute.** To integrate the compliance process and avoid duplication of effort, NEPA regulations specify that, to the fullest extent possible, agencies must prepare the NEPA documentation concurrently with *any* other environmental requirements.[24] The appropriate NEPA documentation must also indicate any federal permits, licenses, and other entitlements required to

---

[21] 40 C.F.R. § 1505.2.

[22] For projects with less than significant environmental impacts, the project cannot proceed until the action is classified as a CE or a FONSI is approved for an EA.

[23] 40 C.F.R. §§ 1501.6 and 1508.5.

[24] 40 C.F.R. § 1502.25.

CRS-8

implement the proposed project. This means that compliance requirements of any additional environmental laws, regulations, or executive orders must be determined (but not necessarily completed) during the NEPA process. In this capacity, NEPA functions as an umbrella statute, meaning it is a framework to coordinate or demonstrate compliance with any studies, reviews, or consultations required by any other environmental laws. The use of NEPA in this capacity has led to confusion. The need to comply with another environmental law, such as the Clean Water Act or Endangered Species Act, may be identified within the framework of the NEPA process, but NEPA itself is not the source of the obligation. If, hypothetically, the requirement to comply with NEPA were removed, compliance with each applicable law would still be required.

For additional information about NEPA's history and requirements, see CRS Report RL33152, *The National Environmental Policy Act: Background and Implementation*, by Linda Luther.

## Issues in Attributing NEPA Implementation to Project Delays

Debate regarding the need for streamlining measures originates from assertions that NEPA delays federal projects. The debate stems from disagreement among stakeholders regarding the degree to which, if any, the NEPA process itself is to blame for federal project delays. Delays attributed to the NEPA process generally fall into two broad categories: those related to the time needed to complete required documentation (primarily EISs) and delays resulting from NEPA-related litigation.

**Determining Delays Related to NEPA Document Preparation.** The research, data collection, analyses, and public participation necessary to prepare NEPA documentation takes time, in some cases years. The debate begins when stakeholders attempt to determine the extent to which the preparation of NEPA documentation alone adds to or delays the time to complete a federal project. Several unique aspects of NEPA make it difficult to determine the degree to which the NEPA process itself is the source of delays.

First, other than the Department of Energy (DOE), and very recently the Department of Transportation (DOT), federal and state agencies do not routinely maintain information on the time needed to complete the NEPA process. Therefore, gathering accurate data specific to the time needed to prepare NEPA documents is difficult. Also, for some classes of projects, document preparation under NEPA is generally done concurrently with other stages of a project, such as preliminary project design. If a project undergoes specification changes, those changes may necessitate changes in NEPA analysis and documentation. Consequently, the time to complete the NEPA process may be extended. However, determining if such delays are directly attributed to the NEPA process itself may be problematic.

Another challenge related to gathering data deals with how one measures the time taken on a federal project that actually involves the NEPA process. When measuring the length of the NEPA process for a given project, an agency generally looks at the date of the notice of intent (NOI) to file an EIS and the date of the ROD. However, these dates do not necessarily reflect the time it take to prepare NEPA documentation for a given project. A federal project may stop and restart for any

CRS-9

number of reasons that are unrelated to NEPA or any other environmental requirement. This may be the case particularly for costly or controversial projects. For example, filing an NOI in 1988 and subsequently issuing the ROD in 1998 does not necessarily mean that it took 10 years to complete the EIS; the time it took to complete the project may have been associated with funding issues, changes in agency priorities, community opposition to the project, or engineering requirements, to name a few.

Second, a project having significant impacts on the environment is likely to require compliance with a number of environmental laws. The use of NEPA as an umbrella statute blurs the distinction between the time to complete the NEPA process and the time it takes to address other environmental requirements. The sometimes extensive reviews required under other environmental laws by agencies such as the Corps, the Fish and Wildlife Service, the Coast Guard, or EPA, as well as various state regulatory agencies, are often attributed to the NEPA process. In fact, the NEPA process may be extended as a result of the need to complete a permitting process or other analysis required under separate statutory authority (e.g., the Clean Water Act or Endangered Species Act), over which the lead agency may have no authority. One agency, FHWA, observed that many delayed projects or failed processes can be traced back to a disintegrated and disconnected approach to meeting NEPA and other requirements. FHWA stated that experience in administering NEPA has shown that many practitioners do not fully understand or practice the approach of using the NEPA process as an umbrella for integrating all required studies, reviews, or consultations.[25]

Third, a project with significant impacts may be a large, high-profile, complex project costing millions of dollars. Depending on the impacts, such projects may generate local controversy and be opposed by certain stakeholders. Delays of such projects are well-known among agency officials and interested stakeholders. However, such projects make up a small percentage of all federal actions. Further, although examples of NEPA-related delays associated with such projects exist, few data suggest that delays associated with them are widely applicable to all federal projects subject to NEPA.

Finally, it has been observed that it takes longer to complete necessary NEPA documentation today than it did in the 1970s. The NEPA process as it is implemented today is not comparable to the NEPA process soon after the law was enacted. Until November 1978, there were no binding CEQ regulations outlining EIS, EA, or CE requirements. While an EIS may have been completed relatively quickly during the 1970s, compared with today, it may not have withstood judicial review. Further, many agencies did not have their own NEPA procedures until well into the 1980s. Such procedures may make the process take longer today, but they may result in fewer overall project delays in situations where adherence to the procedures results in a more legally sound EIS. Also, there were fewer environmental laws and regulations in the 1970s (see reference to the use of NEPA as an umbrella statute, above), and the public is more involved in the NEPA process today than in the 1970s.

---

[25] Notice of Proposed Rulemaking, 65 *Fed. Reg.* 33965 (May 25, 2000).

CRS-10

**The Role of Litigation in NEPA's Implementation.**  Critics of NEPA often cite litigation as a significant cause of NEPA-related project delays.  Such critics charge that individuals and groups who disapprove of a federal project will use NEPA as the basis for litigation to delay or halt that project.  Others argue that litigation only results when an agency does not comply with its own NEPA procedures.

Since 2001, plaintiffs have primarily cited two reasons for filing NEPA-related lawsuits.  The first is that the required NEPA documentation (e.g., an EIS, EA, or FONSI) was inadequate.  That may mean that they charge that, among other things, an EIS or EA did not include sufficient analysis of all project alternatives, did not consider all "reasonable" project alternatives, or did not adequately analyze the cumulative or indirect impacts of an action.  The second is that an EA was prepared when an EIS should have been (i.e., a FONSI was issued when impacts were in fact significant).[26]

NEPA litigation began to decline in the mid 1970s and has remained relatively constant since the late 1980s.  This may be due in part to improved agency compliance after promulgation of CEQ and agency NEPA procedures and improved agency expertise at preparing required documentation. For example, in 2004, a total of 170 NEPA-related cases were filed.  Of those, 11 resulted in an injunction.[27] The majority of suits were filed against two agencies — the USDA (80 cases filed, primarily against the U.S. Forest Service) and the Department of the Interior (31 cases filed).[28]

Although litigation has decreased, agency concern regarding the *threat* of litigation still has an affect on the NEPA process, particularly for complex or controversial projects.  A project sponsor may be mindful of previous judicial interpretation when preparing NEPA documentation in an attempt to prepare a "litigation-proof" EIS.  Stakeholder opinions vary on this aspect of NEPA implementation.  Some look at it positively, asserting that the fear of a lawsuit makes agencies more likely to adhere to NEPA's requirements.  Others counter that the threat of litigation may lead to the generation of wasteful documentation and analysis that does not add value to, but can slow, the decision-making process.

Like issues related to documentation, several unique elements to NEPA have led to litigation playing a prominent role in the law's implementation.  For example, unlike other environment-related statutes, NEPA's requirements apply only to federal agency actions and no individual agency has enforcement authority over those requirements. The absence of government enforcement authority is sometimes cited as the reason that litigation has been chosen as an avenue by individuals and groups that disagree with how an agency meets NEPA's mandate or EIS requirements for a

---

[26] Council on Environmental Quality, *2004 Litigation Survey*, available at [http://ceq.eh.doe.gov/nepa/nepanet.htm].

[27] Ibid. Note: there may have been further developments since the publication of this litigation survey.

[28] Many of these suits relate to the finalization of land and resource management plans and implementation projects on federal land.

given project (e.g., they may charge that an EIS is inadequate or that the environmental impacts of an action will in fact be significant when an agency claims that they are not).

Another unique element of NEPA is the role that public participation is intended to play in the process. In 1997, a CEQ study found that the extent to which the public is involved in the decision-making process has a bearing on the potential for litigation.[29] The study found that some states, citizen groups, and businesses believe that certain EAs are prepared to avoid public involvement (i.e., because public participation requirements are not specified for EAs). As stated earlier, disagreement regarding the decision to prepare an EA, rather than an EIS, is the most common source of conflict and litigation under NEPA.

## Common Streamlining Provisions

In recent years, numerous legislative and administrative proposals have been proffered to streamline compliance with NEPA's requirements. Those proposals have generally been unique to the categories of projects they are intended to expedite. However, most streamlining provisions, particularly legislative proposals, include similar elements. For example, discussed below are elements common to legislative streamlining provisions in laws enacted in the 108th and 109th Congresses (for a discussion of selected laws in which these provisions are included, see the "Legislation Enacted" section, below). Also discussed below are selected issues associated with each element.

**Establishing a Coordinated Compliance Process.** Most legislative streamlining provisions direct the lead agency to create some form of coordinated environmental review or compliance process. This process often requires the lead agency to establish specific administrative procedures for processing permits, license applications, or environmental reviews under the NEPA process. Often, that coordinated process must be delineated in a Memorandum of Understanding (MOU) between the designated lead agency and participating agencies for certain classes of projects (e.g., projects that require preparation of an EIS or EA). Legislation usually delineates required elements of the coordinated process, the content of the MOU, or both. For example, it may specify certain decision-making authorities of the lead and participating agencies in the selection and analysis of project alternatives, and it may specify methods to conduct the environmental review process under NEPA concurrently with other environmental requirements.

Some legislative proposals have allowed the lead agency to establish such a process only if requested by a project sponsor or applicant. Others specify that such a process *must* be implemented for entire classes of projects undertaken by an agency (e.g., all projects that require an EIS).

---

[29] Council on Environmental Quality, *The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years*, January 1997, p. 19, available at [http://ceq.eh.doe.gov/nepa/nepanet.htm].

CRS-12

Proponents of a coordinated compliance process argue that it is crafted to address the charge that the problem of delays with the NEPA process lies in its implementation and that a better coordinated process could lead to better and faster results. Critics are concerned with the details of such processes, such as limits on participating agency input or the imposition of strict deadlines, especially if those deadlines could limit public involvement.

**Codifying Existing Regulations in Law.**  CEQ's regulations currently include numerous provisions intended to reduce delays and paperwork.[30] Following are current requirements in CEQ regulations that are often found in streamlining proposals (often as part of the coordinated environmental review process, referred to above):

- Integrate requirements of NEPA with other planning and environmental review procedures so that all procedures run concurrently, rather than consecutively.
- Integrate the NEPA process at the earliest possible time to avoid delays and potential conflicts.
- Establish appropriate time and page limits on EISs.
- Emphasize interagency cooperation before the EIS is prepared, rather than adversary comments on a completed document.

Some streamlining proponents argue that these directives would be more strongly emphasized if put in to law.  Others counter that if similar regulatory provisions are already required of agencies, there is no guarantee that such statutory provisions would enable or cause agency staff to execute them more efficiently. Further, they argue that the difficulty in integrating many of these existing streamlining requirements has more to do with a lack of sufficient staff and resources to perform those responsibilities than a lack of will to do so.

**Delineating Lead Agency Authority.**  As discussed previously, the lead agency is the agency responsible for preparing the NEPA analysis and documentation.  Most streamlining legislation establishes in law a specific agency as the lead agency for certain categories of projects and delineates that agency's authority in the environmental compliance process (e.g., DOT is to be the lead agency for surface transportation projects). Many legislative streamlining provisions authorize the designated lead agency to set deadlines applicable to participating agency actions and to implement dispute resolution procedures. Some proposals also specify in law the existing requirement that the lead agency is authorized to determine an EIS's "purpose and need" statement and to define project alternatives, as required under NEPA.[31]

---

[30] 40 C.F.R. §§ 1500.2 and 1500.4-1500.5.

[31] See correspondence between Transportation Secretary Norman Mineta and CEQ Chairman James Connaughton regarding existing parameters of lead agency authority. Secretary Mineta asked for clarification of the roles of lead and cooperating agencies with regard to developing a highway project's purpose and need. While not addressed in the correspondence, NEPA regulations also specify the selection of reasonable alternatives to

(continued...)

CRS-13

Establishing a lead agency in legislation specific to individual agency actions may serve to reassert lead agency authority to participating agencies. However, since this right is already afforded to federal agencies under current law and regulatory requirements, additional legislation may not significantly streamline the compliance process.

**Delegating Authority to States.** One element of the NEPA process that has been identified by some stakeholders as a potential cause for delay is the added step of obtaining federal agency approval of less complex documentation, such as categorical exclusion determinations. Some industry stakeholders argue that some of these federal environmental responsibilities could be delegated to states, which could speed up the environmental review process by eliminating a significant layer of bureaucracy that federal approval entails.

This approach is not endorsed by environmental stakeholders who have expressed concern that the delegation of authority to the states would be the "fox guarding the hen house." They argue that states often have vested interests in moving projects forward, and thus their determinations may not have the level of scrutiny that would be provided with federal oversight.

One potential challenge to state delegation of authority includes a possible lack of staff qualified to process potentially complex documentation. In May 2003, the General Accounting Office (GAO, now the Government Accountability Office) reported that some transportation stakeholders identified state agency staff shortages as a significant cause of project delays.[32] If a state or local agency does not have sufficient staff to accommodate its needs, the delegation of additional authority to that agency may serve to slow the compliance process instead of streamline it. Staff at the state or local level may have difficulty determining all environmental requirements applicable to their project, which could further slow the process if it takes longer to ensure that required documentation is complete. It may be a difficult task for a project sponsor to review and approve the documentation that will ultimately demonstrate that all environmental requirements have been met. For example, a state may have had a consultant prepare NEPA documentation for an EIS, but relied on the federal agency to provide oversight for a CE determination.

**Specifying Categorically Excluded or Exempt Projects.** As discussed previously, individual agencies are required to specifically list types of projects that can be categorically excluded from the requirement to prepare an EIS or EA.

---

[31] (...continued)
the proposed action, which must also be analyzed, as within the authority of the lead agency. Text of Secretary Mineta's May 6, 2003 letter, and Chairman Connaughton's May 12, 2003, response are available at [http://www.dot.gov/execorder/13274/impsched/letters/minetamay6.htm].

[32] General Accounting Office, *Highway Infrastructure: Stakeholders' Views on Time to Conduct Environmental Reviews of Highway Projects*, GAO-03-534, (Washington, D.C., May 23, 2003).

CRS-14

According to CEQ, most agency CEs were approved 10 or more years ago.[33]  One method of expediting the NEPA process includes developing new or broadening existing CEs.  The updating process usually begins with a data request from an agency's headquarters to its field offices.  The data gathered and submitted is used to develop the proposal for new and revised CEs.  In developing CEs, most agencies use information from past actions to establish the basis for the "no significant effect" determination.[34]  New agency CEs are proposed through the public rule-making process; the proposed CEs are published in the *Federal Register* and open to public comment before final approval.

Proponents of the legislative designation of CEs argue that the regulatory process of adding CEs is cumbersome.  They further argue that because such projects have no significant environmental impact, their designation should be done more quickly.  Opponents to this approach argue that legislatively designating actions as CEs circumvents the process and eliminates the potential for public comment.  Further, since CE determinations generally do not provide an opportunity for public comment, public involvement in such projects will likely be eliminated.  Also, opponents argue that some actions in categories designated by law as CEs may in fact have potentially significant environmental impacts.

**Establishing Limits on Judicial Review.**  NEPA contains no express provision for judicial review of agency action and hence, not surprisingly, no deadline on when such petitions for review must be filed.  In the large majority of instances, cases that consider delay in the filing of NEPA litigation have applied laches, an equitable defense under which a court may dismiss an action after assessing the length and reasonableness of the filing delay and the resulting prejudice to the defendant.  Numerous courts have said that laches is to be sparingly applied, however, out of concern that NEPA's environmental objectives may be frustrated.  In other cases, courts have turned to the statute of limitations used for judicial review under the Administrative Procedure Act.  That statute (at 28 U.S.C. § 2401) mandates broadly that civil actions against the United States must be filed within six years after the right of action first accrues.

One streamlining method involves the establishment of a specific statute of limitations on the judicial review of final agency actions related to NEPA (e.g., publication of a ROD).   Proponents of such provisions argue that other environmental statutes specify statutes of limitations on the filing of petitions for review, often 60 to 120 days, and that the six years allowed under 28 U.S.C. § 2401 is too long.  Opponents of such measures fear that if the statute of limitations is too short, it will effectively eliminate the mechanism for citizen enforcement of NEPA's environmental review requirements.

---

[33] "The NEPA Task Force Report to the Council on Environmental Quality: Modernizing NEPA Implementation," September 2003, available at [http://ceq.eh.doe.gov/ntf/report/index.html].

[34] For more information about the documentation required for CEs and the agency process for developing and revising CEs, see CEQ's *The NEPA Task Force Report to the Council on Environmental Quality: Modernizing NEPA Implementation*, Chapter Five, "Categorical Exclusions," available at [http://ceq.eh.doe.gov/ntf/report/index.html].

CRS-15

# Overview of Existing Streamlining Activities

Recently, there have been numerous legislative and administrative streamlining activities, including the following:

- The enactment of legislation that alters individual agency NEPA procedures;
- administrative changes in individual agency NEPA procedures; and
- the creation of NEPA "task forces," established by CEQ and Congress, to study the NEPA process or expedite implementation of certain types of projects.

## Legislation Enacted

Most streamlining legislation involves actions undertaken by those agencies that tend to file the most EISs. In 1999, of the 501 draft and final EISs filed with EPA, only 6 agencies filed more than 20 draft or final EISs. Those agencies were USDA (primarily the U.S. Forest Service), DOT (primarily FHWA and the Federal Aviation Administration [FAA]), the Department of the Interior (DOI), the Corps, and the Department of Energy (DOE). The following legislation, enacted in the 108th and 109th Congress,[35] includes streamlining provisions for certain types of projects within those agencies:

- Healthy Forests Restoration Act of 2003 (P.L. 108-148): fuel reduction projects undertaken by the USDA's Forest Service or the DOI's Bureau of Land Management (BLM) on federal land.
- Vision 100-Century of Aviation Reauthorization Act (P.L. 108-176): airport capacity enhancement projects at congested airports undertaken by the FAA.
- The Safe, Accountable, Flexible, and Efficient Transportation Equity Act of 2005: A Legacy for Users (SAFETEA-LU, P.L. 109-59): construction of or modifications to surface transportation projects undertaken by FHWA and the Federal Transit Administration (FTA).
- The Energy Policy Act of 2005 (P.L. 109-58): various energy-development projects, such as oil and gas leasing and permitting on federal land, and the designation of energy facility rights-of-way and corridors on federal lands. Streamlining provisions in this law apply primarily to the actions of DOI, DOE, and FERC.
- FY2004, FY2005, and FY2006 appropriations laws for DOI and related agencies (including the USDA's Forest Service): grazing permit applications.

---

[35] This report addresses only enacted legislation. Numerous bills have been introduced that include streamlining provisions. Also, for background information regarding legislative modifications to NEPA, see CRS Report 98-417, *Statutory Modifications of the Application of NEPA*, by Pamela Baldwin.

CRS-16

**Healthy Forests Restoration Act.** The law (Title I) authorizes expedited planning and review procedures for projects to reduce hazardous levels of biomass fuels on federal lands. Priority is directed to reducing fuels near "at-risk communities" and in municipal watersheds where forest fire risk from brush, trees, and other organic "fuel" is deemed high. Title I authorizes a new, alternative NEPA and public involvement process for actions aimed at reducing biomass fuels on up to 20 million acres of national forests or BLM lands in the following areas: in or near a wildland-urban interface and municipal water supply systems, certain endangered species habitats, and areas affected by wind or ice storms or by insect or disease epidemics that threaten ecological health or natural resources.

In preparing environmental analyses for authorized fuel reduction projects, the law limits the number of project alternatives that the Forest Service or BLM is required to analyze. Alternatives required for consideration depend on the type and location of the project under consideration.

For its projects, the Forest Service is to develop a new "pre-decisional" review process to supplant the existing administrative appeals process. Administrative reviews must be exhausted before litigation is allowed. Lawsuits against agency projects must be filed in the district court for the area in which the project is proposed. Courts are encouraged to review cases expeditiously. Preliminary injunctions are limited to 60 days, but can be renewed, and courts are directed to balance short- and long-term impacts of action and of inaction.

These provisions have been controversial. Proponents assert that biomass fuels are at unprecedented, unnatural levels that pose serious threats to ecosystems and to humans and their structures in or near wildlands. They also argue that NEPA analysis, public participation, and legal and administrative challenges to decisions are delaying actions needed to protect people, homes, and ecosystems. Opponents argue that short-circuiting the public involvement and review process can allow timber sales and other environmentally harmful, socially undesirable activities in the guise of fire protection.

For more information on issues related to the Healthy Forests Restoration Act of 2003, see CRS Report RS22024, *Wildfire Protection in the 108th Congress*, by Ross Gorte.

**Vision 100-Century of Aviation Reauthorization Act.** The act creates an "expedited, coordinated environmental review process" applicable to the aviation project review process for airport capacity enhancement projects at congested airports, aviation safety projects, and aviation security projects. The coordinated process provides that any environmental review, analysis, opinion, permit, license, or approval issued or made by a federal agency or airport sponsor for such a project must be completed within a time period established by the Secretary of Transportation, in cooperation with the agencies that participate in the process. The coordinated process may be delineated in an MOU between the Secretary and the heads of other federal and state agencies who participate in the process.

The FAA is designated as the lead agency, pursuant to NEPA's requirements, for projects processed under the coordinated review process. The act authorizes FAA

to define the scope and content of a project's EIS and requires all participating agencies to be bound by the purpose and need and project alternatives analysis determined by the Secretary of Transportation.

**SAFETEA-LU.** The Safe, Accountable, Flexible, and Efficient Transportation Equity Act of 2005: A Legacy for Users (SAFETEA-LU) authorizes federal surface transportation programs (highway, highway safety, and transit programs) undertaken by DOT for FY2005-FY2009. With regard to streamlining NEPA, many of the provisions in SAFETEA-LU codify existing regulatory requirements, such as designating DOT as the lead agency for surface transportation projects, specifying the role of the lead and cooperating agencies, and allowing deadlines for decision making to be set. Following are key provisions of SAFETEA-LU related to streamlining:

- Establishing procedures for "Efficient Environmental Reviews for Project Decision-Making," part of which includes the collaborative development, by the lead and participating agencies, of a project's statement of purpose and need and project alternatives, including deadlines on agency comments.
- Establishing a 180-day judicial limitation on claims challenging final agency actions related to environmental requirements.
- Authorizing transportation funds to help agencies that are required to expedite the environmental review process.
- Establishing a dispute resolution process that may be initiated by a state governor or project sponsor when agencies disagree on elements of the environmental review process.
- Authorizing states to determine whether certain classes of projects may be processed as categorical exclusions.
- Authorizing state pilot programs to allow participating states to assume certain federal responsibilities for compliance with environmental laws.

For more information, see CRS Report RL33057, *Surface Transportation Reauthorization: Environmental Issues and Legislative Provisions in SAFETEA-LU (H.R. 3)*, and CRS Report RL32024, *Background on NEPA Implementation for Highway Projects: Streamlining the Process*, both by Linda Luther.

**The Energy Policy Act of 2005.** The environmental streamlining provisions in the Energy Policy Act primarily specify procedures intended to expedite the completion of federal authorizations for a variety of energy development projects. Federal authorizations include permits, special use authorizations, and approvals that may be required under a number of local, state, tribal, or federal requirements (e.g., permitting requirements under the Clean Air Act or the Clean Water Act). The act also includes several provisions intended to streamline compliance with environmental reviews under NEPA. Categories of projects or actions for which NEPA streamlining provisions are provided include the following:

- **Designation of right-of-way corridors.** Under § 368, the act requires the Secretaries of Agriculture, Commerce, Defense, Energy, and the Interior, in consultation with FERC, states, tribal or local units, affected utility industries, and other interested persons, to

CRS-18

complete, within two years of enactment, any environmental reviews required for the designation of right-of-way corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on federal land. The two-year environmental review deadline applies to corridor designations in Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. For other states, the *identification* of such corridors is required within four years of enactment (there is no reference to a deadline for environmental reviews in those states).

- **Commercial leases for oil shale and tar sands.** Under § 369, the act requires the Secretary of the Interior to complete a programmatic EIS for a commercial leasing program for oil shale and tar sands resources on public lands, with an emphasis on the most "geologically prospective" lands within each of the states of Colorado, Utah, and Wyoming. This section also establishes an interagency coordination process that designates DOI as the lead agency to coordinate all federal authorizations related to oil shale and tar sands projects.

- **Rights-of-way on public land for natural gas pipelines and "utility facilities."** Under § 372, the act requires the Secretary of Energy, in consultation with Secretaries of the Interior, Agriculture, and Defense to enter into an MOU to coordinate all applicable federal authorizations and environmental reviews relating to processing a right-of-way application. Among other provisions, the MOU must provide for an agreement among the affected federal agencies to prepare a single environmental review document to be used as the basis for all federal authorization decisions granting rights-of-way on public land for natural gas pipelines and "utility facilities" (e.g., facilities or systems for the transportation or storage of oil, natural gas, synthetic liquid fuel, and gaseous fuel; or the generation, transmission, and distribution of electric energy).

- **Siting interstate electric transmission facilities.** Under § 1221, the act amends the Federal Power Act (16 U.S.C. 824 et seq.) to establish, among other provisions, a process to coordinate federal authorizations required to site a transmission or distribution facility and designates the Department of Energy (DOE) as the lead agency responsible for coordinating all applicable federal authorizations or related environmental reviews. It also allows DOE to set deadlines related to federal authorizations and environmental reviews.

Under § 390, the act designates specific actions undertaken by the Secretary of the Interior in managing public lands or the Secretary of Agriculture in managing National Forest System lands that will be presumed to be categorical exclusions under NEPA. Those activities, if conducted pursuant to the Mineral Leasing Act for the exploration or development of oil or gas, are as follows:

CRS-19

- Individual surface disturbances of less than 5 acres, as long as the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to NEPA has been completed previously.

- Drilling an oil or gas well at a location or well pad site at which drilling has occurred previously within five years prior of the date of starting (referred to as *spudding*) the well.

- Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity (if that plan or document was approved within the previous five years).

- Placement of a pipeline in an approved right-of-way corridor (as long as the corridor was approved within the previous five years).

- Maintenance of a minor activity, other than any construction or major renovation of a building or facility.

For more information, see CRS Report RL32873, *Key Environmental Issues in the Energy Policy Act of 2005 (P.L. 109-58, H.R. 6)*, by Brent D. Yacobucci, coordinator.

**Appropriations for the Department of the Interior and Related Agencies.** Other legislation with provisions that may be considered streamlining include various Interior appropriations bills. The streamlining provisions apply to requirements to prepare a NEPA analysis for grazing permits administered by the USDA's Forest Service or the Department of the Interior's BLM. The appropriate environmental analysis, conducted either by the Forest Service or BLM, must be completed before the agency can issue or reissue a grazing permit. A significant backlog of permit applications and renewals currently exists at both agencies. Since 1999, to respond to that backlog, a provision has been included each year in the Interior appropriations bill that gives the agencies the authority to extend grazing permits and leases under their same terms and conditions until completion of NEPA compliance.[36]

The 2003 Consolidated Appropriations Resolution (P.L. 108-7, Division F, Title III, § 328) directed the Secretary of Agriculture to renew grazing permits for those

---

[36] For more information about NEPA and livestock grazing permits administered by the Forest Service and BLM, see the statement of Fred Norbury, Associate Deputy Chief, National Forest System, Forest Service, before the Senate Subcommittee on Public Lands and Forests, Committee on Energy and Natural Resources, Sept. 28, 2005, available at [http://energy.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=1500]; and the statement of Jim Hughes, Deputy Director Bureau of Land Management, before the Senate Energy and Natural Resources Committee, Subcommittee on Public Lands and Forests, Oversight of Grazing on Public Lands, June 23, 2004, available at [http://energy.senate.gov/hearings/testimony.cfm?id=1237&wit_id=1635].

CRS-20

permittees whose permits expired prior to or during FY2003. The NEPA analyses were still required to be completed on those allotments, and the terms and conditions of the renewed grazing permit were required to remain in effect until the NEPA analyses were completed. The FY2004 Interior Appropriations Act (P.L. 108-108, § 325) further directed the Secretaries of the Interior and Agriculture to renew grazing permits that expired or were transferred or waived between FY2004 and FY2008. The act also directed the Secretaries to report to Congress beginning in November 2004, and every two years thereafter, the extent to which analysis required under applicable laws is being completed prior to the expiration of grazing permits. The 2005 Consolidated Appropriations Act (P.L.108-447, Division E, Title III, § 339) specified that for FY2005 through FY2007, certain decisions made by the Secretary of Agriculture to authorize grazing would be categorically excluded under NEPA, if the following conditions apply:

- the decision continues current grazing management of the allotment;
- monitoring indicates that current grazing management is meeting, or satisfactorily moving toward, objectives in the land management plan; and
- the decision is consistent with agency policy concerning extraordinary circumstances.

The total number of allotments that may be categorically excluded under this authority may not exceed 900.

## Administrative Actions

Like legislative streamlining efforts, administrative streamlining procedures are specific to the programs undertaken by each agency. Selected examples of agency actions that may be categorized as streamlining NEPA are discussed below.

**Forest Service and BLM Timber-Related Activities.** The Forest Service and BLM issued regulations to expand their list of categorical exclusions under NEPA. Added to the list of projects deemed to have no significant environmental impact have been forest fuels reduction activities (up to 1,000 acres treated mechanically or 4,500 acres burned by prescription), rehabilitation activities for lands (up to 4,200 acres) and infrastructure affected by fires or fire suppression,[37] and "small" timber harvesting projects (up to 70 acres of live trees or up to 250 acres of dead or dying trees or to control insects of disease).[38] (These regulations were subsequently found to violate the Forest Service Appeals Reform Act [§322 of P.L. 102-381; 16 U.S.C. §1612 note] by excluding decisions from the public comment

---

[37] 68 *Fed. Reg.* 33813 (June 5, 2003).

[38] 68 *Fed. Reg.* 44598 (July 29, 2003).

CRS-21

and appeals process and for other reasons.[39])  The Forest Service also added land management plans, plan amendments, and plan revisions to its list of CEs.[40]

In addition to expanding its list of CEs, the Forest Service modified its application of "extraordinary circumstances" when determining whether a project qualifies as a CE.[41]  Previously, the rule appeared to automatically preclude an action from being categorically excluded if extraordinary circumstances were present; the new rule gives the responsible official discretion to determine whether extraordinary circumstances warrant NEPA analysis and public involvement in otherwise exempt projects.

For more information, see CRS Report RL33792, *Federal Lands Managed by the Bureau of Land Management (BLM) and the Forest Service: Issues for the 110th Congress*, coordinated by Ross W. Gorte and Carol Hardy-Vincent.

**FERC Liquified Natural Gas Facility Operations.**  On February 11, 2004, DOT, FERC, and the U.S. Coast Guard announced an interagency agreement to provide for the comprehensive and coordinated review of land and marine safety and security issues at the nation's liquefied natural gas (LNG) import terminals.  With a goal of reducing duplication of agency effort and maximizing the "exchange of relevant information related to the safety and security aspects of LNG facilities and the related marine concerns," the agreement

- designated FERC as the lead agency for environmental reviews under the NEPA and, as such, specified that it would coordinate its reviews with DOT's Research and Special Programs Administration (RSPA) and the Coast Guard;
- delineated the roles and responsibilities of each agency relative to LNG terminals and LNG tanker operations;
- stipulated that the agencies identify issues early and resolve them quickly;
- specified that the agencies share information and cooperate in the inspection and operational review of LNG facilities; and
- specified that required NEPA reviews will meet the needs of the participating agencies, as well as any other cooperating agencies, so that any necessary permits could be issued concurrently with the FERC authorizations.

The agreement also specified that FERC would notify the other participating agencies as early as possible of the start of the NEPA review of LNG facilities, including meetings with potential applicants.  FERC would then establish a schedule

---

[39] *Earth Island Institute v. Pengilly*, 376 F. Supp. 2d 994 (E.D. Cal. 2005), now under the name *Earth Island Institute v. Ruthenbeck*.

[40] 71 *Fed. Reg.* 75481 (Dec. 15, 2006).  For more information, see the USDA Forest Service website "Categorical Exclusion for Developing, Revising, or Amending Land Management Plans," available at [http://www.fs.fed.us/emc/plan_ce/index.html].

[41] 67 *Fed. Reg.* 54622 (Aug. 23, 2002).

CRS-22

for the project review process and coordinate meetings with the participating agencies.

## NEPA Task Forces

In addition to legislative and administrative activities, four NEPA task forces have been established to either conduct broad reviews of NEPA's effectiveness or address NEPA implementation at individual agencies. Three of the task forces are administrative — established within CEQ or by executive order to improve the NEPA implementation process within the context of the existing regulations. One task force was created by congressional committee with the intent of reviewing NEPA's implementation and determining if amendments to the law are needed.

**CEQ NEPA Task Force.** In 2002, CEQ formed a task force to review NEPA implementation practices and procedures and to determine opportunities to improve and modernize the process. The CEQ Task Force interviewed federal agencies; reviewed public comments, literature, and case studies; and spoke with individuals and representatives from state and local governments, tribes, and interest groups. In compiling its research, the CEQ Task Force received more than 739 stakeholder comments.

In September 2003, the CEQ Task Force released an in-depth report of its findings and recommendations.[42]  Actions to implement the Task Force's recommendations include developing guidance and several handbooks on the following:

- Integrating the NEPA process with environmental management systems.
- Coordinating NEPA with one or more major environmental consultation and coordination requirements (e.g., § 404 of the Clean Water Act, § 106 of the National Historic Preservation Act).
- Establishing CEs and applying them to a proposed action.
- Developing concise and focused EAs with adequate alternatives and mitigation.
- Collaboratively monitoring proposals that rely on the use of CEs and EAs.
- Identifying components of successful collaborative agreements.
- Using programmatic analyses and their appropriate scope, range of issues, and depth of analysis.
- Training for interested and affected parties (e.g. decision makers, tribes, nongovernment organizations, permit applicants, state and local governments, and the public).

---

[42] Both the CEQ Task Force report "Modernizing NEPA Implementation" and public comments are available on the CEQ Task Force website at [http://ceq.eh.doe.gov/ntf/index.html].

CRS-23

Interagency workgroups have been established to develop the handbooks and guidance. Their work is ongoing.[43]

**Energy Task Force.** On May 18, 2001, the President issued Executive Order 13212, *Actions To Expedite Energy-Related Projects*. Specifically, agencies were directed to expedite their review of permits or "take other actions as necessary to accelerate the completion of projects, while maintaining safety, public health, and environmental protections." The agencies were directed to take necessary actions to the extent permitted by law and regulation.

To help expedite energy-related projects, the executive order established an Interagency Task Force, housed within the Department of Energy (for administrative purposes) and chaired by the chairman of CEQ.[44] The task force includes the following members: the Secretaries of Agriculture, Commerce, Defense, Education, Energy, Housing and Urban Development, Health and Human Services, the Interior, Labor, State, the Treasury, Transportation, and Veterans Affairs; the Attorney General; the EPA Administrator; the Director of Central Intelligence; the Administrator of General Services; the Director of the Office of Management and Budget; the Chairman of the Council of Economic Advisers; the Assistant to the President for Domestic Policy; the Assistant to the President for Economic Policy; and such other heads of agencies as the CEQ Chairman may designate.

The task force was directed to monitor and assist federal agencies' efforts to expedite their permit review process or take other necessary actions to accelerate completion of energy-related projects. It was also charged with helping agencies create mechanisms to coordinate federal, state, tribal, and local permitting in geographic areas where increased permitting activity is expected.

The task force developed several MOUs for certain types of energy-related projects that incorporate common streamlining elements. For example, in May 2004, an MOU for the Coordination of Environmental Reviews for Pipeline Repair Projects was agreed to by CEQ, DOT, EPA, FERC, the DOE, DOI, the Department of Commerce, the Department of Defense, USDA, and the Advisory Council on Historic Preservation.

**Transportation Task Force.** In September 2002, Executive Order 13274, *Environmental Stewardship and Transportation Infrastructure Project Reviews*, directed federal agencies to expedite environmental reviews for transportation projects that DOT deemed a "high-priority." Among the criteria for project selection are whether the projects are of national or regional significance and whether they may be delayed by lack of federal interagency coordination. As required by the order, an Interagency Transportation Infrastructure Streamlining Task Force, chaired by the Secretary of Transportation, is to monitor work on expedited projects, review the list of suggested projects, and identify and promote policies that aid in

---

[43] For details on the workgroups as well as other activities to-date and ongoing to implement the CEQ Task Force recommendations, see [http://ceq.eh.doe.gov/ntf/implementation.html].

[44] See the Energy Task Force website at [http://www.etf.energy.gov/]. The Energy Task Force was chartered through Jan. 20, 2005.

streamlining.[45] The task force also includes members from federal agencies likely to be involved in environmental project reviews. The task force has chosen a total of 19 highway, transit, and airport projects for expedited review. A FONSI or ROD has been issued for 12 of those projects. On August 23, 2006, DOT sent letters to the Task Force Member Agencies announcing its intention to designate up to seven new priority projects under Executive Order 13274.

**House Resources Committee NEPA Task Force.** In April 2005, House Resources Committee Chair Richard Pombo announced the formation of a Task Force on Improving the National Environmental Policy Act. The Task Force, chaired by Representative Cathy McMorris, was charged with reviewing and making recommendations on potential changes to NEPA. It held six hearings in various regions of the United States and two in Washington, DC, to hear interested stakeholders' experiences with the NEPA process.

On December 21, 2005, the Task Force released a draft report with its findings and recommendations for "improving and updating" NEPA. Those recommendations include amending NEPA itself, directing CEQ to promulgate certain regulations, and directing CEQ to conduct studies into certain elements of NEPA's implementation. The final report was issued on July 31, 2006. **Table 1** (in the **Appendix**, below) summarizes the individual recommendations within each group and provides comments on how those recommendations compare to existing requirements and on selected issues associated with those recommendations.

The Task Force's charter ended at the beginning of the 110th Congress.

# Conclusion

The process of complying with and documenting compliance with all environmental statutes, regulations, executive orders, and court decisions potentially applicable to a federal project is complicated. Even those projects with no or minor environmental impacts must demonstrate that potential impacts to certain types of resources (i.e., public parkland, historic sites, wetlands, threatened or endangered species and their habitat, or property in minority neighborhoods) have been considered and that compliance with applicable requirements is documented. The perception that compliance with environmental requirements results in extensive delays and additional costs to the successful delivery of federal projects can be magnified when compliance with multiple environmental laws and regulations is required (as would likely be the case with large, complex federal projects).

CEQ provides oversight and guidance to federal agencies, but it does not enforce its regulations. The CEQ regulations were meant to be generic in nature, with individual agencies formulating procedures applicable to their own projects. This approach was taken due to the very different nature of projects and environmental impacts of the various federal agencies. Due to the nature of NEPA

---

[45] Information about Executive Order 13274 and the transportation streamlining task force is available at [http://www.fhwa.dot.gov/stewardshipeo/index.htm].

CRS-25

implementation, determining the time it takes to prepare NEPA documentation,[46] assessing the nature of delays related to NEPA, and finding remedies to those delays may be more appropriately accomplished agency by agency.

Streamlining proposals have generated a great deal of controversy among interested stakeholders (agency representatives, industry groups, environmental organizations, and others). Most stakeholders agree that the process for complying with environmental requirements applicable to complex federal projects could be implemented more efficiently. However, there is disagreement on exactly *how* streamlining best can be or should be accomplished. Stakeholders, such as industry representatives who would like to see their projects implemented more quickly, often feel that the authority of lead agencies must be strengthened to reduce delays caused by potential disagreements among agencies and that hard deadlines must be set and enforced. Environmental groups are concerned that by speeding up the compliance process and reducing emphasis on concerns of "non-lead" agencies, streamlining will have the result of weakening environmental protections. This debate is likely to continue if additional streamlining methods are proposed by agencies implementing their own NEPA procedures. The degree to which additional streamlining provisions will be included in legislation enacted by the 110th Congress is unclear.

---

[46] Including conducting necessary research, data collection, analyses, and other activities.

CRS-26

# For Additional Information

Listed by federal agency, the following websites and CRS products provide additional information (available as of August 24, 2006) regarding environmental compliance issues and agency streamlining activities.

## The U.S. Department of Agriculture

- USDA Forest Service NEPA Web page [http://www.fs.fed.us/emc/nepa/].
- CRS Report RL33792, *Federal Lands Managed by the Bureau of Land Management (BLM) and the Forest Service: Issues for the 110th Congress*, coordinated by Ross W. Gorte and Carol Hardy Vincent.

## The Department of Energy

- Department of Energy's Office of NEPA Compliance and Policy Web page [http://www.eh.doe.gov/nepa/].
- CRS Report RL32873, *Key Environmental Issues in the Energy Policy Act of 2005 (P.L. 109-58, H.R. 6)*, by Brent D. Yacobucci, coordinator.

## The Department of the Interior

- Department of the Interior, Office of Environmental Policy and Compliance, Natural Resources Management Team (NEPA Information), Web page [http://www.doi.gov/oepc/nrm.html].
- CRS Report RL33792, *Federal Lands Managed by the Bureau of Land Management (BLM) and the Forest Service: Issues for the 110th Congress*, coordinated by Ross W. Gorte and Carol Hardy Vincent.
- CRS Report RL32244, *Grazing Regulations and Policies: Changes by the Bureau of Land Management*, by Carol Hardy Vincent.
- CRS Report RL32315, *Oil and Gas Exploration and Development on Public Land*s, by Marc Humphries.

## The Department of Transportation

- FHWA's "NEPA Project Development" Web page [http://www.environment.fhwa.dot.gov/projdev/index.asp].
- FHWA's "Relevant SAFETEA-LU Provisions" Web page [http://www.environment.fhwa.dot.gov/integ/related.asp].
- CRS Report RL33057, *Surface Transportation Reauthorization: Environmental Issues and Legislative Provisions in SAFETEA-LU (H.R. 3)*, by Linda Luther.

CRS-27

## Appendix

### Table 1. The House Resources Committee NEPA Task Force Recommendations To Update NEPA

| Summary | Comments |
|---|---|
| **Recommendation Group 1 — Addressing delays in the process** | |
| 1.1: Amend NEPA to change "major federal action" to "significant federal action"; amend 40 C.F.R. 1508.8 to reflect this change (this regulatory citation is likely listed incorrectly in the report; "major federal action" is defined under 40 C.F.R. 1508.18). | The Task Force asserts that the undefined term "major" leads to inconsistent application of the requirement to prepare an EIS. As it is currently written, NEPA requires the preparation of a detailed statement of environmental impacts for all "major federal actions significantly affecting the quality of the human environment." CEQ regulations (40 C.F.R. § 1508.18) define a "major federal action," in part, as "actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly." Under current regulations, the word "major" does not refer to the size or scope of the action, but the significance of the action's impacts. In the 1970s, the term "major federal action" was litigated extensively and is now fairly well-settled to be a one-step process. It is likely that new terminology would also be litigated. |
| | CEQ has recommended that detail regarding what constitutes a major federal action significantly affecting the environment should be specified in individual agency NEPA procedures. However, most agencies have not done so. |

CRS-28

| Summary | Comments |
|---|---|
| 1.2: Require CEQ to promulgate regulations that would require EISs be completed within 18 months and EAs within nine months; any analyses not concluded within that time frame will be considered completed. Exceptions may be made by CEQ for not more than six months for EISs or three months for EAs. | There is currently no specific time frame for the completion of NEPA documentation. CEQ regulations (40 C.F.R. § 1501.8) specify both requirements and recommendations with regard to time limits. In part, those regulations state that CEQ has "decided that prescribed universal time limits for the entire NEPA process are too inflexible. Federal agencies are encouraged to set time limits appropriate to individual actions." The regulations further specify that time limits shall be set if requested by an applicant, provided that the limits are consistent with the purposes of NEPA and other essential considerations of national policy. Further, the regulations specify that when setting time limits, the agency may consider such factors as the potential harm for the environment; the size of the proposed action; the degree of public need for the action, including consequences of delay; the degree to which relevant information is known and if not known the time required for obtaining it; and other time limits imposed on the agency by law, regulations, or executive order. |
| Amend NEPA to add a policy expressing the need for timely completion of NEPA documents. | One of the factors that influence the timing of an EIS or EA is the time it takes to prepare analyses required under separate statutory authority. For example, to complete an EIS, a lead agency may be required have analyses by the Department of the Interior's U.S. Fish and Wildlife Service (FWS) under certain provisions of the Endangered Species Act, or from the U.S. Army Corps of Engineers under certain provisions of the Clean Water Act. The report does not address whether additional funding will be provided to support agencies required to provide expedited analysis for given federal actions. |

CRS-29

| Summary | Comments |
|---|---|
| 1.3: Require CEQ to promulgate regulations that would "create unambiguous criteria" to differentiate between CEs, EAs, and EISs. The criteria should focus on the "significance" of an action, consistent with existing regulation and case law. | Currently, individual agencies are responsible for developing criteria to determine whether a proposed action will require a CE, EA, or EIS. Criteria that would be applicable to all types of federal actions, undertaken by all federal agencies, may be difficult. For example, the Department of the Interior would likely need to use different criteria to determine whether an oil and gas exploration project has significant environmental impacts, compared with the criteria used by the Department of Housing and Urban Development in determining the environmental impacts of a federal housing project. |
| Amend NEPA to include a policy statement that the type of NEPA documentation prepared for a given federal action will be based on the environmental impacts of that action, not on an agency's effort to reduce the potential for litigation (e.g., producing an EIS when an EA is appropriate). | |
| 1.4: Amend NEPA to codify CEQ regulations (40 C.F.R. § 1502.9(c)(1)(i) and (ii)) regarding requirements for preparing supplemental EISs. | The cited regulations state that a supplemental EIS shall be prepared if the agency makes substantial changes in the proposed action that are relevant to environmental concerns, **or** if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. The Task Force recommendations appear to require that both, instead of either, criteria be met to require preparation of a supplemental EIS.

Specifically excluded from the recommended statutory amendment is 40 C.F.R. § 1502.9(c)(2), which states that agencies "may also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so." The recommendations do not appear to remove this regulatory requirement. |

CRS-30

| Summary | Comments |
|---|---|
| **Recommendation Group 2 — Enhancing public participation** | |
| 2.1: Require CEQ to promulgate regulations that would require agencies to evaluate comments based on "the impact of the entity submitting them." Agencies would be directed to develop a scoring mechanism "consistent with their mission." | There are currently no provisions in NEPA or the CEQ regulations to put more weight on comments received by one group or agency over another. CEQ regulations (40 C.F.R. § 1503) specify requirements for inviting and responding to comments on the draft EIS. Any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in the action or which is authorized to develop and enforce environmental standards must comment. The lead agency is also required to request comments from appropriate state, local, and tribal agencies; the public, particularly those persons or organizations who may be interested in or affected by the action; any agency that has requested that it receive EISs on similar actions; and the applicant (if there is one). The regulations specify that the lead agency has a duty to assess and consider comments and respond to them. However, the agency is not necessarily required to change its decision based on comments received.<br><br>In the narrative portion of the Task Force report, it is explained that the intent of this recommendation is to assign a value to comments from stakeholders most directly affected by a particular action. If enacted, any mechanism used to "score" comments or determine which stakeholder are most directly affected by an action would likely be the subject of litigation. For example, it may be difficult to assign a value to the following parties affected by a highway construction project: property owners whose land must be bought to begin construction; nearby residents affected by increased noise, or highway users expected to benefit from improved traffic flow. |
| 2.2: Amend NEPA to codify CEQ's provision that EISs normally be 150 pages and no more than 300 pages for complex projects. | This proposed amendment is currently in the CEQ regulations at 40 C.F.R. § 1502.7, as noted in the task force recommendation. |

CRS-31

| Summary | Comments |
|---|---|
| **Recommendation Group 3 — Better involvement for state, local, and tribal stakeholders** | |
| 3.1: Require CEQ to promulgate regulations that would allow state environmental review requirements, which are functionally equivalent to NEPA's, to satisfy NEPA requirements. | CEQ regulations (40 C.F.R. § 1506.2) specify procedures to eliminate duplication with state and local procedures. Among other requirements, the regulations specify that "Where State laws or local ordinances have [EIS] requirements in addition to but not in conflict with those in NEPA, federal agencies shall cooperate in fulfilling these requirements as well as those of federal laws so that one document will comply with all applicable laws." The CEQ regulations are silent on tribal NEPA procedures. The recommendations also do not address them. |
| **Recommendation Group 4 — Addressing litigation issues** | |
| 4.1: Amend NEPA to create a policy statement regarding litigation that would recognize the role of litigation as an enforcement tool, but point out that it should be used only in limited cases where there has been a clear demonstration that an agency made a decision without using the best available information and science; an aggrieved party was involved throughout the NEPA process in order to have standing to sue; and that a 180-day statute of limitations be established. | What constitutes best available information and science for a given action would likely differ from project to project. There are currently no definitions for such terms in CEQ regulations or from existing case law, and thus they would likely be litigated if implemented.

CEQ regulations also specify public involvement criteria for actions requiring an EIS (40 C.F.R. § 1506.6) and require agencies to involve environmental agencies, applicants, and the public, *to the extent practicable*, in the preparation of an EA (40 C.F.R. § 1501.4(b)). There are no public involvement criteria specified for CEs. If a party to a citizen suit must demonstrate that it was involved throughout the NEPA process, agencies may be required to develop specific public involvement criteria for EAs and CEs.

Neither NEPA nor the CEQ regulations specify criteria regarding standing or specify a statute of limitation on citizen suits. Decisions regarding standing are generally made by the courts based on constitutional or judicial grounds; with regard to a time limits on legal actions, courts have turned to the statute of limitations used for judicial review under the Administrative Procedure Act (28 U.S.C. § 2401), which mandates broadly that civil actions against the United States must be filed within six years after the right of action first accrues. |
| Require CEQ to promulgate regulations that would clarify how the policy declaration would be implemented. | |

CRS-32

| Summary | Comments |
|---|---|
| 4.2: Amend NEPA to require CEQ to provide litigation guidance to agencies; require CEQ to become a clearinghouse for monitoring and analyzing the effects of court decisions. | CEQ historically performed this function and does so currently, as resources allow. |
| **Recommendation Group 5 — Clarifying alternatives analysis** | |
| 5.1: Amend NEPA to require analysis of only "reasonable alternatives." | Current CEQ regulations (40 C.F.R. § 1502.14) specify that all "reasonable alternatives" to a proposed action be considered. CEQ guidance interprets reasonable alternatives to include "those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant."[a] |
| Require CEQ to promulgate regulations that would specify that "reasonable alternatives" required to be analyzed should include only those that are economically and technically feasible (as supported by feasibility and engineering studies). | With regard to the proposed regulatory requirement regarding feasibility and engineering studies, it is unclear whether the preparation of such studies would be an additional requirement under NEPA. |
| | In evaluating and selecting its final alternative, NEPA does not require the agency to select the least environmentally harmful alternative (e.g., NEPA would not require an agency to select a more costly project alternative even though it has less significant environmental impacts compared to another). |

CRS-33

| Summary | Comments |
|---|---|
| 5.2: Amend NEPA to specify that alternative analysis must include a consideration of the environmental impacts of the "no action alternative" and require an agency to reject this alternative "if, on balance, the impacts of not undertaking a project or decision would outweigh the impacts of executing the project or decision." | The task force report appears to interpret the existing regulations as requiring agencies to only "list" the no action alternative in an EIS, with no corresponding analysis. However, CEQ regulations (40 C.F.R. § 1502.14) and CEQ guidance *do* require analysis of a "no action," or "no change" alternative. CEQ guidance specifies that such analysis is required to demonstrate the environmental impacts of continuing with the present course of action or taking no action. Currently, agencies may use the no action alternative analysis as a baseline against which they can measure the impacts of other alternatives under consideration.

This recommendation appears to add a substantive element to NEPA implementation — it species criteria under which an alternative must be rejected. As NEPA has been interpreted, it is a tool to assist an agency in the decision-making process, but it does not dictate the outcome of that process. For example, NEPA does not require an agency to elevate environmental concerns above others. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other benefits outweigh the environmental costs and moving forward with the action. That is, an agency is not currently required by NEPA to choose or reject a project alternative based on its environmental impacts. |
| 5.3: Require CEQ to promulgate guidance to make environmental mitigation proposals binding on the agency recommending the action.

Amend NEPA to "recognize that mitigation proposals that a [sic] utilized as part of the decision-making process must be implemented." | CEQ regulations require an EIS or ROD to include a discussion or analysis of measures that may be taken to mitigate the environmental impact of a proposed alternative (40 C.F.R. §§ 1502.14(f) and 1502.16(h)). However, it is not required that mitigation measures discussed in the NEPA documentation actually be implemented, only that the environmental impacts of an action be considered if such measures were implemented.

CEQ guidance is not enforceable. It is unclear whether CEQ guidance directing agencies to require a "mitigation guarantee" would be enforceable. |

CRS-34

| Summary | Comments |
|---|---|
| **Recommendation Group 6 — Better federal agency coordination** | |
| 6.1: Require CEQ to promulgate regulations that would encourage more consultation with interested stakeholders. Those regulations "will focus on creating a mechanism that includes all appropriate stakeholders with particular emphasis on not including 'fringe' elements that would only seek to delay the decision-making process." | Agency and public participation requirements are currently specified in CEQ regulations for projects requiring an EIS. When determining the scope of issues to be addressed and identifying the significant issues related to a proposed actions, CEQ regulations (40 C.F.R. § 1501.7) require agencies to "invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds)." CEQ regulations (40 C.F.R. § 1506.6) also specify that agencies must "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" and how such efforts should be made.<br><br>The CEQ regulations (40 C.F.R. 1501.4(b)) specify that if an action does not require an EIS, the agency shall involve environmental agencies, applicants, and the public, *to the extent practicable*, in preparing EAs. Otherwise, public participation requirements for projects requiring an EA or CE are left largely to the discretion of the lead agency. It is unclear from the task force report whether the recommendation would apply to EAs and CEs.<br><br>It is likely that attempts to define "fringe elements" in the NEPA process or to identify a stakeholder as one that is seeking to delay the decision-making process would be litigated. |
| 6.2: Amend NEPA to clarify the responsibility of lead agencies to charge that agency with "the responsibility to develop a consolidated record for the NEPA reviews, EIS development, and other NEPA decisions." | With regard to EIS development, current CEQ regulations (40 C.F.R. § 1508.16) define "lead agency" as the agency or agencies preparing or having taken primary responsibility for preparing an EIS.<br><br>The task force report does not include details regarding what constitutes "other NEPA decisions" for which a lead agency would have responsibility. |

CRS-35

| Summary | Comments |
|---|---|
| **Recommendation Group 7 — Additional authority for CEQ** | |
| 7.1: Amend NEPA to direct CEQ to "control NEPA related costs" and provide CEQ with statutory authority to do so. Direct CEQ to bring recommendation to Congress for cost ceiling policies. | There are currently few data on NEPA-related costs. They may be difficult to determine because it is difficult to isolate costs or project expenses associated *only* with NEPA. For example, environmental analyses may be required pursuant to separate statutory requirements (e.g., the Clean Water Act, Clean Air Act, Endangered Species Act). |
| **Recommendation Group 8 — Clarify the meaning of "cumulative impacts"** | |
| 8.1: Amend NEPA to clarify how agencies would evaluate the effect of past actions for assessing cumulative impacts. Add a provision to establish that an agency's "assessment of existing environmental conditions is the appropriate methodology to account for past actions." | CEQ regulations (40 C.F.R. 1508.7) define cumulative impacts as those that "can result from individually minor but collectively significant actions taking place over a period of time." Such impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.<br><br>In looking at the impact of past actions, CEQ guidance[b] specifies that a review of such actions is required to the extent that the review informs agency decision making. The analysis of past actions may identify trends that could influence the effects of current actions. CEQ's interpretation is based, in part, on previous court decisions. Changes to that interpretation would likely be litigated as well. |

CRS-36

| Summary | Comments |
|---|---|
| 8.2: Require CEQ to promulgate regulations that would modify existing regulations (40 C.F.R. 1508.7) to clarify which types of future actions would be considered "reasonably foreseeable" when conducting cumulative impact analysis. The regulations should "make certain that speculative actions are not 'reasonable' within the context of cumulative impacts." | CEQ's interpretation of what constitutes "reasonably foreseeable" future actions is based, in part, on previous case law. Changes to the regulatory definition would likely be litigated. Further, new terminology such as "speculative actions" would likely be litigated. |
| Amend NEPA to instruct federal agencies to employ "practical considerations to assesses the practicality of a future action's impacts on the environment." | |
| **Recommendation Group 9 — Studies** | |
| 9.1: Require CEQ to conduct studies to determine or evaluate: how NEPA interacts with other federal environmental laws; the amount, if any, of duplication and overlap in the environmental evaluation process; and potential methods to address overlaps among federal laws. | The Task Force recommendations do not discuss how much funding, if any, CEQ would receive to conduct these studies. |

CRS-37

| Summary | Comments |
|---|---|
| 9.2: Require CEQ to conduct a study of federal agency NEPA staffing issues. | The Task Force recommendations do not discuss how much funding, if any, CEQ would receive to conduct these studies. |
| 9.3: Require CEQ to conduct a study of NEPA's interaction with state "mini-NEPAs." | The Task Force recommendations do not discuss how much funding, if any, CEQ would receive to conduct these studies. |

**Source:** Congressional Research Service (CRS) review of recommendations in the House Resource Committee's Task Force on Improving the National Environmental Policy Act, *Initial Findings and Draft Recommendations*, Dec. 21, 2005

a. Council on Environmental Quality, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 *Fed. Reg.* 18,026 (Mar. 23, 1981), available at [http://ceq.eh.doe.gov/nepa/regs/40/40P1.htm], as of Aug. 24, 2006.

b. Council on Environmental Quality, "Guidance on the Consideration of Past Actions in Cumulative Effects Analysis," June 24, 2005 available at [http://ceq.eh.doe.gov/nepa/regs/guidance.html], as of Aug. 24, 2006.

EXHIBIT "B"

Kathryn Brack Morrow (NM Bar No. 24739)
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003
(307) 632-5105 Telephone
(307) 637-3891 Facsimile

*Attorney for Proposed Defendant-Intervenors*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| **FOREST GUARDIANS and SINAPU,** | No. 1:07-cv-01043-JB-ACT |
| Plaintiffs, | |
| v. | **MOTION TO INTERVENE ON BEHALF OF THE NEW MEXICO CATTLE GROWERS' ASSOCIATION, THE NEW MEXICO FEDERAL LANDS COUNCIL, AND THE COALITION OF ARIZONA/NEW MEXICO COUNTIES FOR STABLE ECONOMIC GROWTH** |
| **UNITED STATES FOREST SERVICE,** | |
| Defendant, | |
| and | |
| **NEW MEXICO CATTLE GROWERS' ASSOCIATION, NEW MEXICO FEDERAL LANDS COUNCIL, and COALITION OF ARIZONA/NEW MEXICO COUNTIES FOR STABLE ECONOMIC GROWTH,** | |
| Proposed Defendant-Intervenors. | |

COME NOW the proposed Defendant-Intervenors, New Mexico Cattle Growers'

Association, New Mexico Federal Lands Council, and the Coalition of Arizona/New

Mexico Counties for Stable Economic Growth, by and through their undersigned

attorney, Kathryn Brack Morrow of the Budd-Falen Law Offices, LLC, and hereby

request the Court's leave to intervene as of right under Fed.R.Civ.P. 24(a) or, in the

alternative, by the Court's permission under Fed.R.Civ.P. 24(b). Proposed Defendant-Intervenors represent the grazing permittees whose grazing permits and allotments are implicated by this Complaint. Filed on even date herewith, the proposed Defendant-Intervenors submit the attached Declarations and Memorandum in Support of the proposed Defendant-Intervenors' Motion to Intervene and a proposed Answer to Plaintiffs' Second Amended Complaint.

The proposed Defendant-Intervenors, on behalf of their members, request permission to intervene as of right under Fed.R.Civ.P. 24(a) for the following reasons: (1) The proposed Defendant-Intervenors' application to intervene is timely, (2) the proposed Defendant-Intervenors have a significantly protectable interest at stake, (3) the disposition of this action will, as a practical matter, impair or impede the proposed Defendant-Intervenors' ability to protect their interests, and (4) the proposed Defendant-Intervenors' interests are not adequately represented by the existing parties. In the alternative, the Court should grant the proposed Defendant-Intervenors' request for permissive intervention under Fed.R.Civ.P. 24(b), because the proposed Defendant-Intervenors' claims and defenses share substantial questions of law and fact with the main action and the proposed Defendant-Intervenors will be adversely affected if the Plaintiffs prevail.

On November 30, 2007, proposed *pro hac vice* counsel for the proposed Defendant-Intervenors, Brandon L. Jensen, conferred with counsel for the Federal Defendants, Andrew A. Smith, regarding the Defendant-Intervenors' Motion to Intervene. The Federal Defendants take no position with regard to the proposed

Defendant-Intervenors' Motion to Intervene. Similarly, on November 29, 2007, proposed *pro hac vice* counsel for the proposed Defendant-Intervenors, Brandon L. Jensen, conferred with counsel for the Plaintiffs, Jay Tutchton, regarding the proposed Defendant-Intervenors' Motion to Intervene. The Plaintiffs oppose the proposed Defendant-Intervenors' Motion to Intervene.

RESPECTFULLY SUBMITTED this 28th day of February, 2008.

/s/ Kathryn Brack Morrow
Kathryn Brack Morrow (NM Bar No. 24739)
Budd–Falen Law Offices, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003–0346
(307) 632–5105 Telephone
(307) 637–3891 Facsimile

kathryn@buddfalen.com

*Attorney for Proposed Defendant-Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2008, I filed the Motion to Intervene on Behalf of the New Mexico Cattle Growers' Association, the New Mexico Federal Lands Council, and the Coalition of Arizona/New Mexico Counties for Stable Economic Growth through the CM/ECF system, which caused the following parties or counsel to be served by electronic means:

Andrew A. Smith, Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
201 Third Street, N.W., Suite 900
Post Office Box 607
Albuquerque, New Mexico 87102
andrew.smith@usdoj.gov

Jan Elizabeth Mitchell
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87103
jan.mitchell@usdoj.gov

Melissa Hailey
Forest Guardians
312 Montezuma Ave., Suite A
Santa Fe, New Mexico 87501
mhailey@fguardians.org

James Tutchton
Forest Guardians
1536 Wynkoop St., Suite 302
Denver, Colorado 80202
jtutchton@fguardians.org

/s/ Kathryn Brack Morrow
Kathryn Brack Morrow

-4-

EXHIBIT "C"

UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

<u>Clerk's Minutes</u>

**Before the Honorable James O. Browning**

<u>**CASE NO.**</u>  CIV 07-1043 JB/ACT          <u>**DATE:**</u>  April 30, 2008

<u>**TITLE:**</u>    *Forest Guardians v. United States Forest Service*

<u>**COURTROOM CLERK:**</u>  K'Aun Sanchez    <u>**COURT REPORTER:**</u>  Danna Everett

<u>**COURT IN SESSION:**</u>  10:07 a.m.        <u>**COURT IN RECESS:**</u>  12:26 p.m.

<u>**TYPE OF PROCEEDING:**</u>  Motion Hearing (see below)

<u>**COURT'S RULINGS/DISPOSITION:**</u>  Motion to Intervene on Behalf of the New Mexico Cattle Growers' Association, the New Mexico Federal Lands Council, and the Coalition of Arizona/New Mexico Counties for Stable Economic Growth [17] - **GRANTED**

<u>**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**</u>  Court

<u>**ATTORNEYS PRESENT FOR PLAINTIFF(S):**</u>    <u>**ATTORNEYS PRESENT FOR DEFENDANT(S):**</u>

 Jay Tutchton                  Andrew Smith, AUSA

 Melissa Hailey                Karen Budd-Falen (for Intervenor)

<u>**PROCEEDINGS:**</u>

**Court in Session:      10:07 a.m.**

**Court:**  Calls case.  Counsel enter appearances.  Nicole Rosmarino, on behalf of Forest Guardians, present.  Caren Cowen, Executive Director of New Mexico Cattle Growers Association, present.

**10:09 a.m.  Ms. Budd -Falen:**  Argues in support of motion.

**10:44 a.m.  Mr. Smith:**  Govt. takes no position on motion - comments on cases other Judges in this district have handled.

**10:57 a.m.  Mr. Tutchton:**  Argues in opposition to motion.

**11:38 a.m.  Mr. Smith:**  Addresses Court further.

**11:47 a.m.  Ms. Budd-Falen:**  Argues in reply in further support of motion.

**11:58 a.m.  Court:**  With regard to intervention as of right, does not believe there is question that application to intervene is timely - it is more a question as to whether is premature, so believes

that is easily satisfied here.  Argument and Court's analysis have focused on whether intervenors have an interest that rule 24(a) recognizes – will issues short opinion and order - believe that *Utah Association of Counties* and *San Juan County* call in to question 9th Circuit rule and Judge Vazquez's order on NEPA cases.  Do believe intervenors have protectable interest as defined by the rules and the two 10th Circuit cases.  Question is should this Court qualify their permissive right in some way because their interest becomes stronger later in the case, but believe they have a protectable interest in the first part of the case.  Certainly and concededly have interest at remedy stage, but believe when the Court broadens the definition of interest to include what the 10th Circuit has discussed in *Utah Association of Counties* and *San Juan County* that would also include their ability to discuss the NEPA violation here.  Agree with Plaintiff's counsel, do not see way to distinguish Judge Vazquez's case except to say that think if she had the benefit of *Utah Association of Counties* and *San Juan County* she might have reached a different result. Concerned would be unduly restricting the broad scope of rule 24(a) if this Court were to require, even for just NEPA cases, the intervenor to establish standing to be a party in the case - believe 10th Circuit has indicate is not direction wants Court to go.  Particularly persuaded by situation in *Utah Association of Counties* and *San Juan County* where the district court limited the intervention of the environmental groups and the 10th Circuit said that the court had mis-perceived the application of rule 24 - think would be doing the same thing if were to narrow the definition of interest as must as 9th Circuit has done.  Do believe disposition of this action could as a practical matter impede or impart the Intervenors ability to protect their interests and while the Intervenors have not been able to articulate quite as clearly as the Court would like at this state of how the Govt. is not going to adequately argue this, can see enough distance between their position - both from a theoretical and practical standpoint - and the standard is not high enough for the fourth requirement, but think that element is established.  So believe the Intervenors have established all four elements for rule 24(a).  Also believe that even if the Court were not to find that this is intervention as of right that the Court does believe that the Intervenors defenses and arguments share substantial questions of law and fact with the action here and that their interests will be adversely affected if the Plaintiffs prevail in this case, so would grant permissive intervention as well.  Not sure will include in opinion, and need to look at *San Juan* further, but concerned about rule 24 in terms of intervention in the cases rather than into phases - understand may have flexibility to limit intervention based upon certain claims and certain phases of the case even after *San Juan*, but do think that the limitation of interest here to just harm, as Plaintiffs have advance, is more narrow than what the Court's understanding of rule

24(a)(2) to be, so think even if the Court has that flexibility to limit it to claims, believe the Intervenors have established that they have an interest in the NEPA violation stage of this case and not just in the harm and remedial stages of the case. Grants motion and will issue short opinion allowing the intervention.

**Mr. Tutchton:** Raises with Court question regarding whether Intervenors can intervene on second claim.

**Court:** Asks if Intervenor intends to comment on count 2? Whether Plaintiffs ability to appeal within the Forest Service itself?

**Mr. Smith:** Case being referred to is *Earth Island*. Not same grazing reg as here. Discusses case further w/Court. Are 26 administrative records here because 26 different grazing decisions are being challenged that occurred over a period of a couple years. In process of working with client to avoid duplication.

**Ms. Budd-Falen:** Have not discussed claim 2 with client - grazing permittees are in different positions with regard to appeal under the Forest Service regulations than are her clients, who are counties. Counties are in same position as Forest Service with regard to whether they can appeal categorical exclusions or not, so clients are kind of conflicted in terms of count 2. Requests permission to confer with client and issue letter stating position.

**Court:** Fine.

**Ms. Budd-Falen:** Will do tomorrow morning.

**Court:** Should talk with counsel to make sure fair on page limits.

**Ms. Budd-Falen:** Will do so.

**Mr. Tutchton:** Reminds Court motion to amend caption is pending.

**Court:** Opposed?

**Mr. Tutchton:** Not by intervenors

**Mr. Smith:** Govt. takes no position - only concern was that there are 2 groups that apparently merged in some way and legally does that mean that is a different group or is it the same group that can carry on the same rights as the earlier group?

**Mr. Tutchton:** Not a corporate lawyer, does not know if is true merger - told interests and people of both groups are now one - submitted appropriate paperwork with Secretary of State's office. It is a new corporation, but is non-profit - Wild Earth Guardians has retained the tax i.d. number that belonged to Forest Guardians.

**Mr. Smith:** As a practical matter, do not see how would change anything. Do not oppose change.

**Ms. Budd-Falen:**  Do not oppose motion.

**Ms. Hailey:**  Represents did submit form of order.

**Court:**  Rather than changing caption, perhaps should exercise powers under rule 21 regarding dropping and adding parties.  Will add Wild Earth Guardians and drop the other two.

**Mr. Smith:** Fine.

**Court:**  Instructs counsel to submit an order.

Counsel indicate there is nothing further.

**Court:**  Will be expecting letter from Ms. Budd-Falen after talking to clients and Mr. Tutchton about page limits.

**Court:**  Asks if need to set ISC?

**Mr. Smith:**  No.  Parties will talk and will submit motion and order after agree on date to submit administrative record.

**Mr. Tutchton:**  Want order setting ISC - does not believe administrative record will get filed until ISC is set.

**Court:**  Not sure normal Initial Scheduling Order will be helpful - concerned will put parties to unnecessary work.

**Mr. Tutchton:**  Just  want a date for the filing of the administrative record.

**Court:**  Want scheduling conference so the deadlines can be set?

**Mr. Smith:**  Wants to just talk and if not able to work something out will let know.

**Mr. Tutchton:**  Happy to confer w/opposing counsel.

**Court:**  Does not want case to go into black hole.

**Mr. Tutchton:**  Want scheduling conference in a month.  Believe already have record as requested it through FOIA.

**Court:**  Will set something in late May or early June.

**Court in recess: 12:26 p.m.**