JEFFREY R. CHANIN (CSB # 103649)
KLAUS H. HAMM (CSB # 224905)
WARREN A. BRAUNIG (CSB # 243884)
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA 94111
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188
Email: jchanin@kvn.com
          khamm@kvn.com
          wbraunig@kvn.com

LAUREN M. RULE (ISB # 6863), *pro hac vice*
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
Telephone:    (208) 342-7024
Facsimile:    (208) 342-8286
Email: lrule@advocateswest.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; NATURAL RESOURCES DEFENSE COUNCIL; CENTER FOR BIOLOGICAL DIVERSITY; CALIFORNIA TROUT; ENVIRONMENTAL PROTECTION INFORMATION CENTER; KLAMATH SISKIYOU WILDLANDS CENTER; LOS PADRES FOREST WATCH; SIERRA FOREST LEGACY; SEQUOIA FORESTKEEPER; GRAND CANYON TRUST; UTAH ENVIRONMENTAL CONGRESS; RED ROCK FORESTS; and OREGON NATURAL DESERT ASSOCIATION, <br><br>                         Plaintiffs, <br><br>        vs. <br><br> U.S. FOREST SERVICE, <br><br>                         Defendant. | Case No.: C 08-01460 PJH <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT** <br><br> **[Administrative Procedure Act Case]** |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

## I.    INTRODUCTION

1.    Plaintiffs challenge Defendant U.S. Forest Service's widespread and unlawful practice across numerous forests in the western United States of reauthorizing livestock grazing on federal land without conducting the proper environmental review under the National Environmental Policy Act ("NEPA").   The Forest Service has thereby eliminated meaningful public input and thorough environmental analysis for decisions that adversely impact imperiled species, important fish and wildlife habitat, wilderness areas, and other valuable natural resources.

2.    Livestock grazing adversely impacts ecological communities such as aquatic and riparian areas, meadows, sagebrush ecosystems, aspen stands, and grass and forb communities, all of which are critically important habitat for fish and wildlife.  Cows and sheep trample and eat vegetation, compact soils and cause erosion, and degrade water quality.  When livestock degrade this habitat, it impairs the ecological functioning or survival of many fish, wildlife and plant species.

3.    Because grazing causes so many adverse environmental impacts, NEPA normally requires the Forest Service to complete an environmental assessment ("EA") or environmental impact statement ("EIS") before issuing or renewing ten-year grazing permits.  Such review provides for a thorough examination of the impacts of livestock grazing on public land resources as well as an opportunity for the public to comment on and appeal grazing decisions.

4.    At the behest of the Forest Service, however, Congress passed an appropriations rider in 2005 that allows the agency categorically to exclude grazing reauthorizations from NEPA review under certain narrow circumstances.  Specifically, the Forest Service may categorically exclude a decision only if: (1) it does not increase grazing; (2) the Forest Service has monitoring data showing that the grazing is meeting or satisfactorily moving toward applicable ecological objectives; and (3) the Forest Service has demonstrated there will be no significant impacts to certain special resources such as imperiled species, wetlands, and wilderness areas.

5.    Yet the Forest Service has routinely and improperly used this rider as a blank

1

1    check, frequently relying on it to reauthorize grazing without any EA or EIS even when it has not

2    met the rider's requirements, and in fact when grazing will cause further degradation of

3    resources.  Plaintiffs challenge 138 decisions involving 25 forests across the West where the

4    Forest Service reauthorized grazing on 386 allotments based on an abuse of the appropriations

5    rider.  There are clear patterns to these abuses.  For instance, the Forest Service repeatedly has

6    used the categorical exclusion shortcut to "reauthorize" grazing where no grazing has been

7    taking place, or to dramatically increase its intensity. The agency also has categorically excluded

8    many grazing allotment reauthorizations even in the complete absence of monitoring data to

9    demonstrate that grazing is not preventing the achievement of applicable ecological objectives—

10    particularly data about grazing's impact on sensitive and biologically rich areas and the species

11    that depend on them.  And in numerous decisions the Forest Service acknowledged the presence

12    of special resources, such as endangered, threatened, or sensitive fish, wildlife, and plant species,

13    but failed to demonstrate that grazing is not harming these resources.

14         6.         Further, for many of the grazing allotments at issue, the Forest Service either has

15    never conducted any site-specific environmental analysis under NEPA to assess the impacts from

16    livestock grazing, or the only NEPA analysis completed is now 20 to 40 years old—well before

17    scientists recognized many of the adverse effects from grazing, including to species that are now

18    known to be imperiled.  By using the rider quickly to renew grazing permits the Forest Service is

19    trying to escape in-depth environmental analysis and public comment on, or appeal of, its

20    decisions on these allotments, many of which are thousands of acres in size and suffer from

21    significant documented degradation.  Because these decisions do not meet the requirements of

22    the rider, and will have significant adverse impacts on the environment, Defendant Forest

23    Service has violated NEPA by failing to conduct the appropriate environmental analysis.

24         7.         Plaintiffs thus seek judicial review and relief reversing and setting aside the

25    decisions challenged herein, and further declaratory and injunctive relief to prevent the Forest

26    Service from continuing to exempt from NEPA decisions that do not meet the requirements of

27    the appropriations rider.

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

## II.    JURISDICTION AND VENUE

8.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 et seq.; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; the FY 2005 Consolidated Appropriations Act, Pub. L. No. 108-447, Sec. 339; and the Equal Access to Justice Act, 28 U.S.C. § 2214 et seq.  An actual, justiciable controversy now exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, a substantial part of the public lands and resources at issue are located within this district, and Plaintiffs California Trout and Environmental Protection Information Center reside in this district.

10.    The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## III.    INTRADISTRICT ASSIGNMENT

11.    Assignment of this case to the San Francisco or Oakland Division is proper because a substantial part of the events or omissions that give rise to the claims herein occurred in Lake County and a substantial part of the property at issue is located in Lake County.

## IV.    PARTIES

12.    Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West.  WWP has offices in Idaho, Utah, Wyoming, Arizona, and California and more than 1,300 members located throughout the United States.  Through agency proceedings, public education, scientific studies, and legal advocacy conducted by its staff, members, volunteers, and supporters, WWP is actively engaged in protecting and improving riparian areas, water quality, fisheries, wildlife, and other natural resources and ecological values of western watersheds.  WWP has participated in

3

422276.01

1  decision-making processes for livestock grazing on Forest Service lands across the West,

2  including most of the national forests at issue here.  WWP, and its staff and members, use and

3  enjoy the wildlife, public lands, and other natural resources on national forest lands, including

4  the forests at issue here, for many health, recreational, scientific, spiritual, educational, aesthetic,

5  and other purposes.  WWP and its staff and members pursue activities such as hiking, fishing,

6  hunting, wildlife viewing, biological and botanical research, photography, and spiritual renewal

7  on Forest Service lands.  Livestock grazing that degrades these lands and their natural resources

8  impairs the use and enjoyment of these forests by WWP staff and its members.

9     13.  Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-

10  profit environmental organization that uses law and science to protect the earth's wildlife and

11  wild places and to ensure a healthy environment for all living things.  NRDC has more than

12  530,700 members nationwide and offices across the country, with regional offices in San

13  Francisco and Los Angeles, California.  Through its nationwide membership and staff of

14  lawyers, scientists, and other environmental specialists, NRDC takes a leading role on a diverse

15  range of federal land and resource management issues, including livestock grazing.  NRDC has

16  long been involved in efforts to improve the Forest Service's management of livestock grazing

17  on national forest lands across the West, including the forests that are the subject of this

18  litigation.  NRDC's staff and members use and enjoy these forests and their resources for many

19  purposes, such as hiking, fishing, hunting, wildlife viewing, solitude, aesthetic appreciation,

20  scientific study, photography, spiritual renewal, and other similar purposes.  Livestock grazing

21  that degrades fish and wildlife habitat and other natural resources on the national forests at issue

22  here impairs the use and enjoyment of these areas by NRDC staff and its members.

23     14.  Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a non-profit

24  corporation dedicated to the preservation, protection, and restoration of biodiversity, native

25  species, ecosystems, and public lands throughout the United States.  CBD has offices across the

26  United States, including offices in California, Arizona, and Oregon, and more than 40,000

27  members nationwide.  CBD uses science, law, advocacy, and public outreach and education to

28  protect the lands, water, and climate that native species need to survive in order to protect

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

1   biodiversity, particularly those species on the brink of extinction.  CBD actively engages in

2   activities throughout the western United States to protect native species and their habitat from

3   livestock grazing.  CBD staff and individual members use and enjoy national forests across the

4   West, including the forests at issue here, for hiking, biking, nature and wildlife viewing,

5   photography, spiritual renewal, solitude, and other recreational, educational, aesthetic, and

6   spiritual purposes.  Livestock grazing that harms native species and their habitat impairs the use

7   and enjoyment of these forests by CBD staff and its members.

8       15.    Plaintiff CALIFORNIA TROUT ("CalTrout") is a non-profit conservation

9   organization whose mission is to protect and restore wild trout and steelhead and other native

10  fish species such as salmon by protecting the waters that nurture these fish species, throughout

11  the State of California.  CalTrout is incorporated under the laws of the State of California with its

12  principal place of business in San Francisco, California.  CalTrout has more than 7,000 members

13  across the State that regularly use the streams in California national forests, including the forests

14  at issue in this case, for fishing, photography, hiking, and to seek aesthetic relief.  CalTrout

15  fulfills its mission by protecting freshwater wild trout habitat throughout California, and the

16  native biodiversity associated with this riparian habitat.  CalTrout regularly participates in

17  restoration efforts, management activities, education, and legal advocacy to protect and restore

18  streams for native fishes throughout California, including on national forest land across the State.

19  Livestock grazing that harms native fishes by damaging riparian areas and streams impairs the

20  use and enjoyment of the national forests in California by CalTrout's staff and members.

21      16.    Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER

22  ("EPIC") is a 501(c)3 nonprofit public interest organization that works to protect the long-term

23  health of the ecosystems of Northern California.  EPIC is dedicated to preserving, protecting, and

24  restoring biodiversity, native species, watersheds and ecosystems in Northern California.  EPIC

25  is located in the State of California, with its main office in Humboldt County, and has

26  approximately 2,000 members.  EPIC's staff and members use and enjoy the national forests of

27  Northern California, including the Mendocino National Forest, for recreational, scientific,

28  educational, and aesthetic purposes.  EPIC has actively opposed livestock grazing that harms

5

1   watersheds and native species, such as salmon and steelhead.  Grazing that degrades these

2   resources impairs the use and enjoyment of the forests of Northern California by EPIC's staff

3   and members.

4          17.    Plaintiff KLAMATH SISKIYOU WILDLANDS CENTER ("KS Wild") is a

5   non-profit public interest conservation organization based in Williams, Oregon and Ashland,

6   Oregon.  KS Wild's organizational mission is to conserve the outstanding biological diversity of

7   the Klamath-Siskiyou region in Southern Oregon and Northern California.  KS Wild and its staff

8   and members seek to protect the biological health and ecological resources of the region by

9   protecting and preserving the native habitat and hydrologic health of the Klamath-Siskiyou

10  ecoregion, including in the Klamath National Forest and Marble Mountain Wilderness.  KS Wild

11  staff and members use and enjoy the national forests and wilderness areas within this region.

12  Livestock grazing that degrades these values and conflicts with the recreational use of the forests

13  and wilderness areas within this region impairs the use and enjoyment of these areas by KS Wild

14  staff and members.

15         18.    Plaintiff LOS PADRES FOREST WATCH is a non-profit conservation

16  organization dedicated to protecting and restoring public lands along California's central coast

17  using community involvement, scientific collaboration, innovative field work, and legal

18  advocacy.  Los Padres Forest Watch acts as a citizen-supported watchdog group for the Los

19  Padres National Forest and has approximately 700 members, including members who reside

20  within Monterey and San Luis Obispo counties.  Members of Los Padres Forest Watch include

21  outdoor enthusiasts, hikers, mountain bikers, biologists, horseback riders, river runners,

22  backcountry travelers, anglers, hunters, bird watchers, business leaders, and others who depend

23  on a healthy forest and seek to prevent environmental damage caused by the use of public lands

24  that are contrary to environmental protection laws.  Los Padres Forest Watch staff and members

25  visit the Los Padres National Forest for recreation, scientific, and aesthetic purposes, and the

26  degradation of these lands by improperly managed livestock grazing impairs their use and

27  enjoyment of the forest.

28         19.    Plaintiff SIERRA FOREST LEGACY is a non-profit coalition of environmental

6

1   groups which are dedicated to the conservation, enhancement, and protection of old-growth

2   forests, wildlands, at-risk species, rivers and streams and the ecological processes which shape

3   the forests of the Sierra Nevada.  Sierra Forest Legacy is headquartered in Sacramento,

4   California.  Its staff, members, and supporters use and enjoy the Sierra Nevada national forests,

5   including the Modoc, Lassen, Plumas, Inyo, Sierra, Stanislaus, and Sequoia National Forests, for

6   hiking, camping, fishing, wildlife viewing, photography, solitude, and other recreational,

7   scientific, aesthetic, and spiritual pursuits.  Sierra Forest Legacy is concerned about proper

8   livestock grazing management on these forests, and has participated in grazing decision

9   processes.  Livestock grazing that degrades the natural resources on these national forests

10   impairs their use and enjoyment by Sierra Forest Legacy staff and members.

11       20.      Plaintiff SEQUOIA FORESTKEEPER is a non-profit conservation corporation

12   whose mission is to protect and restore the ecosystems of the Southern Sierra Nevada including,

13   but not limited to, the Giant Sequoia National Monument and Sequoia National Forest through

14   monitoring, enforcement, education, and litigation. Sequoia ForestKeeper is based in Kernville,

15   California and its more than 800 members and supporters have vital interests in protecting

16   wildlife and imperiled species that occur on the public lands in the Sequoia National Forest.

17   Staff and members of Sequoia ForestKeeper use and enjoy the Sequoia National Forest,

18   including the Kiavah Wilderness, for recreation, aesthetic, spiritual, scientific, and educational

19   purposes.  Livestock grazing that harms wildlife habitat, imperiled species, and wilderness

20   resources impairs their use and enjoyment of the Sequoia National Forest.

21       21.      Plaintiff GRAND CANYON TRUST is a regional, non-profit conservation

22   organization whose mission is to protect and restore the Colorado Plateau of southern Utah and

23   northern Arizona and the spectacular landscapes, rivers, plant and animal diversity, and beauty

24   found there.  Grand Canyon Trust uses collaboration, advocacy, science, and litigation to

25   promote responsible management of public lands on the Colorado Plateau.  Grand Canyon Trust

26   has offices in Moab, Utah and Flagstaff, Arizona and members throughout the nation.  Trust

27   members and staff use and enjoy the forests of southern Utah, including the Fishlake and Manti

28   La Sal National Forests, for recreation, sightseeing, aesthetic beauty, solitude, and scientific

7

422276.01

1    study.  Grand Canyon Trust has been engaged in livestock grazing management decisions in

2    Utah for many years, including decisions on the Fishlake and Manti La Sal National Forests.

3    Grazing that degrades the natural resources of the Fishlake and Manti La Sal National Forests

4    impairs the use and enjoyment of these forests for Grand Canyon Trust staff and members.

5         22.     Plaintiff UTAH ENVIRONMENTAL CONGRESS ("UEC") is a Utah non-profit

6    conservation organization based in Salt Lake City, Utah.  UEC's mission is to maintain, protect,

7    and restore the native ecosystems on public lands within Utah.  UEC participates in public land

8    management for national forests throughout Utah, including the Wasatch-Cache, Ashley, Manti

9    La Sal, and Fishlake National Forests.  UEC staff, members, and supporters visit these forests for

10   recreation, photography, solitude, scientific study, and to enjoy the biological diversity and

11   harmony of the natural ecosystems there.  UEC has been active in promoting proper grazing

12   management on these four forests for many years, and livestock grazing that harms the native

13   ecosystems as well as recreation opportunities within the Wasatch-Cache, Ashley, Manti La Sal,

14   and Fishlake National Forests impairs the use and enjoyment of these forests for UEC staff,

15   members, and supporters.

16        23.     Plaintiff RED ROCK FORESTS is a Utah non-profit environmental organization

17   based in Moab, Utah that formed in 1999 to protect the mountains and plateaus above the

18   redrock desert in southern Utah.  Red Rock Forests uses science, education, public policy,

19   litigation, citizen action, and collaboration to protect the forests of southern Utah and their

20   wildlife and waterways, including the Manti La Sal National Forest.  Red Rock Forests has

21   participated in livestock grazing decisions on the Manti La Sal National Forest in an effort to

22   protect the wildlife, watersheds, and wilderness areas there.  Red Rock Forests staff and

23   members visit the Manti La Sal National Forest to recreate, study the ecology, enjoy the

24   aesthetics and solitude, and photograph the scenery.  Livestock grazing that degrades the wildlife

25   habitat and native ecosystems impairs the use and enjoyment of the Manti La Sal National Forest

26   for Red Rock Forests staff and members.

27        24.     Plaintiff OREGON NATURAL DESERT ASSOCIATION ("ONDA") is an

28   Oregon non-profit public interest organization based in Bend, Oregon with more than 1000

8

1    members nationwide.  ONDA works to protect, defend, and restore the health of Oregon's native

2    deserts and its imperiled wildlife.  ONDA actively participates in agency proceedings and

3    decisions concerning management of public lands in eastern Oregon, particularly with regard to

4    livestock grazing management.  ONDA has been active in monitoring resources and livestock

5    grazing decisions on many forests in eastern Oregon, including the Umatilla and Malheur

6    National Forests.  ONDA staff and members use and enjoy the Umatilla and Malheur National

7    Forests for educational, recreational, spiritual, aesthetic, and scientific activities.  Livestock

8    grazing that harms the resources and wildlife on the Umatilla and Malheur National Forests

9    impairs the use and enjoyment of these forests for ONDA staff and members.

10           25.      Plaintiffs, both organizationally and on behalf of their staff, members, and

11   supporters, have deep and long-standing interests in the preservation and protection of western

12   national forests and their resources, which interests are directly harmed by Defendant's actions

13   challenged herein.

14           26.      Plaintiffs have been involved in many public and private efforts to protect these

15   national forests from harmful impacts of livestock grazing and to preserve or restore their special

16   resources, including endangered, threatened, and sensitive species.  Plaintiffs' staff, members,

17   and supporters will continue frequently to visit these national forests in the future—to hike, hunt,

18   fish, camp, observe wildlife, take photographs and otherwise enjoy their natural and scenic

19   beauty and biodiversity.

20           27.      The above-described aesthetic, conservation, recreational, scientific and other

21   interests of Plaintiffs and their staff, members and supporters have been, are being, and, unless

22   the relief prayed for is granted, will continue to be adversely affected and irreparably injured by

23   Defendants' violations of law.  Plaintiffs have no adequate remedy at law, and thus the requested

24   relief is appropriate.

25           28.      Defendant UNITED STATES FOREST SERVICE is an agency or

26   instrumentality of the United States, and is charged with managing the public lands and

27   resources of the National Forests, in accordance and compliance with federal laws and

28   regulations.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

# V.    LEGAL BACKGROUND

## A.    National Environmental Policy Act

29.    As our nation's basic environmental charter, NEPA requires federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including preparing a detailed EIS for all major Federal actions that may significantly affect the quality of the human environment.  An EIS must consider a range of reasonable alternative actions and assess site specific and cumulative impacts of these actions.  42 U.S.C. § 4332(2)(C).  Cumulative impacts are the past, present, and reasonably foreseeable future actions that must be assessed, in combination with the proposed action, to determine the potential for significant impacts to the environment.  40 C.F.R. § 1508.7.

30.    Under federal regulations, agencies may prepare an EA to assist in the NEPA process.  40 C.F.R. § 1508.9.  An EA is a more limited review of environmental factors associated with a federal action, performed to assist the agency in determining whether an EIS is warranted.

31.    NEPA also provides for public input into the decision-making process, and Forest Service regulations allow the public to appeal its final EA or EIS decisions.  40 C.F.R. §§ 1503.1, 1506.6; 36 C.F.R. Part 215.  As noted by the Supreme Court, NEPA requires an agency to: (1) take a "hard look" at the environmental consequences of its proposed action before proceeding with implementation of the action, and (2) encourage public involvement in the decision-making process.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

32.    The issuance or renewal of a federal livestock grazing permit is a major federal action that triggers NEPA review.  *See, e.g., Natural Resources Defense Council v. Morton*, 388 F. Supp. 829 (D.D.C. 1974), *aff'd without opinion*, 527 F.2d 1386 (D.C. Cir. 1976); *Idaho Watersheds Project v. Hahn*, 307 F. 3d 815 (9th Cir. 2002).

## B.    2005 Appropriations Rider

33.    In the fiscal year 2005 appropriations bill, Congress passed a rider that allowed the Forest Service categorically to exclude grazing reauthorizations in fiscal years 2005 through

10

2007 from documentation in an EA or EIS if: "(1) the decision continues *current grazing management*; (2) monitoring indicates that *current grazing management* is meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary; and (3) the decision is consistent with agency policy concerning extraordinary circumstances." FY 2005 Consolidated Appropriations Act, Sec. 339 (Pub. L. 108-447) (emphasis added). The total number of allotments authorized under this rider could not exceed 900.

34.    The Forest Service used the rider to exclude hundreds of permit renewals from environmental review under either an EA or an EIS, including dozens in the last month before the rider expired. But, even with this last rush of excluded renewals, the Forest Service did not reach its target of 900 allotments, and Congress extended the rider for fiscal year 2008. FY 2008 Consolidated Appropriations Act, Sec 421 (Pub. L. 110-161). Congress also added the limitation that a categorical exclusion could not be used for any allotment within a federally designated wilderness area.

35.    Under the rider's first requirement, the categorically excluded decision must continue *current grazing management*. It cannot authorize more grazing or grazing under different circumstances than what is presently taking place. The Forest Service's internal guidelines interpret "current management" to mean the management that has been implemented over the past three to five years. *See* Forest Service Handbook 2209.13, 92.31.

36.    The rider's second requirement ensures that a decision will be categorically excluded only when the Forest Service has monitoring information showing that current grazing management is meeting, or satisfactorily moving toward, land and resource management plan objectives. Each forest or group of forests has its own Land and Resource Management Plan ("Forest Plan"), which sets forth desired conditions, goals, standards and guidelines for various resources on the forest such as fish and wildlife, vegetation, soils, water, recreation and cultural resources.

37.    The rider's third requirement is that the categorically excluded decision must comply with the Forest Service policy on extraordinary circumstances, which is found in the

Forest Service Handbook, chapter 1909.15.30.3.2.  In determining whether extraordinary circumstances exist, the Forest Service must first determine whether certain resource conditions are present in the action area.  Those resource conditions are:  a) federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or Forest Service sensitive species; b) flood plains, wetlands, or municipal watersheds; c) congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas; d) inventoried roadless areas; e) research natural areas; f) American Indian and Alaska Native religious or cultural sites; or g) archaeological sites, or historic properties or areas.  Next, the Forest Service must assess the "degree of potential effect of the proposed action on these resource conditions" to determine whether extraordinary circumstances exist.  The Forest Service must demonstrate that there will be no significant effects on any of these special resource conditions to avoid preparing an EA or EIS.

## C.    Administrative Procedure Act

38.    The APA provides for judicial review of agency actions, and calls for the reviewing court to hold unlawful and set aside actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or that are in excess of statutory authority; or that were made without observance of procedure required by law.  5 U.S.C. § 706(2).

39.    As demonstrated below, the Forest Service has violated both Section 706(2) of the APA by issuing the decisions challenged herein as categorical exclusions, when they do not meet all of the requirements for exclusion set forth in the 2005 appropriations rider.

## VI.    FACTUAL BACKGROUND

## A.    Impacts of Livestock Grazing

40.    Livestock grazing by cattle and sheep dramatically alters native ecological communities and damages habitat for a multitude of fish, wildlife, and plant species.  Grazing harms both upland and riparian communities[1] by degrading vegetation, soils, and streams.

---

[1] Upland communities refer to dry plant communities that are not adjacent to water sources. Riparian communities refer to areas adjacent to water sources such as rivers, streams, ponds, lakes, seeps, springs, bogs, fens, or wet meadows, which normally contain lush, highly productive vegetation.

**Impacts on upland communities**

41.    Upland plant communities impacted by grazing include meadows, aspen stands, grasslands, tall forb communities (forbs are non-woody broad-leaved flowering plants – commonly called wild flowers), sagebrush communities, and forests with undergrowths of grass, forbs, and shrubs. Livestock consume large quantities of vegetation, impacting not only plant growth, but also species diversity and composition, the seral state[2] and vigor of plants, and the prevalence of weeds. Trampling of vegetation adds to the adverse impacts of grazing when livestock crush and displace plants and damage woody shrubs.

42.    One of the primary adverse effects of livestock grazing is its alteration of plant diversity and composition. Cows and sheep generally prefer to eat native grass and forb species. By selectively grazing these plants and eating their seed heads and flowers, livestock reduce seed production and regeneration of native plants. In turn, non-native invasive species quickly take root and spread in their place. Many rangelands in the western United States are now in poor ecological condition, because livestock grazing has eliminated the natural and healthy diversity and abundance of native grasses, forbs, and shrubs, allowing invasive species to take over.

43.    Invasive species, such as cheatgrass, Kentucky bluegrass, crested wheatgrass, star thistle, and other exotic weeds are often of lower value to watershed health and wildlife. Furthermore, invasive plants can lead to increased use of herbicides, forest health problems, and altered fire cycles. One dramatic example is the expansion of cheatgrass across the West, which has increased wildfire frequency and intensity.

44.    Livestock also trample and break the branches off woody shrubs, reducing their vigor and eliminating canopy cover on which many wildlife species depend. Heavy browse of young shrubs and saplings prevents regeneration and recruitment of new woody shrubs, aspen, and cottonwood, leaving only decadent stands of old shrubs and trees.[3]

45.    Further, grazing reduces the density and vigor of grasses and forbs in forested

---

[2] The seral state of a plant refers to its successional status—*i.e.*, whether it is an early colonizer of an area that was recently disturbed, or a "climax" plant that appears when a community has matured.

[3] A shrub or tree is decadent when it is in a state of decline.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

1    areas.  By removing the herbaceous vegetation understory[4] that normally outcompetes tree

2    seedlings, grazing leads to thick stands of small trees that increase the risk of wildfire.

3        46.    Grazing also greatly impacts soil conditions, significantly altering biological

4    communities and the hydrology of watersheds.  First, livestock deplete vegetation, leaving the

5    ground bare.  Then they disturb the bare ground with their hooves, creating a bed ready-made for

6    the growth of quickly-spreading noxious weeds and other invasive species, the seeds of which

7    livestock carry in their hooves, guts, or hair.

8        47.    Second, increased bare ground, combined with livestock disturbance and

9    destruction of biological soil crusts, leads to erosion when loose soil is transported by wind, or

10    by overland water flows during rain events or snowmelt.  This erosion causes rills (small rivulets

11    in the soil), gullies (channels in the soil formed by moving water), and pedestalling of plants (soil

12    loss around the base of plants, making them appear elevated).

13        48.    Further, livestock trampling compacts soils, reducing water infiltration and

14    increasing surface water run-off that carries away the topsoil no longer protected by soil crusts.

15    Often this topsoil ends up as sediment in streams.

16        49.    When less water permeates the soil due to compaction, water storage capacity is

17    reduced, which can be particularly stressful to plants and animals in times of drought.  Soils dry

18    out faster, impairing plant productivity.  Later in the summer, less groundwater is available,

19    causing stream flows to diminish or dry up completely.

20    **Impacts on riparian communities**

21        50.    Although riparian areas, such as perennial streams, seeps, springs, intermittent

22    streams, wet meadows, bogs and fens, make up a tiny percentage of the rangelands of the West,

23    they provide critical habitat for fish, wildlife, and sensitive plant species.  Riparian areas enjoy

24    greater biodiversity than any other plant community because of their rich, moist soils and multi-

25    layered vegetation.  Unfortunately, because riparian areas provide water, food, and shade, they

26    also disproportionately attract livestock, especially cattle, which then damage these areas.

27        51.    As with upland communities, livestock deplete vegetation and alter plant

28

---

[4] Herbaceous vegetation are plants lacking a woody stem.

diversity and composition in riparian communities by selectively grazing native vegetation and allowing less-desirable invasive species to spread. Livestock also impact the survival and the age-diversity of trees and woody shrubs in riparian areas, by browsing saplings and young shrubs. Furthermore, grazing and trampling increase bare ground and compact wet soils, causing these sites to become drier, which in turn reduces plant productivity and converts species from lush riparian vegetation to dry-site vegetation.

52.    The depletion of native riparian vegetation and compaction of wet soils also reduces water infiltration, which decreases the water storage capacity of wet meadows, fens, springs and seeps, and streamside riparian areas. This loss of infiltration significantly impacts the hydrology of a watershed, creating higher peak flows of surface run-off that scour stream channels and erode streambanks during snowmelt and rain storms. At the same time, the loss of groundwater lowers the water table, which leads to dried up streams later in the season.

53.    The Forest Service's increasing reliance on water developments, which pipe water from natural springs into troughs for livestock to drink, lowers the water table even more. The drying out of riparian areas increases as livestock grazing impacts are added to the effects of global warming, seriously altering the hydrologic regime of our western watersheds.

54.    Livestock also directly impact water quality when they walk in streams and graze and trample streambanks. Urine and manure deposited directly into streams or carried into streams through run-off increase the bacterial and nutrient contents in the water, which in turn reduces dissolved oxygen. When livestock walk in streams, they also stir up the sediment of the stream bed, creating higher turbidity levels.

55.    Trampling and grazing of streambanks lead to erosion and increased sediment. Livestock destabilize banks when they trample them or eat riparian vegetation, which typically have deep, stabilizing root systems. Denuded and destabilized banks easily erode and deposit sediment into stream channels. Grazing of riparian vegetation also reduces its effectiveness at trapping the sediment carried in overland run-off. Increased sediment leads to shallower and warmer streams, and reduces the frequency and quality of pools, while bank trampling and

422276.01

sloughing[5] reduce undercut banks and meanders, creating wider, straighter streams with higher water velocity.

**Impacts on fish, wildlife and plant habitat**

56.    The adverse impacts of livestock grazing on upland and riparian communities described above have significant ramifications for the fish, wildlife, and plant species that inhabit these communities.

57.    Aspen stands, which often grow on the edge of meadows, are second only to riparian areas in their native biodiversity. These stands provide habitat for migratory and resident birds, including sensitive species like goshawks and flammulated owls. Livestock browse and kill young aspen stems, preventing them from regenerating or becoming overstory and causing significant decline of existing aspen stands. In addition, when livestock graze the grass and forb understory and disturb the soil in these stands, conifer encroachment increases. Conifer stands have replaced aspen stands all across the West, causing a loss of important habitat for many wildlife species.

58.    The grazing of understory plants in forested areas, as well as in meadows and grasslands, also impairs the habitat of small mammals and invertebrates. These species require tall grasses and forbs for protection and food, but livestock grazing reduces the value of these plants to wildlife and often converts native plant species to less valuable invasive species. Livestock also trample the nests and young of small mammals and compact the soil, making it more difficult for burrowing animals to survive. Population declines of small mammals and invertebrates caused by livestock, in turn, adversely impact predatory species such as spotted owls, goshawks, great gray owls, bats, and lynx, all of which are now in decline.

59.    Similarly, livestock grazing of tall forbs impacts the species that rely on these plants. Many forbs produce flowers that provide food for pollinators like hummingbirds and bees. When livestock eat these forbs, it eliminates pollinators' food source and impairs the productivity and reproduction of more forbs. As the native forbs disappear, they are replaced by

---

[5] Bank sloughing occurs when a part of the streambank breaks away and "sloughs" off, due to livestock walking along the edge of the bank. These chunks of streambank then erode into the

422276.01

1    plants that do not support pollinators.

2         60.     In recent years the sage-steppe ecosystem in the western United States has

3    decreased dramatically.  Most of what remains faces adverse impacts from livestock grazing.

4    This ecosystem did not historically support herds of large, grazing ungulates and the native

5    vegetation developed without significant grazing pressure, making it particularly sensitive to

6    livestock grazing.

7         61.     Sagebrush or sage-steppe communities provide habitat for many wildlife species

8    such as sage-grouse.  The sage-grouse is now in serious decline and is being considered for

9    listing under the Endangered Species Act.  Myriad other mammals, birds, and reptiles inhabit

10    sage-steppe communities, including species of concern such as the pygmy rabbit, Brewer's

11    sparrow, sage sparrow, sagebrush vole, and pronghorn antelope.

12         62.     Grazing these sagebrush communities harms the species that depend on these

13    shrubs, as well as the grass and forb understory beneath the sage shrubs, for cover and forage.

14    Ground nesting birds such as sage-grouse or Brewer's sparrow rely on dense sagebrush canopy

15    cover to protect their nests from avian predators.  Similarly, pygmy rabbits use sagebrush to hide

16    from predators by climbing up into the shrubs.  Both sage-grouse and pygmy rabbits also rely

17    exclusively on sagebrush for food in winter.  Livestock damage sagebrush by breaking their

18    branches, removing canopy cover and eliminating the brush as a food source for wildlife.  They

19    also trample and browse young shrubs, preventing regeneration.  And, livestock graze the

20    understory of tall grasses and forbs beneath shrubs, eliminating additional cover for nests as well

21    as important summer forage for sage-grouse and other wildlife.  By grazing this understory,

22    livestock can convert the plants to invasive species that are less valuable for wildlife.

23         63.     Livestock also trample nests, burrows, and even small creatures in shrub

24    communities, and can disturb and displace wildlife from nesting, brooding, and over-wintering

25    sites.

26         64.     These impacts often occur near range "improvements," such as fences, corrals, or

27    water developments that provide water from springs or stock ponds.  The disturbance caused by

28    stream channel.

422276.01

livestock is intense even a mile or more from these structures, interrupting and fragmenting habitat for native birds and wildlife.  In addition, fences needed for livestock management provide perches for raptors that prey on sage-grouse and other birds.   Fences also disrupt the migration or food search of larger mammals, like deer, elk, and pronghorn.

65.    As noted above, riparian areas provide the greatest biodiversity of any community, but receive disproportionately higher adverse impacts from livestock grazing. Impacts to streams and their channels adversely affect fish, especially those species that require clean, cold water for survival like salmon, steelhead, and native trout species.  Many species of salmon, steelhead, and trout are at risk because of habitat degradation.  Livestock degrade fish habitat when they trample spawning beds, reduce streamside vegetative cover and shade, and cause increases of sediment and other pollutants, leading to higher water temperatures, algae blooms, and fewer pools and undercut banks that provide cover and refuge for fish.

66.    Aquatic macroinvertebrates (insects), many of which also require cold water with little sediment or pollutants, suffer from these same impacts.  Moreover, both aquatic and terrestrial insects rely on riparian plants for their food source.  Grazing reduces the amount and diversity of streamside vegetation, reducing this primary food source.  Loss of invertebrate abundance and diversity in turn affects fish that prey on these insects.

67.    Livestock grazing of streamside vegetation and woody shrubs also affects bird, mammal, and amphibian species.  Many birds, like the endangered willow flycatcher, and mammals such as deer, elk, and Canada lynx, rely on the complex vegetative structure of riparian areas for cover and food.  By browsing and damaging woody shrubs and trees, particularly willow and cottonwood, livestock reduce the amount and quality of cover and nesting sites for these birds and mammals.  Beaver cannot create water-conserving dams when livestock deplete their food source (largely willows).  The grazing and trampling of herbaceous vegetation reduces cover for amphibians, and alters the plant diversity of the area by removing native species and replacing them with less valuable invasive species.

68.    Other wetlands, such as seeps, springs, fens, and wet meadows, provide specialized riparian habitat for many different plants and animals.  Wetlands are habitat for

18

422276.01

1    aquatic species, a water source for terrestrial animals, and a source of food and cover for birds,

2    reptiles, amphibians, and mammals.  Seeps and springs often support unique plant and animal

3    species.  In fact, approximately 200 endemic vertebrate and invertebrate species as well as

4    hundreds of plants, many of which are designated as threatened or sensitive, occupy only these

5    habitats.

6        69.    Because wetlands are drying out or degraded, many of the plants, amphibians,

7    and macroinvertebrates that rely on them are now in decline.  For example, large numbers of

8    frogs and toads are now listed as threatened or sensitive.  Species that depend on these habitats at

9    certain times of the year are also adversely impacted, such as migratory birds and sage-grouse.

10    In late summer, after vegetation in their upland habitat has dried out, sage-grouse depend upon

11    forbs around seeps and springs for food during their late brood-rearing period.

12        70.    Livestock using these highly critical wetland areas not only step on nests and

13    small animals, they also destroy habitat by trampling and grazing the vegetation, compacting and

14    drying out soils, and impairing water infiltration, all of which reduces water storage and plant

15    productivity and converts wetlands into drier sites.

16        71.    Even fencing off springs and pumping water to upland troughs adversely impacts

17    wildlife because these water developments prevent large animals from accessing the vegetation

18    and water around springs, and remove water that would normally keep the soils moist, retain

19    high plant productivity, and later contribute to stream flows.

20        72.    Finally, grazing even harms large wildlife in various ways.  Livestock compete

21    with deer and elk for forage.  In addition, when livestock move to riparian areas and aspen stands

22    to graze, they often displace deer and elk which use these areas as their primary cover.

23        73.    Bighorn sheep compete with livestock for forage as well, but the bigger problem

24    for them is the transmission by domestic sheep of fatal respiratory disease.  Contact between

25    domestic and bighorn sheep often causes pneumonia in bighorns, leading to large die-offs of

26    bighorn herds.  Bighorn populations have declined dramatically from their historic numbers and

27    continue to struggle due in large part to disease caused by contact with domestic sheep.

28        74.    Even wolves and grizzly bears are indirectly impacted by livestock grazing

19

422276.01

through policies of relocating or killing wolves or bears that kill domestic sheep or cows grazing upon federal public lands. This policy has led to the killing of more than 600 gray wolves as well as numerous grizzly bears since the mid-1990's because of conflicts with livestock on public land. As wolves and grizzly bears expand their range, the conflicts with domestic livestock will increase.

**Impacts on cultural resources**

75.    National forest lands in the western United States contain many historic and prehistoric sites from early white settlers and Native Americans, and the Forest Service is charged with preserving and protecting these sites. These sites consist of artifacts or structural remains from early homesteads; historic or prehistoric trails, roads, and inscriptions on trees and rocks; as well as Native American artifacts, structures, lithic scatters, and sacred sites.

76.    Livestock trample and bed down on artifacts. They also disturb and erode soil that covers artifacts, displace artifacts, and degrade sacred sites. These impacts are particularly likely in heavy use areas such as salting or bedding grounds, trailing routes, water developments, or along fencelines.

**Impacts on Wilderness**

77.    Under the 1964 Wilderness Act, Congress has preserved more than 105 million acres of land across the United States to protect some of the last remaining wild places in the country. 16 U.S.C. §§ 1131-1136. The purpose of the Act was to preserve and protect Federal lands in their natural condition, for future use and enjoyment *as wilderness*. *Id.* § 1131(a).

78.    The Wilderness Act defines wilderness as:

> An area where the earth and its community of life are untrammeled by man;
>
> An area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions;
>
> An area that generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; and
>
> An area that has outstanding opportunities for solitude or a primitive and unconfined type of recreation.

20

422276.01

1   *Id*. § 1131(c).  Further, these areas shall be devoted to the public purposes of recreation, scenic,

2   scientific, educational, conservation, and historic use.  *Id.* § 1133(b).

3         79.    The Act allows for the continuation of livestock grazing within wilderness areas

4   where that use was established prior to the designation of an area as wilderness, subject to

5   regulation by the Forest Service.  *Id.* § 1133(d)(4)(2).  Further Congressional guidance states that

6   the Forest Service will not curtail or phase-out grazing simply because of a wilderness

7   designation, but can adjust livestock numbers during its planning process to protect wilderness

8   resources from deterioration.  Pub. L. No. 96-560, Sec. 108.

9         80.    Livestock undermine the natural conditions and primitive recreation value of

10  these wild places by degrading them as described above.  Livestock also can turn hiking trails

11  into wide, muddy, manure-fouled avenues that are unappealing, prone to erosion, and infested

12  with noxious weeds.  They also can ruin wilderness campsites.  Wilderness users often camp

13  near lakes or streams, which are areas heavily used by livestock that foul the waters, deposit

14  manure, and trample the vegetation and soils at these sites.

15        81.    Livestock also graze and trample the open meadows and alpine areas sought after

16  by the public for their scenic beauty.  The majority of recreational users dislike livestock in

17  wilderness areas, and signs of cattle or sheep reduce their feeling of solitude and their enjoyment

18  of wild scenic beauty.

19        82.    In sum, livestock grazing adversely impacts our natural resources in many

20  different ways.  Yet, the Forest Service often has either never assessed these impacts, or has not

21  done so for more than twenty years.  In the meantime, numerous native fish, wildlife, and plant

22  species have been in serious decline or face extinction, weeds have increased, riparian

23  destruction has increased, and global warming (to which cattle contribute) grows as a threat.

24  Now, the Forest Service is relying improperly on the 2005 appropriations rider to escape its

25  obligation under NEPA to conduct in-depth site-specific environmental analysis and involve the

26  public in ten-year-long grazing decisions on nearly a thousand grazing allotments covering

27  millions of acres of public lands in the western United States, lands that contain wilderness areas,

28  imperiled species, key wildlife habitat, and cultural resources.  In many instances these easy

grazing reauthorizations do not meet the criteria of the rider and are unlawful.

**B.      Violations of the 2005 Appropriations Rider**

83.      The 2005 appropriations rider contains three requirements that the Forest Service must satisfy to reauthorize grazing under a categorical exclusion ("CE"), as noted above.  Instead of carefully picking grazing allotments that meet these requirements, the Forest Service is using the rider to reauthorize grazing allotments wholesale in highly sensitive areas.

84.      The agency's violations of the rider fall into several patterns described below.

**The rider's first requirement**

85.      Under the rider's first requirement, the CE decision must "continue current grazing management."  Evidently, the Forest Service has interpreted this requirement to allow it to authorize grazing at levels allowed under a previous permit even when *no grazing* has actually taken place on the allotment for years.  Not only does this interpretation contradict the plain meaning of "*current grazing management*," it also contradicts the Forest Service's own handbook and policy guidance, which state that current management means the management implemented *over the last three to five years* through Allotment Management Plans or Annual Operating Instructions.

86.      Many of the challenged CE decisions authorize more grazing than what has actually taken place during the past five years.  In some cases, the Forest Service has used the rider to authorize grazing on allotments where no grazing has occurred for several years.  Other CE decisions reauthorize levels stated in previous grazing permits, even though grazing levels have decreased significantly in recent years.

87.      By using a CE to reauthorize grazing at levels much higher than the grazing actually implemented over the last five years, the Forest Service is not continuing current grazing management.  Moreover, any up-to-date monitoring of these grazing allotments is relevant only to assess conditions under the recent grazing levels; such monitoring cannot provide meaningful data to support increased levels.

**The rider's second requirement**

88.      The second condition of the rider is that "monitoring [must] indicate[] that

422276.01

current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan." To satisfy this requirement, the Forest Service must actually have monitoring data *and* this data must demonstrate that the *current grazing* is not unduly harming resources on the grazing allotment at issue. Numerous CE decisions violate this requirement because the Forest Service either lacks relevant monitoring data or the data shows that conditions are degraded and are not getting better as a result of the current grazing levels implemented.

89.    The referenced land and resource management plan objectives come from individual or region-wide Forest Plans. These plans set forth desired conditions, goals, standards and guidelines for maintaining or restoring properly functioning ecosystems; promoting ecologically healthy and diverse vegetation, soils, water resources, and fish and wildlife habitat; and protecting species of concern and cultural resources.

90.    The monitoring information needed to demonstrate that forests are meeting or moving toward these objectives consists of information from studies of the effects of grazing on upland communities, riparian communities, and fish and wildlife habitat. But, in many cases, the Forest Service has assessed and continues to assess the impact of grazing simply by measuring the amount of forage consumed by livestock. This limited focus offers little or no information about the impact that grazing has on the health of rangelands and their associated wetlands, habitat, and inhabitants, and thus cannot be used to demonstrate that current grazing management is meeting or moving towards all land and resource management plan objectives.

91.    For example, to measure the impacts grazing has on upland plant communities, monitoring must assess, among other things, plant diversity, composition, age-structure, and vigor; presence and growth of invasive species or noxious weeds; condition and amount of woody shrub cover; amount of bare ground; condition of microbiotic soil crusts; and the presence of compacted soil or signs of erosion. Moreover, monitoring only one type of plant community, which is frequently what the Forest Service does, is not sufficient to assess the impact to all upland habitats. Monitoring one sagebrush community, for instance, does not provide meaningful data about other types of shrub communities and certainly cannot provide

information about impacts to aspen or other forested areas, dry meadows and grasslands, or forb communities. In some cases, the Forest Service has conducted the widespread monitoring necessary to assess the impact of grazing on individual allotments. In many of the CE decisions challenged here, however, such data is completely lacking.

92.    Similarly, because livestock spend so much time in riparian areas and impact them so heavily, the Forest Service must monitor these areas when they are present in an allotment area. Appropriate monitoring must analyze riparian vegetation condition, diversity, and composition for herbaceous species and woody shrubs, as well as soil conditions. In addition, because livestock erode streambanks, the monitoring must measure bank stability and water quality. Nor can the monitoring focus solely on perennial streams, which are only one kind of riparian habitat; it also must consider the effect of grazing on wet meadows, springs, seeps, fens, and intermittent streams.

93.    Fish, wildlife, and plants have a variety of habitat needs distinct from those of livestock and require additional monitoring to assess whether grazing is impairing those needs. In upland sagebrush communities, monitoring must take into account wildlife needs such as dense sagebrush stands with high canopy cover and tall residual native grasses and forbs under shrubs. In aspen, meadow, and forb communities, the monitoring must track whether livestock are preventing regeneration of key species or grazing and trampling herbaceous vegetation too heavily to provide adequate protection and food for wildlife. Plants grazed to three to five inches do not provide adequate cover for many wildlife species or flowers for pollinators.

94.    In riparian areas, it is crucial to assess livestock grazing impacts on the habitat of fish, insects, migratory birds, amphibians, mammals, and sensitive plant species. To assess conditions for fish and macroinvertebrates, instream monitoring must consider sediment and other pollutant loads; water temperature; the presence of cover in the form of deep pools, undercut banks, overhanging vegetation, and woody debris; width–to-depth ratios; and channel substrate. For terrestrial species, monitoring must assess whether enough forage and cover exist in the form of woody shrubs, trees, and herbaceous plants.

95.    The Forest Service generally recognizes the importance of this kind of

24

monitoring, yet, in many instances it has not adequately completed it, or undertaken it at all. The Forest Service often lacks any monitoring data for upland aspen, grass, or forb communities, and the data it has collected in upland sage-steppe areas frequently focuses primarily on livestock forage utilization levels.[6] Thus, the Forest Service lacks monitoring data for many conditions that are essential to recognizing the degradation and decline of upland communities.

96.    Furthermore, when the Forest Service has collected information on bare ground or plant species diversity, it often has collected this data only recently or sporadically, and thus has no way of knowing whether livestock grazing is causing conditions to improve, remain stable, or degrade over time.

97.    Second, monitoring for riparian areas is also inadequate for many CE decisions because the Forest Service collects up-to-date information for only a small percentage of streams covered under its decisions, and it has collected virtually no information on the conditions of seeps, springs, wet meadows, or intermittent streams. Even for those areas that the Forest Service has monitored, it has not collected data for many important riparian or instream variables.

98.    Third, the Forest Service has issued CE decisions having very limited or no information on fish, wildlife and plant species and their habitat. For many species, including multiple sensitive species and Management Indicator Species,[7] the Forest Service has conducted no surveys of grazing allotments to determine whether the species is present, its location, or its population trend. Moreover, the Forest Service rarely has surveyed habitat conditions for fish, wildlife, or plant species, despite acknowledging that suitable habitat for certain species exists on the allotment and that livestock grazing can impact that habitat.

99.    Finally, some of the Forest Service's CE decisions do not comply with the rider's

---

[6] Livestock utilization is the proportion of current year's forage production that is consumed by animals, and is typically determined at the end of the grazing season. The Forest Service uses a variety of methods to measure utilization from "ocular estimates" to comparing height and weight of plants from grazed and ungrazed sites.

[7] Management Indicator Species are species selected by the Forest Service to represent a suite of species that all use similar habitat. By monitoring population trends and impacts to these indicator species, the Forest Service presumes similar trends and impacts are occurring for other species in that habitat.

second requirement because the monitoring actually shows that livestock grazing is causing serious damage. The agency has issued decisions even when its monitoring information indicates degraded riparian conditions, excessive bare ground, noxious weeds, and damage to shrubs caused by livestock grazing.

**The rider's third requirement**

100.    Under the rider's final requirement, the Forest Service's CE decisions must be consistent with the agency's policy on extraordinary circumstances. As discussed above, this policy looks at whether certain resource conditions, including endangered, threatened, and sensitive species, wetlands, cultural resources, and wilderness areas, are present and the degree of potential effect on these resource conditions.

101.    Many of the allotments covered under CE decisions contain these special resource conditions. Yet, for many of the challenged decisions, rather than analyze the impact of continued grazing, the Forest Service has summarily concluded—with little or no analysis and data whatsoever—that acknowledged impacts on these special resources do not amount to extraordinary circumstances.

102.    For instance, multiple allotments occur in wilderness areas but the Forest Service often does not discuss grazing impacts that are occurring to wilderness values.

103.    Similarly, the Forest Service decisions frequently cite evidence that grazing is harming wetlands, cultural resources, and imperiled species. Still, in the face of this evidence, the decisions simply assert the unsupported conclusion that continued grazing will not have significant impacts.

104.    Moreover, the Forest Service has completely neglected to assess the cumulative impacts of other CE decisions even when those decisions are in the same forest and sometimes cover directly adjacent land. Thus, the Forest Service's assertion that a specific grazing decision will not impact *overall* populations of sensitive species, or *overall* abundance of wetlands does not take into account the cumulative impacts of the grazing authorized on thousands of additional adjacent or near-by acres under other CE decisions.

105.    Because, in many instances, the Forest Service has not demonstrated the absence

1    of extraordinary circumstances despite the presence of special resource conditions and yearly use

2    of those areas by livestock, it has not complied with the rider's third requirement.

3        106.    The above paragraphs describe the Forest Service's general abuse of the CE

4    rider.  Specific CE decisions challenged by Plaintiffs are described below.  These decisions

5    authorize grazing on different forests across the West and each violates the rider in one or more

6    ways.

7    **C.    Unlawful CEs Issued In California Forests**

8        **1.    Los Padres National Forest**

9        107.    This Forest encompasses nearly two million acres of the central California

10   Coastal Mountain Range.  Its ecosystems range from semi-desert in interior areas to redwood

11   forest on the coast, and they provide permanent or transitory refuge for approximately 468

12   species of fish and wildlife.  The importance of the Los Padres Forest's habitat has increased as

13   habitat losses in the urban areas outside the Forest mount.

14       108.    On September 26, 2007, the Los Padres National Forest issued a CE decision

15   authorizing grazing on the 1,074 acre Sweetwater allotment in violation of the 2005

16   appropriations rider.  The Sweetwater allotment is in the northern most part of the Forest, in the

17   Santa Lucia Mountains between the famed Big Sur coast and the Salinas River valley in

18   Monterey County.  Part of the allotment lies within the Ventana Wilderness, an area with one of

19   the most diverse vegetative communities on the planet.

20       109.    This CE does not continue current grazing management, because it authorizes

21   grazing for the next ten years even though, at the time of the decision, no grazing had taken place

22   on the Sweetwater Allotment since 1998—well more than three to five years before the CE

23   decision.

24       110.    The Los Padres National Forest issued this CE decision even though it lacked

25   monitoring showing that current grazing management is meeting or satisfactorily moving toward

26   applicable Forest Plan objectives.  Among other reasons, the Forest Service had not monitored

27   the allotment for residual dry matter since 1998.  Nor has the Forest Service monitored the effect

28   that grazing has on blue oak woodland within the allotment.

27

422276.01

111.    This CE decision also violates Forest Service policy on extraordinary circumstances.  Among other reasons, continued grazing harms the South-central California steelhead, which is a listed threatened fish species.  These fish use a stretch of Vaquero Creek that runs through the Sweetwater allotment to spawn, and the decision authorizes grazing during their spawning season.  Moreover, the Forest has not demonstrated that grazing has no significant impacts to the Ventana Wilderness, which is another extraordinary resource condition.

### 2.    Mendocino National Forest

112.    This one million-acre forest straddles the eastern spur of California's Coastal Mountains to the northeast of the San Francisco Bay Area.  It is the state's only national forest not traversed by a paved road.

113.    On July 5, 2007, the Mendocino National Forest issued a CE decision authorizing grazing on four allotments, in violation of the 2005 appropriations rider.  The four allotments— Pine Mountain, York Cabin, Middle Creek, and Elk Mountain—cover nearly 85,000 acres on the west side of the Forest, six miles north of Upper Lake in Lake County, California.

114.    The Forest Service issued this CE decision despite its lack of monitoring demonstrating that conditions on the allotments are in satisfactory condition or trending upward in light of current grazing management.  The Forest has not monitored the range condition or trend on the Middle Creek allotment at all, and it has not measured them on the York Cabin allotment since 1958.  Also, on the York Cabin allotment, the Forest has collected very little utilization data in recent years, and the data it has collected shows that its standards were not met.  Likewise, on the Pine Mountain allotment, the Forest has not measured range condition and trend since 1961.  Finally, on the Elk Mountain allotment, the Forest's range condition and trend monitoring revealed the range to be in "fair" and "low" condition.

115.    This CE decision is inconsistent with the Forest Service's extraordinary circumstances policy because continued grazing on these allotments threatens coho salmon and steelhead, which are both endangered species.  The Pine Mountain and York Cabin allotments contain designated critical habit for coho salmon and habitat for steelhead, which will be

1    degraded by livestock.

2         **3.    Klamath National Forest**

3         116.    This Forest covers 1.7 million acres on both sides of the California-Oregon

4    border.  The Klamaths are the oldest of the Pacific coastal mountains, dating back about 500

5    million years.

6         117.    On September 26, 2006 the Klamath National Forest issued four CE decisions

7    that violate the 2005 appropriations rider.  These decisions cover the Little North Fork, Shelly

8    Meadows, Big Ridge, and the Big Meadows allotments.  The allotments cover more than 64,000

9    acres in Siskiyou County, California.

10        118.    The Klamath National Forest lacked monitoring demonstrating that current

11   grazing management is meeting or moving toward Forest Plan objectives.  The Forest's

12   monitoring did not adequately measure the impact of grazing on streamside vegetation or other

13   riparian variables, even though some stream banks within the allotments are grazed by cattle.

14   Prior to issuing these decisions, the Forest did not monitor riparian vegetation composition or

15   diversity, woody species regeneration, streambank stability and disturbance, or residual dry

16   matter.  Nor did the Forest collect sufficient information on meadow conditions, despite the fact

17   that much of the grazing in these allotments occurs in wet and dry meadows.  Due to this lack of

18   monitoring, the Forest also lacked data on habitat conditions for various fish and wildlife species

19   that potentially use the riparian areas and meadows on the allotments.

20        119.    The CE decisions also violate Forest Service policy concerning extraordinary

21   circumstances.  For one, all four allotments lie within the Marble Mountain Wilderness and

22   continued grazing threatens wilderness resource conditions.  Second, habitat exists for numerous

23   sensitive species on the allotments, including goshawk, great gray owl, willow flycatcher,

24   yellow-legged frog, and cascade frog.  Yet despite acknowledging potential impacts to these

25   species from livestock grazing, the Forest has not surveyed for their presence or monitored this

26   habitat, and thus cannot demonstrate that grazing is not having any significant effect.

27        **4.    Modoc National Forest**

28        120.    One of California's most remote national forests, the nearly two million-acre

29

422276.01

Modoc Forest lies in the shadow of the Warner Mountains in the far northeastern corner of the State. The Forest consists of pine forests and meadows, lakes, streams, rugged canyons, wetlands, lava beds and high desert plateaus. Plaintiffs challenge two 2007 CE decisions covering five allotments in this Forest based on violations of the 2005 appropriations rider.

121.    The Forest Service issued a CE on March 20, 2007 for the 14,000 acre Mount Dome allotment, located in the northeast corner of Siskiyou County, California. The allotment borders the Lava Beds National Monument.

122.    The Forest issued this CE even though its monitoring did not show that current grazing management is meeting or moving toward Forest Plan objectives. On the contrary, the monitoring shows that grazing is causing severe damage to vernal pools,[8] including intense trampling damage that has denuded the ground in many places and all but eliminated certain native species. The harm includes damage to the watch list plant Newberry's Cinquefoil (*Potentilla newberryi*) and to the habitat for Profuse-flowered Pogogyne (*Pogogyne floribunda*). In addition, the Forest Service lacked other key monitoring information. It could not locate the 14,384 acre allotment's single condition and trend plot. And it has no information about the effect grazing has had on the declining Mount Dome mule deer herd, even though mule deer is one of the Forest's Management Indicator Species.

123.    This CE decision also is inconsistent with Forest Service policy regarding extraordinary circumstances. Continued grazing on the allotment will harm archeological resources. Although no acceptable archeological surveys have taken place on the allotment, previous limited surveys have disclosed 10 archeological sites covering 110 acres that include lithic scatters, temporary camps, and sites with complex rock features, such as hunting blinds, rock rings, and rock stacks and alignments.

124.    The Modoc National Forest's September 13, 2007 CE decision authorized grazing on four allotments in violation of the 2005 appropriations rider. The four allotments—

---

[8] Vernal pools are seasonal depressional wetlands that are covered by shallow water for variable periods from winter to spring. They are often isolated pools found in grasslands and provide unique habitat for numerous rare plants and animals.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

1    Beaver Dam, East Grizzlie, Timbered Mountain and Surveyors Valley—lie on the Devil's

2    Garden Plateau between the Oregon border and Alturas in Modoc County, California and cover

3    more than 147,000 acres of plateau intersected with volcanic reefs.

4         125.    The CE for two of these allotments does not continue current grazing

5    management.  No grazing took place on the Timbered Mountain allotment from 2002 to 2005

6    and no grazing took place on the Surveyors Valley allotment from 2001 to 2004.

7         126.    This CE decision is not supported by monitoring data demonstrating that grazing

8    management is meeting or satisfactorily moving toward applicable Forest Plan objectives.

9    Monitoring shows that large sections of the four allotments were in unsatisfactory ecological

10   condition when the CE decision issued, and it does not show that conditions were improving.

11   For example, even though grazing had not taken place on the Timbered Mountain allotment for

12   four years, in 2005, according to the Forest Service's own data, only 60% of the allotment was in

13   satisfactory condition, meaning that 25,718 acres were in unsatisfactory ecological condition,

14   including wetlands, streamside vegetation, juniper, low sage, silver sage, big sage and mountain

15   mahogany.  In addition, grazing is damaging the watch-list plants Profuse-flowered Pogogyne

16   (*Pogogyne floribunda*) and Baker's Globe Mallow (*Illiana bakeri*).

17        127.    The decision also is not consistent with Forest Service policy regarding

18   extraordinary circumstances.  Among other reasons, all four allotments contain habitat for the

19   endangered Lost River sucker and short nose sucker.  Grazing is causing significant harm to

20   these endangered fish species.  Moreover, the Timbered Mountain and Surveyors Valley

21   allotments include proposed critical habitat for these species, a fact that the Forest Service did

22   not consider when it issued the CE decision.  Grazing on the allotments also has damaged habitat

23   for Slender Orcutt Grass (*Orcuttia tenuis*), which is a federally listed threatened species.  In

24   addition, continued grazing will damage cultural resources.  Surveys to-date have disclosed more

25   than 375 archeological sites on the allotments.  The Forest Service has not determined the effect

26   that grazing has on these sites, although it acknowledges that it should monitor them to find out

27   their significance and susceptibility to damage.

28

422276.01

5.    **Lassen National Forest**

128.    This 1.2 million acre forest surrounds the Lassen Volcanic National Park.  Ishi, the famed last survivor of the Yahi Yana Native American tribe, once lived in this Forest.  With 361 animal species and 29 fish species, Lassen is home to a variety of wildlife and supporting ecosystems.

129.    Plaintiffs challenge two 2006 CE decisions and four 2007 CE decisions issued by this Forest.  They are: (1) a July 12, 2006 decision authorizing grazing on the Diamond Mountain allotment; (2) a September 29, 2006 CE decision authorizing grazing on the Champs Flat, Gooch Valley, Lower Pine Creek and North Eagle Lake allotments; (3) a September 27, 2007 decision authorizing grazing on the Butte Creek allotment; (4) a September 27, 2007 decision authorizing grazing on the Horse Valley allotment; (5) a September 27, 2007 decision authorizing grazing on the Soldier Mountain allotment; and (6) a September 27, 2007 decision authorizing grazing on the Deer Creek and Lyonsville allotments.

130.    The decisions for the Diamond Mountain and Soldier Mountain allotments authorize increased grazing, rather than continue current grazing management.  When the Forest Service issued the CE decision for the Diamond Mountain allotment, no grazing had taken place there for four of the five prior years.  Similarly, the Soldier Mountain allotment was not grazed during the three seasons prior to the CE decision.

131.    The decisions for the Diamond Mountain, Champs Flat, Gooch Valley, Lower Pine Creek, North Eagle Lake, Horse Valley, Deer Creek and Lyonsville allotments are not supported by monitoring data showing that grazing management is meeting, or satisfactorily moving toward the objectives in the applicable Forest Plan.  No monitoring of the Diamond Mountain allotment has occurred since 2002.  Furthermore, prior monitoring does not provide enough information to determine whether Lassen Forest Plan objectives are being met. Indeed, to address this shortcoming, the CE decision requires more thorough monitoring in the future.

132.    Monitoring of the Champs Flat, Gooch Valley, Lower Pine Creek, and North Eagle Lake allotments show that the four allotments are increasingly infested with noxious weeds that cattle can spread.  The allotments contain at least four different types of noxious

32

1   weeds: Scotch thistle, perennial pepperweed, medusahead, and bull thistle. Scotch thistle is the

2   most harmful of the four, and it has increased significantly over the past three years. In addition,

3   monitoring shows that cattle are damaging some of the more than 50 aspen and cottonwood

4   stands in the allotments, as well as some riparian areas. The Forest Service does not monitor

5   range conditions on the Horse Valley allotment at all and it does not monitor any of the key areas

6   on the Lyonsville allotment.

7        133.    Several of the challenged CE decisions are inconsistent with the Forest Service

8   policy concerning extraordinary circumstances. The Forest Service admits that it does not know

9   the effect that continued grazing will have on archeological and historic sites within the Diamond

10  Mountain allotment, including numerous aspen carvings and a sparse lithic scatter. There are 21

11  known heritage sites in the allotment, including six in the primary grazing range. Likewise, the

12  Champs Flat, Gooch Valley, Lower Pine Creek, and North Eagle Lake allotments have 258

13  recorded heritage sites, all of which are unfenced and open to grazing. Grazing has caused

14  extensive damage to these resources.

15       134.    In addition, the continued spread of noxious weeds by cattle in these allotments

16  threatens sensitive plant species such as Baker's globe mallow (*Iliamna bakeri*). The Butte Creek

17  allotment has the rare sensitive species ephemeral monkeyflower (*Mimulus evanescens*), which

18  occurs in only 11 other locations in California. The Forest Service acknowledges that livestock

19  can negatively impact this plant and that it sometimes flowers while cattle graze the part of this

20  allotment where it occurs. The Horse Valley allotment contains 20 acres of critical habitat for

21  the endangered Slender Orcutt Grass (*Orcuttia tenius*) and the Soldier Mountain allotment has

22  two of five known occurrences in California of Bellinger's meadowfoam (*Limnathes floccosa*

23  spp. *bellingeriana*). Finally, the Deer Creek allotment is home to the sensitive species Cascade

24  Frog, which is in severe decline in the Lassen National Forest. This decline may be caused by a

25  fungus spread by cattle, and the decision authorizes cattle to graze on Alder Creek, where the

26  frog is found.

27       **6.    Plumas National Forest**

28       135.    This 1.1 million-acre National Forest sits at the northern end of the Sierra

---

33

1    Nevada, just south of the Cascade mountain range.  The Forest includes foothills, timbered

2    slopes and rugged high country, and its lakes, streams and rivers include the federally designated

3    Feather River wild and scenic area.

4        136.    The Plumas National Forest has issued numerous CE decisions that violate the

5    2005 appropriations rider.  These decisions include: (1) a November 20, 2006 decision

6    authorizing grazing on the Mount Haskell allotment; (2) a November 20, 2006 decision

7    authorizing grazing on the Snow Lake and Spring Creek allotments; (3) a November 20, 2006

8    decision authorizing grazing on the Trosi Canyon and Trosi-Galeppi allotments; (4) a March 14,

9    2007 decision authorizing grazing on the Thompson Valley, Dotta Neck, and Bacher allotments;

10    (5) a March 14, 2007 decision authorizing grazing on the Frenchman Lake allotment; (6) a

11    March 14, 2007 decision authorizing grazing on the Mercer allotment; (7) a September 17, 2007

12    decision authorizing grazing on the Bulson allotment; (8) a September 17, 2007 decision

13    authorizing grazing on the Ramelli and Hall allotments; (9) a September 17, 2007 decision

14    authorizing grazing on the Horton Canyon South and Horton Canyon East allotments; and (10) a

15    September 17, 2007 decision authorizing grazing on the Ramelli Ranch allotment.  These 16

16    allotments cover more than 80,000 acres and lie within the Beckwourth Ranger District, which is

17    in the eastern part of the Forest and in Plumas County, California.

18        137.    Many of these decisions do not continue current grazing management.  The

19    decisions authorize grazing on the Mount Haskell, Snow Lake, Spring Creek and Mercer

20    allotments at levels significantly exceeding the use that the allotments have received during the

21    past five years.  The Ramelli, Hall, Horton Canyon South, and Horton Canyon East allotments

22    were vacant and no grazing has taken place on them for at least the past four years, yet the Forest

23    issued these CEs authorizing grazing on them for the next ten years.

24        138.    The Forest Service issued the challenged CE decisions listed above even though

25    its monitoring does not show that current grazing is meeting or moving toward Plumas Forest

26    Plan objectives.  Among other reasons, the Forest Service has never monitored the effects of

27    grazing on the Mt. Haskell allotment.  For the other CE decisions, the Forest Service did not

28    consider the effect that grazing has on Management Indicator Species.  For example, the Forest

did not consider the impact of grazing on mule deer, even though this is one of the Forest's Management Indicator Species, and the Doyle Deer herd range is found within many of these allotments.

139.    The CE decisions in the Plumas National Forest are also inconsistent with Forest Service policy concerning extraordinary circumstances. Among other reasons, continued grazing will harm several sensitive plant species. Most significantly, one perennial herb, the Lens-pod milkvetch (*Astragalus lentiformis*), could see its numbers significantly reduced as a result of these decisions. All known occurrences of this plant are in the Beckwourth Ranger District, and half of them are in the allotments covered by these decisions. The CE decisions did not consider the cumulative impact that grazing will have on this plant's survival. Sensitive animal species, including the California spotted owl, American marten, and mule deer, are also at risk as a result of these decisions. Finally, continued grazing on these allotments threatens archeological resources. The allotments contain hundreds of archeological sites, including many highly sensitive sites, and past grazing has damaged these sites.

**7.    Stanislaus National Forest**

140.    Created in 1897 and bordering Yosemite National Park, the Stanislaus National Forest is one of the nation's oldest national forests. At the end of September, 2007, the Forest Service issued a series of grazing decisions in violation of the 2005 appropriations rider. The first decision authorized grazing on the Little Crane allotment, the second authorized grazing on three allotments (Shotgun, Lower Blue and Mokelumne), and the third authorized grazing on the Duckwall allotment.

141.    The September 29, 2007 CE decision authorizing grazing on the Little Crane allotment does not continue current grazing management; instead, it increases it. No grazing took place on the allotment during five of the six years preceding issuance of the CE, yet the decision authorizes grazing for 10 years—through 2017.

142.    The Forest Service lacks monitoring showing that the current grazing management on the Little Crane allotment is meeting or satisfactorily moving toward Forest Plan objectives. Among other reasons, the Forest Service has not monitored the condition of springs

1    where grazing takes place.

2        143.    The Little Crane CE decision also violates Forest Service policy regarding

3    extraordinary circumstances.  Among other reasons, the great gray owl, a sensitive species, has

4    been spotted near the allotment, and suitable habitat for threatened and sensitive amphibian

5    species exists on the allotment, yet the Forest Service has not conducted surveys to determine

6    whether these species inhabit the allotment.

7        144.    The Forest Service issued its September 30, 2007 decision authorizing grazing on

8    three allotments—Shotgun, Lower Blue and Mokelumne—even though it lacked monitoring

9    showing that current grazing management is consistent with applicable  Forest Plan objectives.

10    The Forest has not conducted upland range monitoring on these allotments for at least a decade.

11    In fact, it does not maintain range monitoring plots on these allotments, and thus lacks data about

12    the effect of current grazing management.  In addition, grazing has damaged a spring on the

13    Lower Blue allotment, such that the spring is not in proper functioning condition, while other

14    springs and special aquatic features lack any monitoring.

15        145.    On September 30, 2007, the Forest Service issued a CE decision authorizing

16    grazing on the Duckwall allotment, even though monitoring shows that current grazing

17    management in the allotment is not satisfying Forest Plan objectives regarding riparian areas.

18    The Forest Service's monitoring shows that one spring in the allotment is in very poor condition

19    due to grazing.  The Forest Service has not surveyed the other springs within the allotment.

20    Moreover, the Forest Service itself acknowledges that grazing has damaged Cottonwood Creek,

21    including by adding sediment to the Creek and preventing the bank from revegetating.  This is

22    not compatible with the Stanislaus Forest Plan objectives.

23        146.    The decision to authorize grazing on the Duckwall allotment also is not consistent

24    with Forest Service policy regarding extraordinary circumstances.  Among other reasons, the

25    allotment contains sensitive plant species Small's southern clarkia (*Clarkia australis*) and habitat

26    for the sensitive plant species Mariposa clarkia (*Clarkia biloba* ssp. *australis*).  The Forest

27    Service's survey for these plants was inadequate as it took place before the plants were blooming

28    and did not survey all suitable habitat.  The Forest Service also did not adequately assess impacts

36

422276.01

to two sensitive wildlife species, the great gray owl and foothill yellow-legged frog.  Moreover, part of the proposed Clavey Wild and Scenic River Area is within the Duckwall allotment.  Even though Forest Service policy treats *proposed* Wild and Scenic River Areas the same as *designated* Wild and Scenic River Areas, the Forest did not consider whether continued grazing within the proposed Clavey Wild and Scenic River Area created an extraordinary circumstance.

**8.    Inyo National Forest**

147.    Located in the eastern Sierra Nevada, this more than two million acre forest is home to Mt. Whitney, Mono Lake, Mammoth Lakes Basin, and the Ancient Bristlecone Pine Forest, as well as seven Congressionally-designated Wildernesses.

148.    On November 14, 2005, the Forest Service issued a CE decision authorizing grazing covering four desert allotments on the slopes of the eastern Sierra Nevada in violation of the 2005 appropriations rider.  The four Inyo allotments—Tunawee, Ash Creek, Alabama Hills and George Creek—are located between Coso Junction and Independence in Inyo County, California.

149.    The CE decision authorizes increased grazing on the Tunawee allotment, rather than continuing current management.  It permits cattle grazing on this allotment through 2015, even though no cattle grazing had taken place there for the four seasons prior to issuance of the CE.  Tunawee allotment is managed cooperatively with the Bureau of Land Management, which has authorized only sheep grazing on the allotment since 1995.

150.    Moreover, this CE decision is inconsistent with Forest Service policy regarding extraordinary circumstances.  Among other reasons, it approves grazing in the Ash Creek allotment, which lies partially within the Golden Trout Wilderness, without analyzing the impact this grazing will have on wilderness resources.  Also, the Forest acknowledges the harm that grazing will inflict on prehistoric archeological sites within the four allotments, but instead of analyzing these harmful effects as required by the rider, the Forest Service states only that a sample survey of the sensitive areas is necessary.

**9.    Sequoia National Forest**

151.    Situated at the southern end of the Sierra Nevada, this Forest is home to the

37

422276.01

world's largest trees, the Giant Sequoias.  Elevations range from 1,000 feet in the foothill region to peaks over 12,000 feet in the rugged high country.

152.    The Forest Service's September 26, 2007 decision authorizing grazing on two allotments in Sequoia violated the 2005 appropriations rider.  The two allotments, Smith Canyon and Jacks Creek, are located in the northern portion of the Scodie Mountains in Kern County, California.

153.    The decision does not continue current grazing management because both allotments were vacant at the time of the decision and had not been grazed for years, yet the CE decision authorizes grazing through 2017.

154.    The decision also violates the Forest Service's policy on extraordinary circumstances.  Both allotments lie entirely within the Kiavah Wilderness, and grazing would damage the area's wilderness resources.

**D.    Unlawful CEs Issued In Arizona On The Prescott National Forest**

155.    The 1.25 million acre Prescott National Forest lies in central Arizona, with half of the Forest east of the city of Prescott and half to the west.  This Forest varies in elevation from the desert floor to mountains, with vegetation changing from Sonoran desert plants to chaparral, juniper and pinyon pine, and finally forests of ponderosa pine.  Because of the dry climate here, riparian areas are the lifeblood of the Forest for most wildlife.

156.    Plaintiffs challenge 11 CE decisions, each for one allotment, issued by the Prescott National Forest:  two decisions dated September 28, 2006 for the Walnut Creek and Toohey allotments, and nine decisions signed at the end of September 2007 for the V-Bar, Willow, DR T Todd, DR T Rice Peak, DR T Dugas, Chino Valley, Yolo North, Camp Wood, and Granite allotments.  These allotments are all found in Yavapai County and cover 112,900 acres.

157.    The CE decisions for the Walnut Creek, Toohey, DR T Todd, DR T Rice Peak, DR T Dugas, Yolo North, Camp Wood, and Granite allotments violate the first rider requirement because these decisions authorize livestock use at much higher levels than what occurred over the previous five years.  Thus, they are not continuing current grazing management.

38

422276.01

158.    The Prescott CE decisions also violate the second rider requirement.  Current monitoring shows an extensive amount of area throughout these allotments in impaired or unsatisfactory soil condition as well as some areas in fair or poor vegetation condition, and the Forest Service cannot show any improvement due to a lack of long-term monitoring.  Likewise, agency assessments show that multiple riparian areas are not functioning properly, and again no trend is apparent without long-term monitoring.  In addition, for most riparian areas, the Forest Service did not even collect critical information needed to assess the health of streams and riparian areas despite direct and indirect impacts by cattle.

159.    These allotments provide habitat for many fish and wildlife species, including imperiled bird, amphibian, and plant species as well as several Management Indicator Species such as macroinvertebrates, deer and pronghorn.  While the Forest Service recognizes impacts to habitat of these species from livestock, it has not conducted required monitoring to demonstrate that grazing is meeting fish and wildlife objectives.

160.    Finally, these eleven CE decisions are not consistent with the Forest Service's extraordinary circumstances policy.  For one, numerous endangered, threatened, and sensitive species have potential habitat on the allotments, including the endangered Gila chub, threatened Mexican spotted owl, yellow-billed cuckoo, black nighthawk, leopard frog, southwestern toad, and tiger beetle.  The Forest Service has not shown that these riparian-dependent species will not be impacted by the individual or cumulative effects of these eleven CE decisions.  In addition, the Forest Service has completed only minimal inventories on these allotments for cultural resources and has failed to assess impacts from grazing on known cultural sites.

E.    Unlawful CEs Issued In Idaho Forests

1.    Salmon-Challis National Forest

161.    The vast Salmon-Challis National Forest is located on 4.3 million acres in central and eastern Idaho.  This forest contains the largest wilderness area in the continental United States (Frank Church-River of No Return Wilderness), Idaho's tallest peak, and the Wild and Scenic Salmon River and Middle Fork of the Salmon River.

162.    On June 8, 2007, the Salmon-Challis National Forest issued a CE decision for the

39

1   Northeast Leadore allotments, in violation of the 2005 appropriations rider.  The Northeast

2   Leadore CE decision authorizes continued grazing on the Sandy Creek, Pattee Creek, Agency

3   Creek, Peterson Creek, and McFarland Pasture allotments, which total roughly 29,660 acres.

4        163.    This decision does not continue current management on the Agency Creek

5   allotment because in recent years only about 2/3 of the permitted number of cattle have grazed

6   this allotment, yet the Forest Service's CE authorizes grazing at the higher permit level.

7        164.    This CE also violates the rider because the Forest Service does not have

8   monitoring data showing that current grazing is meeting or moving toward applicable Forest

9   Plan objectives, particularly with regard to fish, wildlife, and plant populations and habitat.  The

10  Forest Service has not surveyed for most of the fish, wildlife and plant species that are likely

11  present in the area or assessed habitat conditions, including for numerous sensitive species and

12  Management Indicator Species.   Only limited monitoring of streams and fish habitat and no

13  monitoring of seeps, springs, meadows, and aspen stands has occurred on the allotments despite

14  their importance as habitat for many species.

15       165.    The Northeast Leadore CE is inconsistent with the extraordinary circumstances

16  policy because the Forest Service has not shown that continued grazing will not harm sensitive

17  species cutthroat trout, sage-grouse, pygmy rabbits, goshawks, great gray owls, Columbia

18  spotted frogs, pink agoseris, Lemhi penstemon, and Salmon twin bladderpod.  The Forest

19  Service recognizes that wet meadows, springs, and aspen stands in the allotments are critical for

20  many of these species and could be impacted by livestock grazing and water developments, but

21  never assessed the effects to this habitat from current grazing management.

22       166.    In addition, two or more wolf packs use these allotments and are impacted by

23  grazing due to degradation of habitat for prey species as well as the likely killing of wolves that

24  come into conflict with livestock.  The Forest Service admits that grazing on these allotments

25  may impact the viability of the Lemhi valley wolf population.

26       **2.    Caribou-Targhee National Forest**

27       167.    The Caribou and Targhee National Forests joined in 2000 to form one unit, which

28  now covers more than three million acres in eastern Idaho.  This forest borders Montana, Utah,

40

and Wyoming, and is adjacent to Yellowstone and Grand Teton National Parks.  As part of the Greater Yellowstone Ecosystem, this forest contributes to the best remaining habitat in the contiguous United States for a diverse array of species, including grizzly bears, wolves, lynx, wolverines, and other wide-ranging animals.

168.    The Caribou-Targhee National Forest has issued CE decisions covering more grazing allotments than any other forest in the country.  Plaintiffs are challenging ten decisions authorizing grazing on 77 allotments that cover close to 646,000 acres of land on the forest.  These ten decisions are:  (1) Teton Basin CE for three allotments dated February 28, 2006; (2) Crooked Creek/Birch Creek CE for 11 allotments dated March 22, 2006; (3) Crow Creek CE for four allotments dated December 8, 2006; (4) South Soda CE for 20 allotments dated January 31, 2007; (5) Kelly Canyon/Snakey Canyon CE for six allotments dated April 26, 2007; (6) Ashton-Island Park 9 CE for nine allotments dated May 8, 2007; (7) Big Hole CE for three allotments dated August 17, 2007; (8) Ashton-Island Park 6 CE for six allotments dated September 28, 2007; (9) Meyers/Icehouse CE for two allotments dated September 28, 2007; and (10) Roundup CE for 13 allotments dated September 28, 2007.

169.    The Forest Service is not continuing current management for 28 allotments under these CEs because it is reauthorizing previous permit levels for allotments that have been vacant, in non-use, or at reduced grazing levels over the past five years.  These violations occur for the following allotments: (1) Tepee Creek (Teton Basin CE); (2) Burnt Canyon and Crystal Gulch (Crooked Creek/Birch Creek CE); (3) Wells Canyon (Crow Creek CE); (4) Diamond/Boulder, Fossil Canyon, Henry Cutoff, Johnson Creek, Lander Creek, Lanes Creek, Maybe Canyon, North Sulphur, Sheep Creek, Slug Creek, Webster Creek, and White Creek (South Soda CE); (5) Meadowview, Bootjack, Fall River, Fog Butte, and Ripley Butte (Ashton-Island Park 9 CE); (6) Meadow Creek (Ashton-Island Park 6 CE); Meyers Creek and Icehouse Creek (Meyers/Icehouse CE); and Grand Blowout, South Elk, Poker Peak, and Elk Mountain (Roundup CE).

170.    The Caribou-Targhee CE decisions violate the second rider requirement because the Forest Service does not have monitoring data showing that grazing is meeting or satisfactorily moving toward Forest Plan objectives.  Most of the allotments lack monitoring to

41

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

1    assess adequately upland vegetation conditions and trends, often having either no long-term data

2    or data from just a single site for allotments as large as 10,000 to 20,000 acres in size.  Many

3    riparian areas, including perennial and intermittent streams and springs, as well as aspen stands

4    are also missing monitoring data for vegetation conditions and other key parameters.

5        171.    The minimal data the Forest Service has collected shows problems in upland and

6    riparian areas on numerous allotments, such as excessive or increasing bare ground, poor woody

7    shrub conditions, undesirable plants, and trampling of stream banks and wetlands.  In addition,

8    the Forest Service has frequently failed to monitor habitat conditions for fish, wildlife, and plant

9    species that are known or likely to be on the allotments.  In fact, the Forest Service does not even

10   acknowledge the potential impacts from these CEs to many species such as bighorn sheep, forest

11   owls, and goshawks.

12       172.    The Caribou Targhee CE decisions also do not comply with the extraordinary

13   circumstances policy for several reasons.  First, livestock grazing will continue to adversely

14   impact wilderness study areas, eligible wild and scenic rivers, and research natural areas.

15       173.    Second, the Forest Service has not demonstrated that continued grazing will not

16   harm the many imperiled species found on these allotments, including wolves, grizzly bears,

17   lynx, sage-grouse, Columbia sharp-tailed grouse, pygmy rabbit, great gray owl, goshawk,

18   Columbia spotted frog, Yellowstone cutthroat trout, and several sensitive plants.  Considering

19   that these decisions cover more than a half-million acres, the cumulative impacts from grazing

20   across this landscape create the potential for significant effects to most if not all of these species.

21       174.    Finally, the Forest Service has also failed to survey and discuss the impacts to

22   cultural resources from grazing these 77 allotments.

23   **F.    Unlawful CEs Issued In Wyoming Forests**

24       **1.    Bridger-Teton National Forest**

25       175.    Just east of the Caribou-Targhee National Forest is the Bridger-Teton National

26   Forest, comprising another large part of the Greater Yellowstone Ecosystem.  This 3.4 million

27   acre forest contains extensive wilderness areas in the Wind River mountain range as well as

28   significant wildlife habitat near Grand Teton and Yellowstone National Parks.

42

176.    The Bridger-Teton National Forest issued 10 CE decisions that cover 43 allotments and 586,500 acres in violation of the 2005 appropriations rider. Combined with the Caribou-Targhee CEs challenged here, the Forest Service categorically excluded over 1.23 million acres of livestock grazing within the Greater Yellowstone Ecosystem from proper environmental analysis.

177.    Plaintiffs challenge the following CEs: (1) Silver Creek and Boundary Creek allotments CE, dated October 27, 2005; (2) Hoback Basin CE covering five allotments, dated September 29, 2006; (3) Sweetwater, Blucher Creek, and East Squaw Creek allotments CE, dated September 29, 2006; (4) Pinedale Front CE covering five allotments, dated September 29, 2006; (5) Trespass Creek allotment CE, dated September 29, 2006; (6) Big Greys River and Cedar Creek allotments CE, dated September 30, 2006; (7) Muddy Ridge CE covering six allotments, dated August 27, 2007; (8) Southern Wind River Sheep CE covering 14 allotments, dated September 27, 2007; (9) Three Forks, Corral Creek, and Mink Creek allotments CE, dated September 28, 2007; and (10) Giraffe Creek and Porcupine Creek allotments CE, dated September 28, 2007.

178.    Multiple allotments included within these CEs were rested or received reduced use during the past five years, including but not limited to the Porcupine Creek, Silver Creek, Sweetwater, Big Flattop, Little Flattop, and Soda Lake allotments. Yet instead of continuing the current management, the Forest Service is increasing livestock use on these allotments under the CE decisions, in violation of the first rider requirement.

179.    These CEs also violate the second requirement of the rider because the Forest Service has failed to collect monitoring information showing that conditions on all of these allotments are meeting or moving toward Forest Plan objectives. For many allotments, the Forest Service does not have long-term condition and trend data for many key upland and riparian parameters nor short-term utilization data. Furthermore, the data it has collected shows damage to riparian areas as well as problems with invasive species, woody plant conditions, and the health of tall forb communities on numerous allotments.

180.    There is also a significant lack of monitoring for fish, wildlife, and plant habitat

43

1    to assess current conditions or trends.  Even Management Indicator Species that the Forest

2    Service recognizes are on these allotments and may be impacted by livestock, including elk,

3    deer, pronghorn, bighorn sheep, boreal toad, boreal chorus frog, Brewer's sparrow, rainbow

4    trout, cutthroat trout, and aspen, have insufficient data on habitat conditions.

5          181.    Third, the Forest Service has violated its extraordinary circumstances policy,

6    contrary to the third rider requirement.  Over 195,000 acres and more than twenty allotments

7    from these CEs fall within the popular Wind River Range wilderness areas and grazing will

8    continue to have adverse impacts to resource values and recreation use.  The Forest Service also

9    has not demonstrated that grazing is not harming cultural resources on the CE allotments.

10         182.    Furthermore, each of these allotments contains habitat for numerous threatened

11   or sensitive species such as lynx, wolves, grizzly bear, sage-grouse, Columbia spotted frog,

12   goshawk, great gray owl, Colorado River cutthroat trout, Bonneville cutthroat trout, and multiple

13   sensitive plants, that will continue to be harmed by livestock grazing.  And like on other forests,

14   the Forest Service has not considered the cumulative impacts from all of these Bridger Teton

15   CEs, let alone the combined impacts with CEs on other forests in the Greater Yellowstone

16   Ecosystem that affect the same fish and wildlife populations.

17         **2.    Shoshone National Forest**

18         183.    Continuing east across the Greater Yellowstone Ecosystem, the 2.4 million acre

19   Shoshone National Forest borders the eastern edge of the Bridger Teton National Forest and

20   Yellowstone National Park.  The nation's first national forest, the Shoshone was named after the

21   Shoshoni Indians who lived in the area.  On September 28, 2007, the Shoshone National Forest

22   issued a CE reauthorizing grazing on five allotments in the southern Wind River mountain range

23   under the Washakie Project CE, in violation of the 2005 appropriations rider.

24         184.    The Washakie Project CE, covering about 46,000 acres on the Sawmill, Pine

25   Willow, Slate Creek, Maxon Basin, and South Pass allotments, does not comply with the second

26   requirement of the rider because the Forest Service has collected little monitoring data and thus

27   cannot show that grazing is meeting or satisfactorily moving toward Forest Plan objectives.  The

28   agency has little to no information on many key upland and riparian vegetation and soil

44

1    parameters.  It has no current monitoring data for stream channels or fish habitat, and the most

2    recent information, from 1996, indicates that several streams on the allotments have high

3    sediment levels and are not healthy.  And the Forest Service has done no monitoring to assess

4    wildlife and plant habitat for many native species that are on the allotments.

5        185.    Second, the Washakie CE is inconsistent with the Forest Service's extraordinary

6    circumstance policy because continued grazing will harm numerous endangered, threatened, or

7    sensitive species.  The allotments contain habitat for grizzly bears, gray wolves, bighorn sheep,

8    Brewer's sparrows, water voles, boreal toads, northern leopard frogs, goshawks, mountain

9    suckers, and nine sensitive plants, all of which can be harmed by livestock grazing.  Yet the

10   Forest Service has either refuted that any impacts will occur or simply dismissed the impacts as

11   insignificant with no support for that assertion.  The agency did not even consider the cumulative

12   impacts to these species from the many other CE decisions issued within the Greater

13   Yellowstone Ecosystem, including the allotments on the Bridger Teton National Forest that are

14   next to the Washakie CE allotments in the southern Wind River mountains.

15   **G.    Unlawful CEs Issued In Utah Forests**

16        **1.    Wasatch-Cache National Forest**

17        186.    Located in northern Utah close to Salt Lake City, the 1.3 million acre Wasatch-

18   Cache National Forest is divided into three major areas distinguished by their mountain ranges:

19   the High Uinta Mountains, the Wasatch Front, and the Stansbury Range.  This forest, which

20   contains seven wilderness areas, is increasingly becoming a recreation destination for many

21   outdoor enthusiasts.

22        187.    Plaintiffs challenge five CE decisions issued by the Wasatch-Cache National

23   Forest for violating the 2005 appropriations rider:  (1) Stansbury Allotments CE, dated

24   September 28, 2006; (2) Franklin Basin Allotment CE, dated September 27, 2007; (3) Gilbert

25   Peak and Hessie Lake-Henrys Fork Allotments CE, dated September 30, 2007; (4) Poison

26   Mountain and Red Mountain Allotments CE, dated September 30, 2007; and (5) Red Castle, East

27   Fork Blacks Fork, Middle Fork Blacks Fork, Lyman Lake, Little West Fork Blacks Fork, and

28   Elizabeth Mountain No. 2 Allotments CE, dated September 30, 2007.

188.     These five CE decisions violate the 2005 appropriation rider's second requirement. Monitoring for the Stansbury Allotments CE, which covers six allotments on 42,560 acres in the Stansbury Range, shows that grazing is harming riparian areas and uplands on these allotments. Among other things, these allotments contain numerous springs, which provide much of the riparian habitat for amphibians and other species in this dry area, and grazing is harming many of those wetlands. In addition, upland vegetation is either not at desired condition or is trending downward on several allotments, and the Forest has not even monitored shrub cover.

189.     Monitoring for the 26,000 acre Franklin Basin allotment, located in the Wasatch Front, shows that uplands were in unsatisfactory condition at four of nine sites in 2007 and the Forest has no long-term data to show any upward trends. The Forest Service also has little current and no long-term data for vegetation conditions in riparian areas and no utilization data at all. Agency specialists recognize the need to change management practices on this allotment because current management is not protecting watershed health or wildlife habitat, yet the agency is continuing the current management through this CE, in violation of the rider.

190.     The remaining three CE decisions occur in the High Uintas Mountains, with a significant portion of the allotments falling within the High Uintas Wilderness Area. These CEs violate the second rider requirement because monitoring shows that sheep trailing across several of these allotments is causing severe damage to many upland areas, and impacts from both sheep and cattle are leading to increased sediment levels in streams and wetlands. This damages habitat for macroinvertebrates and amphibians, contrary to direction in the Forest Plan, yet the Forest Service has not even surveyed for these species in the past ten years.

191.     The High Uintas CE decisions also violate the third rider requirement because grazing will continue to significantly impact resources and recreation use in the High Uintas Wilderness Area as well as along five rivers that are eligible as Wild and Scenic Rivers. And high sediment levels and other adverse effects to stream channels will continue to harm sensitive Colorado cutthroat trout, which are generally declining in this area.

**2.     Ashley National Forest**

46

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

192.    The 1.3 million acre Ashley National Forest is located in northeastern Utah, with a small portion spilling over into southwest Wyoming.  This forest is adjacent to the Wasatch-Cache National Forest, and contains the eastern half of the High Uintas Wilderness as well as Flaming Gorge National Recreation Area and King's Peak, the tallest peak in Utah.  Plaintiffs are challenging eight CE decisions issued by the Ashley National Forest for violating the 2005 appropriations rider.

193.    These CE decisions, covering more than 387,000 acres on 30 allotments, consist of the following: (1) Duchesne #1 CE, dated January 6, 2006, covering six allotments; (2) Duchesne #2 CE, dated March 27, 2006, covering six allotments; (3) Duchesne #3 CE, dated March 27, 2006, covering seven allotments; (4) Duchesne #4 CE, dated May 25, 2006, covering three allotments; (5) Ashley-Dryfork CE, dated March 23, 2006, covering three allotments; (6) Taylor Mountain Allotment CE, dated June 30, 2006; (7) Goslin Mountain Allotment CE, dated September 22, 2006; and (8) Cedar Mountain, Spring Creek, and Sugarloaf Allotments CE, dated January 4, 2007.

194.    Several of these CEs do not continue current management, in violation of the rider.  On the Taylor Mountain allotment, the Forest Service converted two of the three units from sheep to cattle just two years prior to the CE decision with no NEPA analysis, and now is authorizing grazing for another ten years without ever assessing the impacts to the environment from changing livestock use on the allotment.  In addition, the Spring Creek and Fall Creek allotments are vacant, and the Cedar Mountain, Sugarloaf, and Goslin allotments were rested or had reduced use for several years prior to the CE decisions.

195.    The Forest Service is also violating the second rider requirement because its monitoring shows that grazing is causing adverse impacts to some riparian areas while many others have not even been surveyed.  The forest is also lacking monitoring information on impacts to soils despite the fact that many of these allotments occur within very arid areas with highly erosive soils and little natural ground cover. And the Forest Service has failed to monitor population trends and habitat conditions for some sensitive species and Management Indicator Species, including species that indicate healthy riparian habitat and aspen woodlands.

196.    The challenged CE decisions are also inconsistent with the Forest Service's extraordinary circumstances policy because of continuing and increasing livestock impacts to the High Uintas Wilderness Area, Flaming Gorge National Recreation Area, several Wild and Scenic Rivers, and municipal watersheds that provide water to Utah communities.  Furthermore, the Forest Service has not demonstrated that grazing is not harming wetlands or sensitive species found on all or most of these allotments, such as sage-grouse, goshawks, several forest owls, and Colorado River cutthroat trout.

### 3.    Manti La Sal National Forest

197.    Spanning 1.4 million acres, the Manti La Sal National Forest is divided into three separate areas within central and southeast Utah.  The Manti division is part of the high Wasatch Plateau, which ranges from 5,000 to 10,000 feet elevation.  The La Sal division at Moab is located just east of Moab, Utah in the La Sal Mountains, near Arches and Canyonlands National Parks.  The La Sal division at Monticello is just west of Monticello, Utah in the Abajo Mountains, south of Canyonlands National Park and east of Glen Canyon National Recreation Area.  Plaintiffs challenge three CEs from the La Sal units and eight CEs from the Manti unit.

198.    The three CEs issued for the La Sal units each reauthorize grazing on a single allotment, consisting of the 75,953 acre Twin Springs allotment, 19,700 acre Dorry allotment, and 12,328 acre North Paradox allotment.  The Twin Springs CE was signed September 28, 2006 and the other two CEs were signed September 28, 2007.

199.    The three La Sal CEs violate the 2005 appropriations rider for several reasons. For one, they violate the first requirement of the rider because they reauthorize full permit numbers despite significantly reduced levels of use on the allotments since 2002.  Second, all three CEs violate the second rider requirement because monitoring does not demonstrate that grazing is meeting or satisfactorily moving toward Forest Plan objectives.  Among other things, the monitoring demonstrates encroachment by non-native species and high levels of bare ground in uplands, as well as damage to several streams and wetlands.  And the Forest Service has little or no monitoring of livestock utilization and browse levels or conditions of key wildlife habitat, including aspen stands, meadows, springs, and willow communities.

48

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

200.    Finally, these CEs violate the third requirement of the 2005 appropriations rider because grazing in the Twin Springs allotment will continue to impact resources and recreation use in the Dark Canyon Wilderness Area.  Furthermore, the Forest Service has not demonstrated that grazing these allotments will not damage habitat for endangered, threatened, or sensitive species, including Mexican spotted owls, southwestern willow flycatchers, goshawks, and several plants, or degrade wetlands and cultural resource sites.

201.    Plaintiffs also challenge eight CEs from the Manti unit of the Forest:  (1) Bob Wright, Horse Creek, and Candland allotments CE, dated September 27, 2007; (2) Willow Creek allotment CE, dated September 27, 2007; (3) Island Lake, Order Mountain, Indian Creek, and Heliotrope allotments CE, dated September 27, 2007; (4) Mountain Lion, Cottonwood-Gooseberry, Swens, and Beaver Dam-Boulger allotments CE, dated September 27, 2007; (5) Spring Lake and Birch Creek-Bear Canyon allotments CE, dated September 27, 2007; (6) South Skyline, Booth Canyon, and Potter Canyon allotments CE, dated September 30, 2007; (7) Trough Springs Ridge, Eccles, Monument Peak, and Crandall Canyon allotments CE, dated February 14, 2008; and (8) Black Canyon, Reeder Ridge, Joes Valley, Claybanks, Olsen Bench, Ridley Ridge, Peavine, and Wagon Road Ridge allotments CE, dated April 2, 2008.  These CEs reauthorize grazing on 29 allotments, covering more than 160,000 acres.

202.    All of the Manti unit CEs were originally included within an EIS that covered 31 allotments.  That EIS was withdrawn by the Forest Service after several of the parties to this litigation filed an administrative appeal.  Now the Forest Service is attempting to avoid preparing a better EIS by using the 2005 appropriations rider to categorically exclude them from such analysis.  However, these CEs do not comply with the rider.

203.    The CEs violate the second rider requirement.  The scant monitoring information the Forest Service has collected shows soil erosion and excessive bare ground in the uplands of many of these allotments (including in high-elevation wet meadows).  Riparian inventories are either outdated or nonexistent for all streams on the allotments, and almost no monitoring of seeps or springs has occurred.  The agency also has failed to monitor aspen stands, meadows, and forb communities, all of which are important wildlife habitat, and has ignored the

49

1    requirement to monitor macroinvertebrates, which are the Management Indicator Species for

2    aquatic habitat.  Thus, the Forest Service does not have monitoring showing that grazing is

3    meeting or moving toward resource objectives.

4        204.    These CEs also do not comply with the extraordinary circumstances policy

5    because the Forest Service has not shown that grazing is not harming sensitive wildlife,

6    including goshawks and Colorado cutthroat trout, multiple threatened or sensitive plants, and

7    cultural resource sites.

8        **4.    Fishlake National Forest**

9        205.    The 1.7 million acre Fishlake National Forest is located in central Utah, south

10   and west of the Manti unit of the Manti La Sal National Forest. The mountains and plateaus of

11   the Fishlake National Forest rise above the surrounding desert valleys, and the Forest gets it

12   name from Fish Lake, the largest natural mountain lake in Utah.

13       206.    Plaintiffs challenge 18 CEs from this Forest:  one CE from the Fremont River

14   Ranger District covering three allotments and 120,000 acres; one CE from the Fillmore Ranger

15   District covering eleven allotments and 141,000 acres; and sixteen CEs from the Richfield

16   Ranger District covering sixteen allotments and 200,000 acres.  The Forest issued each of these

17   18 CE decisions on September 28, 2007, two days before the 2005 appropriations rider expired.

18       207.    These CEs violate the 2005 appropriations rider.  First, the Forest Service does

19   not have adequate data to demonstrate that current grazing is meeting or satisfactorily moving

20   toward Forest Plan objectives.  For instance, many of these allotments lack current condition and

21   trend or utilization data for uplands, and the data that does exist shows numerous allotments with

22   excessive or increasing bare ground and high levels of exotic, invasive species.

23       208.    Monitoring information for many riparian areas, particularly seeps and springs, is

24   non-existent, and surveys that have been conducted show degraded conditions from livestock

25   grazing on several perennial streams.  The Forest Service also has not conducted required

26   monitoring of shrub and aspen browse or wildlife habitat conditions, including for numerous

27   Management Indicator Species and sensitive species with habitat on these allotments.  In fact, the

28   scant evidence that does exist indicates that habitat conditions are not satisfactory for many of

50

1     these species.

2          209.     These CEs also violate the Forest Service's extraordinary circumstances policy

3     because of continued harm from grazing to wetlands as well as to habitat for threatened and

4     sensitive species such as Utah prairie dogs, goshawks, sage grouse, pygmy rabbits, and several

5     sensitive plants.  The Forest Service has not even monitored habitat or population trends for most

6     of these species and thus has not adequately assessed or admitted the individual and cumulative

7     impacts from these CE decisions that cover a combined 460,000 acres—more than a quarter of

8     the entire forest.

9     **H.        Unlawful CEs Issued In Colorado Forests**

10         **1.        Rio Grande National Forest**

11         210.     This 1.86 million acre forest in southwestern Colorado contains 236 miles of the

12    Continental Divide.  It includes a 7,600 foot high alpine desert, the 14,000-foot jagged summits

13    of the Sangre de Cristo and the San Juan Mountains, and the headwaters of the country's third

14    longest river – the Rio Grande.

15         211.     The Rio Grande National Forest has issued numerous CE decisions that violate

16    the 2005 appropriations rider.  These decisions include: (1) an April 14, 2006 decision

17    authorizing grazing on the Roaring Fork allotment;  (2) a June 12, 2007 decision authorizing

18    grazing on the Embargo grazing allotment; (3) a September 17, 2007 decision authorizing

19    grazing on the Pool Table Sheep and Goat allotment; (4) a September 17, 2007 decision

20    authorizing grazing on the Pinon and Indian Head Sheep and Goat allotments; (5) a September

21    19, 2007 decision authorizing grazing on the Alder allotment; and (6) a September 19, 2007

22    decision authorizing grazing on the Bear allotment.

23         212.     Many of these decisions do not continue current grazing management.  The

24    decision regarding the Roaring Fork, Alder and Bear allotments authorize grazing at levels

25    significantly exceeding the use experienced by these allotments during the past five years.  The

26    Pool Table Sheep and Goat allotment was vacant, and the CE decision not only authorizes

27    grazing on it but also combines it with the Blue Park allotment.

28         213.     The Forest issued the six decisions listed above even though monitoring does not

51

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

show that current grazing management is meeting the Rio Grande's Forest Plan objectives. Grazing has caused serious damage to the riparian areas in all of these allotments, including unstable stream banks, severe hummocks, and gully erosion. Moreover, the Forest recognizes that continued grazing in the Pinon and Indian Head allotments poses a threat to the Eagle Rock bighorn sheep herd and that the risk of noxious weeds continuing to spread in the Roaring Fork allotment is high.

214. These decisions are also inconsistent with the Forest Service's policy on extraordinary circumstances. Among other things, continued grazing threatens a conservation population of the sensitive Rio Grande cutthroat trout species. The decision to authorize grazing on the Roaring Fork and Pool Table allotments may negatively affect the character of more than 6,000 acres of the Weminuche Wilderness.

### 2. Medicine Bow-Routt National Forests

215. Encompassing nearly three million acres, the combined Medicine Bow and Routt National Forests extend from north central Colorado to central Wyoming. This immense area includes 13 designated wilderness areas, portions of numerous mountain ranges, and mountain lakes. As an administrative district, it also includes the Thunder Basin National Grassland in northeastern Wyoming.

216. These Forests have used the 2005 appropriations rider to authorize grazing without thorough environmental review on nearly 50 allotments, including on 37 allotments in the month before the rider expired. Many of these decisions violate the terms of the rider, including: (1) a September 28, 2006 decision authorizing grazing on the Centennial Ridge, Holmes and Table Mountain allotments; (2) a September 28, 2006 decision authorizing grazing on the Antelope, East Carter, Little Buffalo, Parkview, Rabbit Ears, West Carter, and Lindsey Creek allotments; (3) an August 30, 2006 decision authorizing grazing on the Egeria allotment; (4) a September 18, 2007 decision authorizing grazing on the Calf Creek, Cow Creek, Encampment, Hog Park, Jack Creek, and Spring Creek allotments; (5) a September 28, 2007 decision authorizing grazing in the Hahns Peak North Livestock Grazing Management area on the Big Agnes, Fireline, Hahns Peak, Grouse Mountain, and Fireline Driveway allotments; and

(6) a September 27, 2007 decision authorizing grazing in the Inyan Kara Analysis Vegetation Management area on the Adkins, Reynolds, Borgialli 310, Barton (Alkali), Stirling & Sewell (Buffalo Creek), Cranston, Kraft, Driskell, Fordyce, North Fork, Hansen, Kummerle, Materi, Mush Creek, Murray, Shannon, and Hedding (Alkali Draw) allotments.

217.    Most of these decisions violate the rider because they do not continue current grazing management.  The decisions authorize grazing on the vacant Rabbit Ears and Hog Park allotments, as well as on several allotments that had been in non-use at least once in the previous three years including the Table Mountain, Egeria, Calf Creek and Spring Creek allotments. Recent grazing has occurred far below the levels authorized by the decisions on the Kraft, Fireline, Hahns Peak, and Grouse Mountain allotments; and the Forest Service has no Actual Use Reports or Annual Operating Instructions over the last five years for the Hansen, Kummerle, Murray, Shannon and Alkali Draw allotments

218.    The decisions also violate the 2005 appropriations rider because, in many instances, monitoring does not show that the grazing management is meeting or moving toward Forest Plan objectives.  On the Table Mountain allotment, bare ground in portions of the allotment is increasing, riparian degradation is taking place, and the Wyoming Fish and Game Department expressed concern that it is overgrazed.  Many of the streams in the other allotments have not been monitored, and, of those that have, several are "functional at risk" with no upward trend.  Other documented adverse impacts to riparian areas include sedimentation likely caused by grazing impacts, damage to natural springs and creeks that affects water flow and causes erosion, and blue green algae blooms likely caused by grazing  In the Inyan Kara Vegetation Management area, which includes seventeen allotments, prolonged drought conditions combined with heavy grazing has reduced vegetation health and vigor in some areas.  The monitoring data for some allotments, including Cow Creek, Encampment, Alkali, North Fork and Adkins, demonstrates that grazing consistently exceeds Forest Plan standards.

219.    Several of the CE decisions for the Medicine Bow-Routt Forest also violate the Forest Service's extraordinary circumstances policy.  The Forest Service has not monitored habitat for sensitive species Colorado cutthroat trout on several allotments, including the

Antelope Creek allotment, which contains a core conservation population of the trout.
Continued grazing in the Inyan Kara and Hahns Peak Management Areas is likely to adversely
affect numerous sensitive species including the sage-grouse (also a Management Indicator
Species), loggerhead shrike, northern leopard frog, northern boreal toad, burrowing owl, black-
tailed prairie dog, bighorn sheep, mountain plover, Brewer's sparrow, and ptarmigan.  Limited
information or monitoring exists for other sensitive species whose habitat is found and could be
damaged by continued grazing on these allotments, including the sharp-tailed grouse, black-
footed ferret, Northern harrier, and ferruginous hawk.  Many of the allotments also contain
habitat for the Canada lynx, and the Forest Service has not demonstrated that grazing on these
allotments, combined with other cumulative impacts, is not harming this species.

### 3.  Pike and San Isabel National Forests

220.    The Pike and San Isabel National Forests cover nearly 3 million acres stretching
from alpine territory in the Rocky Mountains of Colorado to prairie grasslands in Western
Kansas, comprising one of the most diverse forests in the Rocky Mountain Region.  The Forests
are home to an extraordinary diversity of animal species, and numerous sensitive and unique
plants.  The San Carlos Ranger District, in south-central Colorado, is the southernmost part of
the San Isabel National Forest.  Elevations within this district range from 7,500 to 14,000 feet.
It encompasses the eastern half of the Sangre de Cristro Range and the Sangre de Cristo
Wilderness Area.

221.    Plaintiffs challenge the September 21, 2007 CE issued from this Forest that
authorized grazing on four allotments—Antelope, Breece, Huerfano, and Red Creek—spanning
22,356 acres in the San Carlos Ranger District.

222.    It is not apparent whether any of these allotments maintain current grazing
management.  "Use and Management" reports for each allotment indicate historical patterns of
use, but these reports do not contain detail grazing that took place on specific years.

223.    The CE violates the second rider requirement because the Forest Service does not
have monitoring data showing that current grazing is meeting or moving toward Forest Plan
objectives, particularly with respect to riparian areas.  The Forest Service has failed to monitor

54

adequately the riparian areas within these allotments, even though it concluded that "the riparian zone is highly susceptible to impacts from livestock grazing and historical monitoring data would be invaluable for interpreting site potential and trend for riparian health." The Forest Service has acknowledged that certain riparian areas in the Antelope, Breece, and Huerfano allotments have been grazed heavily and that grazing has caused stream bank erosion, trampling of plant life, and other problems. Upland range conditions on the Breece allotment are also degraded in some areas, with one pasture recently rated as "fair to poor and trend appears to be downward;" while another pasture has only 6% desirable species.

224.    The CE also violates the third rider requirement because it is inconsistent with the Forest Service's extraordinary circumstances policy. The Forest Service has not shown that continued grazing on these allotments will not harm three threatened wildlife species: greenback cutthroat trout, Mexican spotted owl, and Canada lynx. Likewise, the Forest Service has failed to show that continued grazing on these allotments will not harm numerous sensitive plant species, and even acknowledges that grazing may lead to the local extirpation of several of these plants. The Decision Memo does not incorporate monitoring and mitigation measures that the Forest Service deemed "necessary to ensure population viability" for greenback cutthroat trout, Hall's fescue, lesser bladderwort, dwarf milkweed, and Colorado Springs evening primrose.

## I.    Unlawful CEs Issued In Oregon Forests

### 1.    Malheur National Forest

225.    The Malheur National Forest covers 1.7 million acres in eastern Oregon that stretch from the rugged Strawberry Mountains to the high desert sage-steppe and grassland communities in the southeast part of the state. The John Day River, which is one of the longest free-flowing rivers in the lower 48 states, originates on the Malheur National Forest and furnishes habitat there for salmon, steelhead, and bull trout.

226.    Plaintiffs challenge six CE decisions for this Forest that cover six allotments within Grant County, Oregon. On August 23, 2007, the Malheur National Forest issued a CE decision reauthorizing grazing on the Bridge Creek allotment, and on September 28, 2007 it issued five decisions reauthorizing grazing on the Antelope, Deardorff, Hot Springs, Indian

422276.01

Creek, and Rail Creek allotments, all in violation of the 2005 appropriations rider.

227. The decisions for the Bridge Creek and Deardorff allotments do not continue current grazing management. These two CE decisions authorize much more use on these allotments than what has occurred over the past five years, which includes several years of non-use. Thus, the CE decisions authorize increased use on these two allotments, in violation of the first requirement of the rider.

228. The six Malheur CEs also violate the second rider requirement because the Forest Service has not collected monitoring information showing that current grazing is meeting or satisfactorily moving toward Forest Plan objectives. On the Bridge Creek allotment, the Forest Service admits livestock grazing is impacting streams and other riparian areas, and completely failed to monitor upland condition and trend, wildlife habitat, and cultural resource sites.

229. For the other five allotments, the Forest Service is relying almost exclusively on utilization monitoring, with little to no evidence of: (1) long-term condition and trend monitoring for upland communities; (2) monitoring of key riparian and stream parameters or fish habitat; (3) inventories of other unique riparian areas like meadows, seeps, springs, intermittent streams, and aspen stands; or (4) surveys for wildlife species and habitat conditions.

230. Finally, these CE decisions do not comply with the extraordinary circumstances policy. Threatened salmon, steelhead, and bull trout occupy several of these allotments, while sensitive species Columbia spotted frog, sage-grouse, pygmy rabbit, mottled sculpin, redband trout, cutthroat trout, and numerous plants have habitat on the allotments. Yet the Forest Service has not adequately assessed the individual or cumulative impacts to these imperiled species from authorizing grazing on all these allotments.

**2.     Umatilla National Forest**

231. The 1.4 million acre Umatilla National Forest is located in the picturesque Blue Mountains of northeast Oregon and southeast Washington. The river valleys, ridges, and plateaus of this forest are home to a variety of fish and wildlife, including salmon and steelhead, bighorn sheep, and one of the largest herds of Rocky Mountain elk found on any national forest in the country.

422276.01

232.    The Umatilla National Forest has issued numerous CE decisions that violate the 2005 appropriations rider, including: (1) two decisions dated December 14, 2005 authorizing grazing on the Lucky Strike and Klondike allotments; (2) four decisions dated December 15, 2005 authorizing grazing on the Little Wall, Monument, Tamarack, and Hardman allotments; (3) two decisions dated December 29, 2006 authorizing grazing on the Yellow Jacket and Collins Butte allotments; (4) two decisions dated September 27, 2007 authorizing grazing on the Thompson Flat and Matlock allotments; and (5) a decision dated September 28, 2007 authorizing grazing on the Ditch Creek allotment.  These 11 allotments cover almost 221,000 acres.  Most are adjacent or in close proximity to one another on the western portion of the Forest.

233.    The Forest Service issued these decisions in violation of the second rider requirement because it did not have monitoring to show that current grazing is meeting or moving toward Umatilla Forest Plan objectives for many resources.  For instance, the Forest lacks current required monitoring data on riparian resources (including seeps, springs, and other wetlands), fish and wildlife population trends and habitat conditions, and utilization of grasses and woody shrubs in uplands.  And the monitoring data that does exist for fish habitat does not show that the forest is meeting or satisfactorily moving toward riparian management objectives instituted to protect threatened steelhead present on the allotments.

234.    The CE decisions also are inconsistent with Forest Service policy on extraordinary circumstances.  For one, the Forest Service has not even surveyed for sensitive species Columbia spotted frogs and gray flycatchers although suitable habitat for these species exists throughout these allotments and grazing can impact that habitat.  Furthermore, the CE decisions do not consider their cumulative impact of authorizing grazing across a quarter-million acres of the Umatilla National Forest not only on populations of sensitive species, but also on threatened steelhead and its critical habitat that exist on these allotments.  Finally, continued grazing threatens hundreds of archeological and cultural sites found on the allotments.

**J.    Unlawful CEs Issued In Washington Forests**

      **1.    Okanogan-Wenatchee National Forests**

235.    The Okanogan and Wenatchee National Forests joined in 2000 to form one

1    administrative unit, covering over 4 million acres in central Washington.  The Okanogan portion

2    of the forest is in remote north-central Washington, just south of the Canadian border, east of

3    North Cascades National Park, and north of Lake Chelan.  This forest contains habitat for the

4    few remaining grizzly bears and wolves found in Washington as well as lynx, wolverine, salmon

5    and steelhead, and many other rare species.

6          236.    The Forest Service has issued three CE decisions for the Okanogan portion of the

7    forest that violate the 2005 appropriations rider:  (1) a March 23, 2006 decision for the Tiffany,

8    Ramsey, and East Chewack allotments;[9] (2) a September 19, 2007 decision for the Big Canyon,

9    Funk, Mutton Creek, and Schalow allotments ("Big Canyon CE"); and (3) a September 26, 2007

10   decision for the Fawn and Goat Creek allotments.  These allotments combined cover more than

11   92,000 acres in Okanogan County.

12         237.    These decisions do not continue current grazing management for two allotments.

13   The Schalow allotment was in non-use from 2003 to 2007, and livestock numbers on the Goat

14   Creek allotment were reduced by 25% for at least the past four years.  Yet the CE decisions

15   authorize full permit numbers for both allotments for another ten years.

16         238.    These CEs also do not comply with the 2005 appropriations rider because

17   current grazing on these allotments is not meeting Forest Plan objectives.  The Forest Service has

18   documented adverse impacts to riparian areas from livestock trampling streambanks and

19   wetlands (many of which contain rare plants), contributing sediment and pollution to streams,

20   and impairing other stream channel attributes.  Grazing is also harming uplands in some areas

21   through overuse of vegetation along with soil disturbance and compaction.  The agency has

22   documented problems from noxious weeds as well.

23         239.    In fact, the Forest Service has proposed actions for the Ramsey and East

24   Chewack allotments as well as the Big Canyon CE allotments to address these problems through

25   construction of more fences and water developments and shifting the grazing season on the

26   Ramsey allotment to reduce impacts to riparian and upland areas and prevent access to sensitive

27   

28   ───────────────
[9]     The Tiffany allotment has been vacant since 1987 and the CE decision closes the
     allotment permanently.  Plaintiffs agree with that part of the decision, but challenge the use of

1   botanical areas that contain numerous rare plants. Yet the Forest Service is continuing to

2   authorize grazing on all these allotments with CEs.

3       240.    Finally, this CE decision is not consistent with the extraordinary circumstances

4   policy. Livestock are harming sensitive plant habitat as well as riparian habitat for sensitive fish

5   species and Columbia spotted frog; and the Forest Service has never even conducted surveys or

6   habitat assessments for sensitive wildlife species such as great gray owls and gray flycatchers.

7       **2.    Colville National Forest**

8       241.    The 1.1 million acre Colville National Forest occurs in the northeast corner of

9   Washington. This forest was shaped by ice-age glaciers that forged the valleys for the Columbia,

10  San Poil-Curlew, and Pend Oreille Rivers. These valleys separate three mountain ranges that run

11  from north to south on the forest: the Okanogan, Kettle River, and Selkirk Mountains.

12      242.    On January 8, 2007, the Colville National Forest issued the Big Border complex

13  CE decision, covering the Churchill, Day Creek, Elbow Lake, Graphite, Hope, Jasper, Little

14  Boulder, Lone Ranch, and Vulcan allotments, in violation of the 2005 appropriations rider.

15  These allotments, which cover roughly 142,000 acres, fall on both the Colville and Okanogan-

16  Wenatchee National Forests but are administered solely by the Colville National Forest.

17      243.    These allotments violate the 2005 appropriations rider because the Forest Service

18  has not demonstrated that grazing is meeting or satisfactorily moving toward Forest Plan

19  objectives. The monitoring that exists shows that grazing is having serious adverse impacts on

20  many streams and wetlands throughout these allotments, and the CE decision even includes a

21  "commitment" to address these problems through various fencing, water development,

22  streambank protection, and plant seeding projects. The Forest Service also recognizes the

23  potential for adverse impacts to sensitive plants found on the allotments, yet has not surveyed to

24  determine the extent of damage from grazing to these plant populations.

25      244.    Monitoring is lacking for soil condition and upland vegetation condition and

26  trend, and the data that exists shows that some areas are degraded due to grazing. Finally, the

27  Forest Service has completely failed to monitor fish and wildlife population trends and habitat

28

the CE to continue grazing on the Ramsey and East Chewack allotments.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01

1    conditions, including for Management Indicator Species deer and beaver and sensitive species

2    great gray owls, redband trout and cutthroat trout.

3        245.    The Big Border CE does not comply with the extraordinary circumstances policy

4    either because of the significant adverse impacts to sensitive fish species that are occurring due

5    to livestock grazing, as well as the lack of information about grazing impacts on sensitive

6    wildlife species such as great gray owls.

7        246.    These allegations summarize the widespread abuse of the 2005 appropriations

8    rider by the Forest Service to avoid any comprehensive and public discussion of the

9    environmental impacts from grazing hundreds of allotments.  This abuse is particularly

10    troublesome because almost none of these allotments have undergone proper NEPA analysis for

11    20 to 40 years.   Plaintiffs therefore request the Court reverse and remand these CE decisions and

12    require the Forest Service to conduct EAs or EISs for these allotments.

13    <center>**FIRST CLAIM FOR RELIEF**</center>

14    <center>**(FOR VIOLATIONS OF THE 2005 APPROPRIATIONS RIDER)**</center>

15        247.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

16        248.    The Forest Service has violated section 339 of the FY 2005 Consolidated

17    Appropriations Act, Public Law Number 108-447, by authorizing livestock grazing using

18    categorical exclusions, where those authorizations do not meet the terms of this appropriations

19    rider.  Such violations include, but are not limited to:

20        a.    Authorizing grazing that is greater than or otherwise different from current

21        grazing management, in violation of the rider's first requirement;

22        b.    Authorizing grazing without having adequate monitoring information to

23        demonstrate that current grazing management is meeting or satisfactorily moving

24        toward Forest Plan objectives, or alternatively where monitoring information

25        shows that current grazing management actually is not meeting or satisfactorily

26        moving toward Forest Plan objectives, in violation of the rider's second

27        requirement; and

28        c.    Authorizing grazing that is not consistent with the Forest Service's policy on

<center>60</center>

1    extraordinary circumstances, in violation of the rider's third requirement.

2    249.    This claim is brought pursuant to the judicial review provisions of the APA, 5

3    U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

4    250.    The Forest Service's violations of the 2005 appropriations rider are arbitrary,

5    capricious, an abuse of discretion, and not in accordance with law under the APA, which has

6    caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

7    **SECOND CLAIM FOR RELIEF**

8    **(FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT)**

9    251.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

10    252.    The Forest Service has violated the National Environmental Policy Act, 42

11    U.S.C. § 4321 et seq., and NEPA's implementing regulations by authorizing livestock grazing

12    without first conducting the necessary environmental analysis of the impacts of such grazing in

13    an EA or EIS in light of the potentially significant impacts that each of the challenged CE

14    grazing decisions will have.

15    253.    This claim is brought pursuant to the judicial review provisions of the APA, 5

16    U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

17    254.    The Forest Service's violations of NEPA are arbitrary, capricious, an abuse of

18    discretion, and not in accordance with law under the APA, which has caused or threatens serious

19    prejudice and injury to Plaintiffs' rights and interests.

20    **PRAYER FOR RELIEF**

21    WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

22    A.    Adjudge and declare that the Defendant Forest Service has violated the 2005

23    appropriations rider; and reverse and set aside the grazing decisions challenged herein as being

24    arbitrary, capricious, an abuse of discretion, and/or contrary to law, pursuant to the judicial

25    review standards of the APA, 5 U.S.C. § 706(2);

26    B.    Adjudge and declare that the Defendant Forest Service has violated NEPA; and

27    order the Forest Service to conduct an appropriate environmental analysis in an EA or EIS for

28    the decisions challenged herein.

C.      Permanently enjoin the Defendant Forest Service from proceeding to reauthorize grazing under the terms of the 2005 appropriations rider, unless and until the Forest Service can demonstrate compliance with the rider, specifically by showing that: (1) each decision does not authorize grazing at levels greater than the average use from the previous three to five years; (2) the agency has adequate current and long-term monitoring data for all ecosystems and communities within an allotment that will be subject to livestock grazing and all fish and wildlife habitat needs and resources impacted by livestock, and that data conclusively shows that all affected resources are meeting or satisfactorily moving toward Forest Plan objectives; and (3) the Forest Service has surveyed for all extraordinary circumstance resource conditions that potentially could exist on the allotment, assessed the actual condition of the resources present and the impacts of livestock upon them, and has determined that the individual and cumulative impacts of the decision combined with other past, present, and future activities will have no adverse impact on any resource conditions;

D.      Enter such other declaratory relief, and temporary, preliminary, and/or permanent injunctive relief, as may be prayed for hereafter by Plaintiffs;

E.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and/or all other applicable authorities; and/or

F.      Grant such further relief as the Court deems just and proper in order to provide Plaintiffs with relief and protect the public interest.

422276.01

1    Dated:  August 6, 2008                                    KEKER & VAN NEST, LLP

2

3
                                                    By:  /s/ Klaus H. Hamm_____
4                                                        Jeffrey R. Chanin
                                                         Klaus H. Hamm
5                                                        Warren A. Braunig
                                                         Attorneys for Plaintiffs
6                                                        WESTERN WATERSHEDS PROJECT;
                                                         NATURAL RESOURCES DEFENSE
7                                                        COUNCIL; CENTER FOR BIOLOGICAL
                                                         DIVERSITY; CALIFORNIA TROUT;
8                                                        ENVIRONMENTAL PROTECTION
                                                         INFORMATION CENTER; KLAMATH
9                                                        SISKIYOU WILDLANDS CENTER; LOS
                                                         PADRES FOREST WATCH; SIERRA
10                                                       FOREST LEGACY; SEQUOIA
                                                         FORESTKEEPER; GRAND CANYON
11                                                       TRUST; UTAH ENVIRONMENTAL
                                                         CONGRESS; RED ROCK FORESTS; and
12                                                       OREGON NATURAL DESERT
                                                         ASSOCIATION.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FISCAL YEAR 2005 CONSOLIDATED
APPROPRIATIONS ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT
Case No.: C 08-01460 PJH

422276.01