RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
DAVID B. GLAZER (D.C. 400966; MD)
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Telephone:    (415) 744-6491
Facsimile:    (415) 744-6476
E-mail:  david.glazer@usdoj.gov
ALISON D. GARNER (UT 9988)
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663, Ben Franklin Station
Washington, D.C.  20004-0663
Telephone:    (202) 514-2855
Facsimile:    (202) 305-0506
E-mail:  alison.garner@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.,* ) | No. 08-CV-1460 PJH |
| ) | |
| Plaintiffs, ) | DECLARATION OF DAVID B. GLAZER |
| ) | SUBMITTED IN SUPPORT OF |
| v. ) | DEFENDANT'S MOTION TO SEVER |
| ) | CLAIMS AND TRANSFER VENUE |
| ) | |
| UNITED STATES FOREST SERVICE, ) | Date:    September 10, 2008 |
| ) | Time:  9:00 a.m. |
| Defendant. ) | |
| ) | Hon. Phyllis J. Hamilton |

I, David B. Glazer, hereby declare as follows:

1.    I am attorney of record appearing in the above-captioned matter for Defendant United States Forest Service.

2.    Attached hereto as Exhibit 1 is a true and correct copy of an order entered on December 18, 2003, by the U.S. District Court for the Northern District of Georgia in *Wild South, et al. v. Jacobs, et al.*, Civil Action No. 1:03-CV-1230-ODE.  The order is cited in Defendant's memorandum of law in support of its Motion to Sever Claims and Transfer Venue [Dkt. #51] and was originally submitted as an attachment to that memorandum [Dkt. #51-3].

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 8th day of August, 2008, in the City and County of San Francisco, California.

/s/David B. Glazer
DAVID B. GLAZER



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C.-Atlanta

DEC 18 2003

LUTHER D. THOMAS, CLERK
By:
Deputy Clerk

WILD SOUTH; FRIENDS OF
MISSISSIPPI PUBLIC LANDS;
SOUTHERN APPALACHIAN
BIODIVERSITY PROJECT; VIRGINIA
FOREST WATCH; OUACHITA WATCH
LEAGUE; JERRY WILLIAMS; FOREST
CONSERVATION COUNCIL; THE JOHN
MUIR PROJECT OF EARTH ISLAND
INSTITUTE; TEXAS COMMITTEE ON
NATURAL RESOURCES; and
SIERRA CLUB,

    Plaintiffs

v.

ROBERT JACOBS, in his official
capacity as Regional Forester
of the Southern Region of the
U.S. Forest Service; DALE
BOSWORTH, in his official
capacity as Chief of the U.S.
Forest Service; the UNITED
STATES FOREST SERVICE, an
agency of the United States
Department of Agriculture; ANN
VENEMAN, in her official
capacity as Secretary of the
U.S. Department of
Agriculture; and UNITED STATES
DEPARTMENT OF AGRICULTURE,

    Defendants

CIVIL ACTION NO.
1:03-CV-1230-ODE

ORDER

  This civil action in which Plaintiffs, various environmental

organizations, challenge the action of Defendants in approving

timber sales and projects in the National Forests of Arkansas,

Mississippi, Texas, and Virginia, in violation of the

Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, the

National Forest Management Act (NFMA), 16 U.S.C. § 1600 et seq.,

and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. is currently before the Court on Defendants' Motion to Sever Plaintiffs' Claims and to Transfer Venue for Such Claims to the United States District Court for the Western District of Arkansas, the United States District Court for the Southern District of Mississippi, the United States District Court for the Southern District of Texas, and the United States District Court for the Western District of Virginia [# 29]. A hearing was held on this motion on December 11, 2003. For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants' Motion.

I.   Background

The instant case is a challenge to thirty-two (32) timber sales[1] in eight different National Forests in the United States Forest Service's Region 8[2], which is headquartered in Atlanta. Plaintiffs are nine environmental organizations and one individual.[3] Defendants are three individuals, each sued in their

---

[1] Specifically, Defendants have contracted with various private companies who will cut and haul away the timber. These contracts apparently also call for the creation of roads in some cases to permit access to the trees which are to be harvested.

[2] Region 8, also known as the Southern Region, encompasses Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas and Virginia.

[3] Plaintiffs are as follows: Wild South, an Alabama non-profit corporation based in Montgomery; Friends of Mississippi Public Lands, a Mississippi non-profit corporation based in Starkeville; Southern Appalachian Biodiversity Project, a North Carolina non-profit corporation based in Asheville; Virginia Forest Watch, a Virginia based non-profit corporation; Ouachita Watch League, an Arkansas based non-profit corporation; Texas Committee on Natural Resources, a Texas non-profit corporation

official capacity - Robert Jacobs, Regional Forester for Region 8;
Dale Bosworth, Chief of the United States Forest Service; and Ann
Veneman, Secretary of the United States Department of Agriculture
- and two agencies, the United States Forest Service and the
United States Department of Agriculture.   The challenged timber
sales occurred in the National Forests of Arkansas, Mississippi,
Texas, and Virginia.   Specifically, five sales occurred in
Arkansas (Ouachita National Forest), thirteen sales occurred in
Mississippi (Homochitto, De Soto, Bienville and Delta National
Forests), one sale occurred in Texas (Sam Houston National
Forest), and thirteen sales occurred in Virginia (Thomas Jefferson
and George Washington National Forests).

Plaintiffs' complaint includes four counts.   Count I alleges
that Defendants violated the National Forest Management Act
("NFMA"), 16 U.S.C. § 1600 et seq. and NFMA's implementing
regulations, specifically 36 C.F.R. §§ 219.19, 219.26, by failing
to collect necessary monitoring data prior to approving the timber
sales at issue.   Plaintiffs charge that these approvals as well as
Defendants' denials of the administrative appeals of these
approvals are arbitrary and capricious in violation of the
Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.   Count
II alleges that Defendants violated Forest Plan[4] Requirements for

based in Houston; Forest Conversation Council, a national non-
profit environmental membership organization; John Muir Project,
a project of the Earth Island Institute which is a national non-
profit environmental organization; Sierra Club, a national non-
profit environmental organization; and Jerry Williams, an
individual resident of Arkansas.

[4] Within the statutory scheme, these plans are also referred
to as land and resource management plans ("LRMPs").   There are

3

Management Indicator Species ("MIS") by failing to collect necessary monitoring data and that such actions are arbitrary and capricious under the APA.  Count III alleges that Defendants violated Forest Plan Requirements for species designated as proposed, endangered, threatened, or sensitive ("PETS") by failing to collect population inventory information or, in the alternative, by failing to comply with PETS monitoring requirements and that such actions are also arbitrary and capricious under the APA.  Count IV alleges that the challenged decisions were not made in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. because Defendants performed Environmental Assessments ("EAs") that improperly resulted in a Finding of No Significant Impact ("FONSI") for each timber sale at issue, thus improperly avoiding further preparation of a Environmental Impact Statement ("EIS"). Plaintiffs seek: (1) a declaratory judgment finding that the agency violated the APA, NFMA, NEPA, and the applicable implementing regulations; (2) an order setting aside and vacating all of the challenged project decisions; and (3) injunctive relief to enjoin the agency from proceeding with all of the challenged projects.

On October 23, 2003, Defendants' counsel informed Plaintiffs that several logging operations had begun on the challenged timber sales lands in Arkansas, Mississippi, and Virginia and that several more were scheduled to begin operation within two weeks of that date.  On December 11, 2003, Defendants filed supplemental

---

five Forest Plans at issue in the instant suit.

4

declarations reporting the current status of those projects as
follows:

(1)   Arkansas:  Four projects with ongoing operations and three
      projects that may have operations within the next two weeks.

(2)   Mississippi:  Four projects with ongoing operations and nine
      projects that will not have operations within the next two
      weeks but may have operations thereafter.

(3)   Texas: One project that will not have operations within the
      next thirty days.

(4)   Virginia:  Two projects with ongoing operations and eleven
      that will not have operations within the next two weeks but
      may have operations thereafter.

Defs.' Supplemental Decls. [# 58].  Contemporaneously with this
order, the Court has issued an order granting in part Plaintiffs'
Motion for a Temporary Restraining Order and enjoining the
Arkansas projects from further logging pending further order of
the Court.

      Because the administrative and statutory schemes that these
timber sales took place under are important to the resolution of
Defendants' severance motion, a synopsis of that framework
follows.  Approximately one hundred and ninety million acres of
federal public land in the United States are managed by the Forest
Service.  The Forest Service operates primarily under the NFMA.
16 U.S.C. § 1600  et seq.  Under the NFMA, forest planning and
management occurs at two levels: National Forest and project.  36
C.F.R. Pt. 219.  At the first level, the Forest Service develops
a Forest Plan, or LRMP, which is a broad, programmatic document,
accompanied by an environmental impact statement and public review

5

process conducted in accordance with NEPA.  42 U.S.C. § 4331 <u>et seq</u>.  The Forest Plan must coordinate the management of "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness."  16 U.S.C. § 1604(e)(1).  The Forest Plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives."  <u>Id</u>. § 1604(g)(3)(B).

At the second level, the Forest Service implements the Forest Plan by approving or disapproving particular projects such as the timber sales at issue here.  Proposed projects must be consistent with the Forest Plan and are subject to further NEPA review.[5]  16 U.S.C. § 1604(I).

To carry out the mandate of NFMA, which requires, among other things, ensuring a diversity of plant and animal species and maintaining the viability of desired species, the Forest Service has promulgated regulations.  At issue in this case is 36 C.F.R. Part 219 which sets forth the process for amending and revising

---

[5]  The Supreme Court in <u>Ohio Forestry Ass'n v. Sierra Club</u>, 523 U.S. 726 (1998), described the administrative process as follows.  A Forest Plan must permit logging to take place on the federally owned land by setting logging goals such as the areas of the forest that are suited to timber production or the appropriate method of timber harvest, but the Plan does not by itself permit the logging.  <u>Id.</u> at 729.  Before the Forest Service can permit the logging, it must (1) propose a specific area in which the logging will take place and the harvesting methods to be used; (2) ensure that the project is consistent with the Plan; (3) provide those affected by proposed logging notice and an opportunity to be heard; (4) conduct an environmental analysis pursuant to NEPA; and (5) subsequently make a final decision to permit logging (called a Record of Decision, "ROD"), which affected persons may challenge in an administrative appeals process (first with an appeal reviewing officer, then with an appeal deciding officer - here, the Regional Forester) and in court (APA review of final agency action, as here).  <u>Id.</u> at 729-30.

Forest Plans, for monitoring the results of the Plans, and for guiding the selection and implementation of site-specific actions.[6]     Section 219.26 titled "Diversity" is a general statement of policy which reads:

> Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process.     Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices.

36 C.F.R. § 219.26.     In addition to this general mandate, 36 C.F.R. § 219.19, titled "Fish and Wildlife resource" focuses specifically on the management of viable populations of fish and wildlife providing in pertinent part:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.     For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area.     In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.
>
> (a) Each alternative shall establish objectives for the maintenance and improvement of habitat for management indicator species selected under paragraph (g)(1) of this section, to the degree consistent with overall multiple use objectives of the alternative.     To meet

---

[6]     These regulations were superseded by other regulations adopted in the Clinton Administration.     However, the Bush Administration suspended those regulations which had the effect of reinstating the prior Part 219 regulations cited here.     Interim Final Rule, 68 Fed. Reg. 53294 (Sept. 10, 2003).

this goal, management planning for the fish and wildlife resources shall meet the requirements set forth in paragraphs (a)(1) through (a)(7) of this section.

. . . .

(6) Population trends of the management indicator species will be monitored and relationships to habitat changes determined. This monitoring shall be done in cooperation with State fish and wildlife agencies, to the extent practicable.

36 C.F.R. § 219.19. The function of Management Indicator Species ("MIS") in the statutory scheme is a key component in Plaintiffs' claims. Subsection 219.19(a) explains that MIS may serve as surrogates for other species in the process of monitoring the effects of management decisions on wildlife. Under this concept, MIS are used as proxies and a Forest Plan must include a listing of MIS for the area covered by the Forest Plan.

Plaintiffs claim (Count I & II) that before the Forest Service approved the timber sales at issue, it should have collected certain data on MIS - data that would gauge the effect of the loss of habitat on the MIS and by analogy the loss of habitat on the other species for which MIS serve as proxies. Plaintiffs also claim (Count III) that the Forest Service should have conducted population inventories for sensitive species - called *proposed, endangered,* threatened or sensitive species ("PETS") - species which usually differ from the MIS although they may overlap.

Additionally, Plaintiffs claim (Count IV) that Defendants violated the NEPA by approving the timber sales without issuing an Environmental Impact Statement ("EIS") rather than relying only an Environmental Assessment ("EA"). Under NEPA, when a federal agency proposes action, such as the timber sales here, it first

8

must comply with NEPA's environmental assessment ("EA") procedures. 40 C.F.R. § 1500 et seq. Under these procedures, a EA is prepared for every project which examines the environmental impacts of a proposed action and provides and evaluates alternatives to the action. Id. If the EA concludes that the proposed action will be significant, an EIS must be prepared. 42 U.S.C. § 4332(2)(C). An EIS is a more thorough and searching review of all of the reasonably foreseeable environmental impacts associated with the action and requires the generation and review of all available relevant scientific evidence. Id. If the EA concludes that the proposed action will not be significant, then a finding of no significant impact ("FONSI") is issued and the action can proceed without further NEPA analysis unless that conclusion is successfully challenged in Court. 40 C.F.R. § 1508.13. Under Count IV, Plaintiffs seek to challenge the FONSI conclusions as to each of the thirty-two projects at issue in this case.

The United States Court of Appeals for the Eleventh Circuit's decision in Sierra Club v. Martin, 168 F.3d 1 (1999), is central to this case though not dispositive of all of Plaintiffs' claims. Martin involved the Chattahoochee and Oconee National Forests in northern Georgia. In 1991, the Forest Service proposed seven timber sales on approximately 2000 acres of the forest and completed the requisite site-specific studies regarding the environmental impacts of the proposed sales. After the sales were approved, the Sierra Club and other environmental groups filed suit in the Northern District of Georgia alleging that the timber harvest approvals violated the NFMA. The district court granted

9

summary judgment to the Forest Service but on appeal, the Eleventh Circuit overturned the district court.    First, the Eleventh Circuit addressed the Sierra Club's argument that the Forest Service violated NFMA by failing to comply with the Forest Plan's requirement that population inventory information on PETS be gathered and considered before implementing any decision affecting areas within the Forest.    Martin, 168 F.3d at 3.    It was undisputed that the Forest Service did not have the data at issue but the Forest Service argued that it had discretion to make determinations of potential impact based on information other than population inventory data, strictly defined.    Id. at 4.    The Eleventh Circuit disagreed and said that it could not defer to the Forest Service's FONSI conclusions when no evidence in the record supported the Forest Service's conclusion that the timber projects would not significantly impact species' diversity or viability. Id.    Rather, the Eleventh Circuit found that there was a complete lack of inventory or population data on thirty-two of the thirty-seven vertebrate PETS species which inhabit the Chattahoochee National Forest.    Id.    The Eleventh Circuit came to this conclusion, not based on NFMA or its implementing regulations by themselves, but based on the language of the Forest Plan at issue which made mandatory the requirement to gather such data.    Id. at 5.    In the light of the Forest Plan's requirements and the failure by the Forest Service to gather the necessary information, the Eleventh Circuit found the agency's position to be contrary to the

clear language of the Plan and statute, and thus not entitled to any deference.[7] <u>Id.</u>

Next, the Eleventh Circuit addressed the Sierra Club's claim that the Forest Service violated 36 C.F.R. §§ 219.19 and 219.26 because it failed to collect population data for MIS (as required by § 219.19) and for all affected species (as required by § 219.26). <u>Id.</u> The Eleventh Circuit first noted that "[t]he obligations of the Forest Service with regard to the Forest Plan continue throughout the Plan's existence," and thus challenges to site-specific projects under section 219.19 were proper. <u>Id.</u> at 6. Then it addressed the substantive dispute over whether the regulations required the collection of population data. It found the requirement in the regulations that population trends be monitored to include an implicit requirement that such data be collected but found that the combination of §§ 219.26 and 219.19 only required the Forest Service to collect inventory data on MIS rather than on all species in the Forest. <u>Id.</u> Its reasoning was as follows:

> MIS are proxies used to measure the effects of management strategies on Forest diversity; Section 219.19 requires that the Forest Service monitor their relationship to habitat changes. Section 219.26 requires the Forest Service to use quantitative inventory data to assess the Forest Plan's effects on diversity. If § 219.19 mandates that MIS serve as the means through which to measure the Forest Plan's impact on diversity and § 219.26 dictates that quantitative data be used to measure the Plan's impact on diversity, then, taken together, the two regulations require the

---

[7] As in <u>Martin</u>, this Court's standard of review under the APA is the arbitrary and capricious standard – meaning that agency action should be reversed if found to be "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Forest Service to gather quantitative data on MIS and use it to measure the impact of habitat changes on the Forest's diversity.

Id.

Defendants argue that the <u>Martin</u> decision, while holding that the Forest Service must collect MIS data before approving site-specific projects, does not lend support to the view that the Forest Service must collect site specific data before it approves any site-specific decision.[8]   Rather, Defendants submit that the <u>Martin</u> Court's decision was premised on the Forest Service's failure to collect MIS data at the forest-wide level before approving a site-specific project.   Defendants argue that in this case, they did collect MIS data on a forest-wide basis as required by <u>Martin</u>, although some data may be missing.

Defendants also point to other decisions of courts that support the view that when the Forest Service relies upon sufficient forest-wide data in making a site-specific decision, it need not separately monitor MIS in the project area itself.   These courts have relied on a combination of habitat analysis and

---

[8]   Defendants also point out that courts are divided on whether the Forest Service needs to collect data regarding MIS at all and if so, whether such data must be collected on the site-specific level.   <u>See</u> <u>Indiana Forest Alliance v. U.S. Forest Serv.</u>, 325 F.3d 851 (7th Cir. 2003) (finding that Forest Service could rely on baseline forest-wide data in combination with other habitat data); <u>Inland Empire Public Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754 (9th Cir. 1996) (upholding use of habitat analysis); <u>Appalachian Voices v. U.S. Forest Serv.</u>, Civ. No. 7:02CV00526 (W.D. Va. Dec. 12, 2002)(finding that habitat data on a forest-wide level can be used to determine the effect on MIS at a site-specific level as long as the Forest Service also relies on other data regarding population trends); <u>Kirchbaum v. Kelley</u>, 844 F. Supp. 1107 (W.D. Va. 1994) (approving of "habitat plus" approach).   Of course, established law of the Eleventh Circuit is binding on this Court.

12

population data - what the Defendants term the "habitat plus" approach.   Plaintiffs respond that some courts interpreting _Martin_ have held that population data must be collected at the project or site-specific level as well.[9]   Defendants appear to admit that they have not collected such data for individual project sites.

## II.   Applicable Law

Defendants seek to sever Plaintiffs' claims under Federal Rules of Civil Procedure 20 and 21 for misjoinder.  They ask the Court to sever the suit into thirty-two separate lawsuits or, in the alternative, to sever the case into four lawsuits, one each for the sales in Arkansas, Mississippi, Texas, and Virginia.  A party seeking joinder under Federal Rule of Civil Procedure 20 must establish two prerequisites: (1) a right to relief arising out of the same transaction or occurrence, and (2) some question of law or fact common to all persons seeking to be joined.  _See_ Fed. R. Civ. P. 20(a).  Under Federal Rule of Civil Procedure 21 a court may sever any claim or party that is misjoined and proceed separately.

Defendants also seek to transfer the venue of these cases to the District Courts for the Western District of Arkansas, Southern District of Mississippi, Southern District of Texas, and Western District of Virginia under 28 U.S.C. § 1404(a).  Section 1404(a)

---

[9]   _See_ _Utah Envtl. Congress v. Zeiroth_, 190 F. Supp. 2d 1265 (D. Utah 2002) (citing _Martin_ and holding that data requirements apply at a site-specific level for proposed timber sales); _Forest Guardians v. U.S. Forest Serv._, 180 F. Supp. 2d 1273 (D. N.M. 2001) (citing _Martin_ and holding that population surveys must be performed in timber sale area).

reads: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In considering a motion to transfer venue pursuant to section 1404(a), the burden is on the moving party to establish the propriety of the transfer. In re Ricoh Corp., 870 F.2d 570 (11th Cir. 1989). Unless the balance of factors under section 1404(a) weighs strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 260 (11th Cir. 1996).

## III. Parties' Arguments

### A.    Severance

First, Defendants argue that misjoinder exists because the claims involve thirty-two unrelated timber projects that do not constitute a common transaction or series of transactions. They point out that because a different fact-intensive analysis was made as to each of the projects, resulting in thirty-two decisions ("Decision Notice and Finding of No Significant Impact") by the District Ranger in the corresponding National Forest, these sales do not constitute a series of transactions. While the Regional Forester, based in Atlanta, ruled on the appeals from the various District Rangers' determinations, Defendants argue that the Regional Forester's rulings pointed to facts pertinent to the particular circumstances of each case.

Second, Defendants argue that misjoinder exists because Plaintiffs' claims do not involve a common question of law or fact. Defendants submit that the essence of Plaintiffs' claims is

14

that the NFMA and/or the Forest Plans required the Forest Service to collect data on MIS and PETS species prior to authorizing site-specific projects involving timber harvesting.    But because different MIS and PETS species occur in each National Forest and thus the requirements for data collection differ, Defendants contend that a common question of fact cannot exist.    Defendants argue that the <u>Martin</u> claims do not constitute a common question of law because Plaintiffs' claims are in reality based on a "general legal theory" that does not provide the proper basis for joinder.

Plaintiffs argue in response that the Regional Forester denied each of these appeals based on a refusal to apply <u>Martin</u> - finding that quantitative MIS data and/or PETS population inventories were not required and/or that all necessary wildlife data existed.    They also submit that Defendants' actions demonstrate a region-wide policy in that for each timber sale, the Forest Service did not consider the impact of the sales significant enough to warrant the preparation of a further EIS and relied on the EA alone.    They also allege that in June of 1999, the Forest Service Regional Headquarters in Atlanta issued a regional directive to all Forest Supervisors in Region 8 authorizing them to continue with the MIS habitat analysis that <u>Martin</u> had held was insufficient to meet 26 C.F.R. §§ 219.19 and 219.26. [<u>See</u> Pls.' Mot. in Opp'n to Defs.' Mot. to Sever/Transfer Venue Ex. B].    Plaintiffs therefore assert a systemic failure to apply established law which makes joinder proper under Rule 20 regardless of whether separate decisions (or separate appeals) for particular projects were made.    Finally, Plaintiffs submit that

15

judicial economy favors continued joinder because severance of the case would multiply the proceedings.

### B.  Transfer

Defendants first argue that this case might have been brought in the judicial districts where the national forests are located, thus satisfying § 1404(a)'s "where it may have been brought" requirement.  Second, Defendants argue that the interests of justice favor transfer because in this case there is a compelling interest in having this localized controversy decided in the states where the National Forests are located.  In matters of environmental law and land use, Defendants argue that disputes should be resolved where the rights and interests of the suit are most vitally affected.  Third, Defendants argue that transfer would not prejudice or inconvenience the parties or witnesses in this case because most of them reside in the districts of proposed transfer and that the administrative record is located in those districts.

Plaintiffs argue in response first that the Northern District of Georgia is the only forum in which the action could be brought in its entirety and thus efficiency and convenience suggest that it should remain here.  Second, Plaintiffs argue that because this case is related to *Chattooga Conservancy et al. V. Robert Jacobs, et al.,* Civil Action No. 1:01-cv-1976-ODE (N.D.Ga.),[10] involving Arkansas timber sales, transfer is disfavored.  Thus, if this case is severed and transferred duplicative and possibly inconsistent

---

[10]*Chattooga* involves challenges to the regional Vegetation Management Environmental Impact Statement which allegedly changes the PETs monitoring provisions of the Ouachita Forest Plan.

16

results in several courts could result.  Third, Plaintiffs argue that their choice of venue is entitled to deference and should not be disturbed unless other considerations clearly outweigh their choice.  They argue that it is common for suits to be filed in the venue where the final administrative decision was made, even though the environmental impact is in another venue.  Fourth, they dispute Defendants' contention that this venue is inconvenient for the parties and witnesses.  They note that most of the environmental organization plaintiffs have offices throughout the Southern Region and that the Defendants reside in this district. They also argue that the inconvenience of the witnesses is not a persuasive factor in this case because this Court's review will be limited to the administrative record and thus it is unlikely that there will be any witnesses.

Finally, Plaintiffs argue that no interests of justice strongly favor transfer and that transfer would unduly prejudice Plaintiffs.  They dispute Defendants' argument that this case is a local interest by noting that the resource at issue is federal land and thus constitutes a national interest.  Plaintiffs argue that transfer would unduly prejudice them because a multiplication of proceedings would substantially harm their ability to bring these cases by increasing the time and litigation costs involved in managing multiple cases.

IV.  Analysis

A.  Severance

Under Rule 20(a), Plaintiffs must assert a claim that arises out of the same transaction or occurrence or series of transactions or occurrences to warrant joinder of claims.  The

17

term "transaction" in Rule 20 has been given a flexible meaning
and "may comprehend a series of occurrences, depending not so much
upon the immediateness of their connection as upon their logical
relationship." Alexander v. Fulton County, Ga., 207 F.3d 1303,
1323 (11th Cir. 2002) (quoting Moore v. New York Cotton Exchange,
270 U.S. 593, 610 (1926)).  Thus "all logically related events
entitling a person to institute a legal action against another
generally are regarded as comprising a transaction or occurrence."
Id. (internal citations omitted).  Here, Defendants submit that
the timber sales are thirty-two separate incidents approved under
different factual circumstances.  Plaintiffs counter that the
denial of their administrative appeals for all thirty-two sales by
the Regional Forester constitutes a logically connected series of
transactions because the Regional Forester engaged in a practice
of denying appeals based on Martin violations and that the
Regional Forester's June 1999 memorandum constitutes an occurrence
giving rise to each claim.

While the standard for joinder under Rule 20 is a liberal
one, the only logical connection between these claims is the
action of the Regional Forester in each administrative appeal of
these sales.   The sales were proposed and approved on an
individualized basis.  Moreover, the Forest Service conducted an
individualized EA on each sale and the purpose of each EA is to
consider the specific environmental impact of each sale on the
species in the proposed area.  Also, the Court does not believe
that the issuance of FONSIs as to the 32 projects means that there
is any policy disfavoring issuance of an EIS when needed;
determination of whether a FONSI was improperly issued must be

18

made on a case-by-case basis.  Finally, the Court does not find in Exhibit B, supra, any directive to disregard required population inventory in favor of habitat analysis.    Therefore, the Court concludes that these claims do not meet the first prong of the Rule 20 test because the only logical connection of these claims - the final action of the Regional Forester - is simply too tenuous.

These claims also must contain some common question of law or fact to meet the Rule 20(a) joinder standard.  Both sides appear to concede that different facts are involved (at least for projects in different forests) because each forest has different species that are considered MIS/PETS.    In terms of a common question of law, if Plaintiffs' arguments that 1) Martin requires site-specific population data or 2) that if such data is missing for any of the MIS identified by a Forest Plan is accepted, Plaintiffs would prevail on many of their 32 claims.  Thus, under the foregoing analysis, there may be a common question of law. However, because the Court finds that the first prong of Rule 20(a) test is not satisfied, joinder is not proper.

Furthermore, in terms of judicial economy, whether the case, even if joined properly, should be severed in the Court's discretion is another important consideration.  Severing this case into thirty-two separate cases would not be judicially efficient because it would compound the proceedings exponentially.  However because of the importance on the provisions of the various Forest Plans the case could proceed efficiently if severed into four cases, based on the four states and Forest Plans at issue.

19

Substantively, some of the claims in this case will likely proceed on two levels.[11] First, the Court must determine what each of the four Forest Plans require in terms of data collection. This determination could be a straight application of <u>Martin</u> or the Court may have to make the further legal determination of whether the statute in conjunction with the Forest Plans at issue require site-specific as opposed to forest-wide data collection on MIS and PETS species. Then, the Court would need to apply this rule of law to the administrative record for each timber sale and determine whether the approval of each of the thirty-two timber sales was based on sufficient MIS/PETS data. This analysis will differ based on data that the Forest Service collected for each site and will also differ based on the different requirements of the Forest Plans. Thus because of the improper joinder of these claims and the fact-specific nature of each timber sale at issue, the Court severs this case into four separate cases based on the states where the National Forests at issue are located.

B.    <u>Transfer</u>

Now the Court must address the transfer of these severed claims. In deciding this motion, the Court must consider whether the factors in § 1404(a) clearly outweigh Plaintiffs' choice of forum. The first two factors - convenience of parties and witnesses - seem to tilt in favor of transfer to the forums in which the Forests are located. Plaintiffs, as parties, primarily reside in the states in which the sales they challenge took place.

---

[11]   Plaintiffs' Count I and IV are not dependent on what the Forest Plans state, but will involve straight statutory/regulatory to fact analysis.

While Defendant Regional Forester resides in Atlanta, the proposed transfer district of Virginia is more convenient for the other Defendants who are located in Washington, D.C. and the other districts, of Mississippi and Texas, are no more or less convenient for these other Defendants than Atlanta. Regarding witnesses, Plaintiffs may be correct that no witnesses are likely to be involved in this litigation but the administrative records are located in the proposed states of transfer.

Under the third factor, the Court must look to the interests of justice. Under this factor, Defendants' argument regarding the importance of having localized controversies decided at home is an important consideration; indeed, more important than the fact that the Regional Forester is located in Atlanta, Georgia. They are correct that the people whose lives are most affected by the timber sales live in the proposed districts of transfer. Also included in the interests of justice factor is the relation of this case to the *Chattooga* case, involving Arkansas timber sales, already pending in this Court. The Court finds that the interests of justice substantially favor keeping the claims from this case that are related to *Chattooga* in this Court to prevent inconsistent judgments that will cover the same geographic area – Arkansas. This is especially true because the Court will already be familiar with the Ouachita Forest Plan because it is also at issue in *Chattooga*.

Therefore, the Court finds that the balance of factors as to the Mississippi, Texas and Virginia claims favors transfer to each of those states while the Arkansas claims should remain with this Court because of their relation to the *Chattooga* case and the

21

Court's familiarity with the Forest Plan at issue. While transfer is statutorily limited to those judicial districts in which the claim originally could have been brought, both parties agreed at the hearing of this case that these districts are proper in terms of venue and service of process on Defendants.

V.    Conclusion

Accordingly, this Court GRANTS in part and DENIES in part Defendants' Motion to Sever Plaintiffs' Claims and to Transfer Venue. This suit is SEVERED into four separate suits based on the challenged sales in each state. Plaintiffs' claims relating to the Arkansas timber sales will remain with this Court in the Northern District of Georgia. The remaining claims are TRANSFERRED as follows: claims relating to the thirteen sales that occurred in Mississippi (Homochitto, De Soto, Bienville and Delta National Forests) are transferred to the United States District Court for the Southern District of Mississippi; claims relating to the thirteen sales that occurred in Virginia (Thomas Jefferson and George Washington National Forests) are transferred to the United States District Court for the Western District of Virginia; and claims relating to the one sale in Texas (Sam Houston National Forest) are transferred to the United States District Court for the Southern District of Texas. Plaintiffs are given leave to file separate complaints as to the several claims in this Court within thirty (30) days of the date of entry of this order; upon filing these cases will be transferred to the appropriate district. If Plaintiffs do not file these separate

22

complaints within the thirty (30) day period, this Court will DISMISS those claims without prejudice.

SO ORDERED, this _18_ day of December, 2003.


ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE