United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WESTERN WATERSHEDS,

       Plaintiff,

       v.

U.S. FOREST SERVICE,

       Defendant.

_____/

No. C 08-1460 PJH

**ORDER GRANTING IN PART
AND DENYING IN PART MOTIONS
FOR SUMMARY JUDGMENT**

The parties' cross-motions for summary judgment came on for hearing before this court on January 18, 2012.  Plaintiffs Western Watersheds Project, et al. ("plaintiffs"), appeared through their counsel,  Warren Braunig and Lauren Rule.  Defendant U.S. Forest Service (""Forest Service" or "defendant") appeared through its counsel, David B. Glazer. Intervenors California Cattlemen's Association ("CCA"), and the California Farm Bureau Federation ("California Farm Bureau"), and the Public Lands Council ("Public Lands")(collectively "intervenors") appeared through their respective counsel, William Thomas, and Jack Rice.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court GRANTS in part and DENIES in part the cross-motions for summary judgment, for the reasons stated at the hearing, and as follows.

## BACKGROUND

This action concerns grazing rights.  The U.S. Forest Service manages the nation's forests.  As part of its management, the Forest Service issues grazing permits to cattle producers and ranchers, allowing them to graze their cattle on national forests under certain circumstances.  On March 14, 2008, plaintiffs – comprised of various non-profit

United States District Court

For the Northern District of California

1    organizations concerned with environmental and wildlife protection – filed the instant suit

2    against defendant Forest Service, challenging the Forest Service's alleged practice of

3    reauthorizing livestock grazing on federal land without conducting the proper environmental

4    review under the National Environmental Policy Act ("NEPA").[1]

5         The action arises under the 1969 National Environmental Policy Act, and the

6    Administrative Procedures Act, although it also implicates other federal laws and

7    regulations.  See Third Amended Complaint ("TAC"), ¶ 1.

8    A.     National Forest Management Act

9         The Forest Service manages the National Forests pursuant to duties and obligations

10   established in part by the National Forest Management Act of 1976 ("NFMA").  See 16

11   U.S.C. §§ 1600-1614.  The NFMA and its implementing regulations provide for forest

12   planning and management at two levels: the forest level, and the individual project level.

13   See id.  At the forest level, the Forest Service is required to develop a Land and Resource

14   Management Plan ("LRMP" or "Forest Plan"), which sets forth a broad, long-term planning

15   document for an entire National Forest, ensuring consideration of both economic and

16   environmental factors.  See 16 U.S.C. § 1604(g)(1)-(3).  At the individual project level, site-

17   specific actions – such as resource plans, grazing permits, contracts, and other instruments

18   for use of forest lands – are approved or denied by the Forest Service consistent with the

19   governing LRMP.  See Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d

20   754, 757 (9th Cir. 1996).

21        The governing LRMPs that are relevant here are those established for two National

22   

23   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

          [1]     The parties have since been joined by several intervenors in the action.
     Originally, the court granted limited permissive intervention under Federal Rule of Civil
24   Procedure 24(b) to the California Cattlemen's Association ("CCA"), nine state cattlemen's and
     grower's associations, the Public Lands Council ("Public Lands"), and several Farm Bureau
25   entities.  After the Ninth Circuit issued its opinion in Wilderness Soc'y v. U.S. Forest Serv., 630
     F.3d 1173 (9th Cir. 2011), however, the court granted a renewed motion to intervene as of
26   right, filed by the CCA, the California Farm Bureau Federation ("California Farm Bureau"), and
     Public Lands (collectively "intervenors").  The court permitted these intervenors to intervene
27   in the action both as to the liabilities and the remedies phases, though it required the
     intervenors to "speak with a single voice in pressing their issues before the court."  See March
28   25, 2011 Intervention Order at 2.

United States District Court

For the Northern District of California

1   Forests:  the Klamath National Forest LRMP ("Klamath LRMP"); and the Mendocino

2   National Forest LRMP ("Mendocino LRMP").  These LRMPs also incorporate direction from

3   a regional Forest Plan, the Northwest Forest Plan.  The Northwest Forest Plan was

4   adopted in April 1994 to provide a regional strategy for managing the National Forests of

5   Northern California, Oregon, and Washington.

6   B.      National Environmental Policy Act

7           The National Environmental Policy Act, codified at 42 U.S.C. § 4231 et seq.,

8   requires the Forest Service to balance the need for timely processed and fairly executed

9   grazing permits, against the need for environmental review.  It is a procedural statute that

10  does not "mandate particular results, but simply provides the necessary process to ensure

11  that federal agencies take a hard look at the environmental consequences of their actions."

12  High Sierra Hikers Assoc. v. Blackwell, 390 F.3d 630, 639 (9th Cir. 2004); see also

13  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) ("If the adverse

14  environmental effects of the proposed action are adequately identified and evaluated, the

15  agency is not constrained by NEPA from deciding that other values outweigh the

16  environmental costs.").

17          To that end, NEPA requires the Forest Service to prepare a detailed environmental

18  impact statement ("EIS") for "all major Federal actions significantly affecting the quality of

19  the human environment." 42 U.S.C. § 4332(2)(c).[2]  Prior to preparing an EIS, the agency

20  may, however, prepare an environmental assessment ("EA") as a preliminary step in

21  determining whether the environmental impact of the proposed action is sufficiently

22  significant to warrant an EIS.  See 40 C.F.R. § 1508.9.  An EA is a "concise public

23  document that briefly provides sufficient evidence and analysis for determining whether to

24  prepare an EIS or a finding of no significant impact."  Blue Mountains Biodiversity Project v.

25  _____

26          [2]       As a general matter, there is no dispute that the issuance of a livestock grazing
    permit is an agency action that normally requires the Forest Service to prepare either an EIS
27  or EA under NEPA.  Greater Yellowstone Coalition v.Bosworth, 209 F.Supp. 2d 156, 160
    (D.D.C. 2002) (citing Natural Res. Defense Council v. Morton, 388 F.Supp. 829, (D.D.C. 1974),
28  aff'd without opinion, 527 F.2d 1386 (D.C. Cir. 1976)).

3

United States District Court

For the Northern District of California

1    Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998).

2         In some cases, however, neither an EA nor an EIS is required.  The Council of

3    Environmental Quality ("CEQ"), established by Congress, has promulgated NEPA

4    regulations that allow a federal agency to ensure compliance with NEPA in one of three

5    ways.  See 40 C.F.R. §§ 1500-1508.  As already noted, the agency retains discretion to

6    prepare an EIS, or an EA.  However, the CEQ regulations establish a third option:  the

7    agency need do neither, if the agency determines that the proposed action falls within an

8    established categorical exclusion (CE).  The CEQ regulations specifically authorize an

9    agency to use a CE for a "category of actions which do not individually or cumulatively have

10   a significant effect on the human environment and which have been found to have no such

11   effect in procedures adopted by a Federal agency in implementation of these regulations."

12   See 40 C.F.R. § 1508.4.  "Neither an EIS nor an EA is required for actions categorically

13   excluded from NEPA review."  Id. (citing 40 C.F.R. § 1507.3(b)(2)(ii); 23 C.F.R. § 771.117).

14   The only caveat to the use of CEs is that an agency must make allowances for

15   "extraordinary circumstances in which the normally excluded action may have a significant

16   environmental effect."  See 40 C.F.R. § 1508.4.  Thus, prior to relying on a CE in a

17   particular instance, an agency must determine that extraordinary circumstances do not

18   exist (if "extraordinary circumstances" exist, the proposed action requires preparation of an

19   EA or an EIS).

20        In accordance with the CEQ's direction, the Forest Service has promulgated a series

21   of CEs under NEPA.  See Alaska Ctr. for Envm't v. U.S. Forest Serv., 189 F.3d 851, 857

22   (9th Cir. 1999).  In order to comply with its obligation to make allowances for "extraordinary

23   circumstances" that might have a significant environmental effect, the Forest Service's

24   NEPA procedures identify certain "resource conditions" that "should be considered in

25   determining whether extraordinary circumstances related to a proposed action warrant

26   further analysis and documentation in an EA or an EIS."  See Forest Service Handbook,

27   1909.15, § 30.4.

28

                                          4

1    C.     The 2005 Appropriations Rider

2          In November 1994 the Forest Service first implemented its policy requiring that

3    NEPA analyses be conducted in connection with the reissuance of any grazing permit.

4    Greater Yellowstone, 209 F. Supp. 2d at 158.  Because of the large number of grazing

5    permits issued every year, the Forest Service was unable to complete all the NEPA

6    analyses prior to reissuing the permits.  Id.  In response to the threat that many permits

7    would expire and not be reissued because of the lack of a NEPA analysis, Congress

8    enacted the Rescissions Act of 1995, Pub. L. No. 104-19, §§ 501-04, 109 Stat. 194

9    (1995)("Rescissions Act"), which set forth a schedule for the Forest Service's completion of

10   NEPA analyses and decisions, and established a temporary exemption from NEPA review

11   for those permits that were up for reissuance before the NEPA review for that allotment had

12   been completed.  Id.

13         The 1995 schedule was deemed largely unworkable due to overly strict timing

14   requirements, however, and ten years later, in 2005, Congress passed the Consolidated

15   Appropriations Act of 2005, P.L. No. 108-447, § 339 ("2005 Appropriations Rider").  The

16   2005 Appropriations Rider expressly allowed the Forest Service to categorically exclude

17   ("CE") certain grazing permit renewals in fiscal years 2005 through 2007, from

18   documentation in an EIS or EA, provided that three conditions were met:

19              (1)    the decision continues current grazing management on the allotment;

20              (2)    monitoring indicates that current grazing managements is meeting, or moving

21                     satisfactorily toward, objectives in the land and resource management plan

22                     (i.e., LMRP), as determined by the Secretary; and

23              (3)    the decision is consistent with agency policy concerning "extraordinary

24                     circumstances."

25         If the Forest Service determines that an allotment meets the three criteria set forth in

26   the 2005 Rider, the allotment may be excluded from full NEPA review.  The 2005 Rider

27   also allowed the Forest Service to issue CEs for up to 900 grazing allotments.  See id.

28

United States District Court

For the Northern District of California

1    Congress renewed the 2005 Rider for fiscal year 2008, adding the further limitation

2    that the Forest Service could not issue CEs pursuant to the 2005 Rider for any allotment

3    contained within a federally designated wilderness area.  Consolidated Appropriations Act

4    of 2008, P.L. 110-161, § 421 (2008).

5    D.    The Instant Action

6        In this action, plaintiffs generally contend that the Forest Service used the 2005

7    Appropriations Rider to exclude hundreds of grazing permit renewals from environmental

8    review under an EA or EIS (and NEPA).  Id. at ¶ 6.  Specifically, plaintiffs complain that

9    several of the Forest Service's categorical exclusions ("CE"s) were unlawful, since they did

10   not comply with the requisite conditions set forth in the 2005 Appropriations Rider.  See id.

11       As a result, plaintiffs assert claims for (1) violation of the 2005 Appropriations Rider;

12   and (2) for violation of NEPA.  See TAC, at ¶¶ 124-31.  Plaintiffs seek declaratory relief

13   stating that the Forest Service is guilty of the alleged violations, and they seek an order

14   from the court reversing and setting aside the grazing decisions issued by the Forest

15   Service, requiring the Forest Service to conduct appropriate environmental analyses under

16   NEPA, and permanently enjoining the Forest Service from reauthorizing grazing under the

17   CE process provided for in the Appropriations Rider, until such time as the Forest Service

18   can demonstrate compliance with the CE process.  See id. at Prayer for Relief.

19       In their original complaint, plaintiffs challenged 25 CE decisions involving nine

20   forests in California where the Forest Service reauthorized grazing on 46 allotments.  See

21   Original Complaint, ¶ 5.  In an Amended Complaint subsequently filed, plaintiffs challenged

22   138 CE decisions involving 25 forests throughout the entire western state region, where the

23   Forest Service reauthorized grazing on 386 allotments.  Then, pursuant to a stipulation

24   entered into by the parties on August 24, 2010, plaintiffs filed the current operative Third

25   Amended Complaint, narrowing plaintiffs' challenges to 10 CE decisions covering just five

26   national forests located within California, and the reauthorization of grazing on 23

27   allotments.  Subsequent to filing of the TAC, the parties have even further narrowed

28

United States District Court

For the Northern District of California

1  plaintiffs' challenges down to 7 CE decisions, covering 3 national forests – the Klamath,

2  Mendocino, and Lassen national forests.

3        For purposes of the instant motions, however, the parties have agreed that only two

4  CE decisions are at issue: the Big Ridge CE pertaining to Klamath National Forest, and the

5  Pine Mountain, York Cabin, Elk Mountain and Middle Creek CE, pertaining to the

6  Mendocino National Forest.

7  E.    The Big Ridge CE

8        The Big Ridge allotment, for which the Forest Service issued a CE, is located within

9  the Marble Mountain Wilderness in the Klamath National Forest.  See Klamath

10 Administrative Record ("Klamath AR") at 00001, 04309.  It encompasses roughly 12,000

11 acres, and the majority of its surface area is forested, containing little forage.  Id.  Sixteen

12 miles of trail run through the allotment, including a portion of the Pacific Crest Trail, as well

13 as the Kelsey Creek, Bear Creek, and Tyler Meadows trails.  Klamath AR at 00353, 04309.

14 Two popular lakes, Bear Lake and Turk Lake, are within the allotment.  Id.  Mountain

15 meadows are found at the headwaters of streams or along riparian areas within the

16 allotment, and these meadows contain habitat or foraging areas for species that include

17 goshawks, great gray owls, willow flycatcher, Cascade frog, western pond turtle, and

18 several plant species.  Klamath AR at 00028-29, 00372-82, 00388-89.  In addition, rainbow

19 trout, neotropical migratory birds and elk use habitats in the allotment's meadow and

20 riparian areas.  Id. at 00230, 00412-416.

21       The Forest Service issued a decision categorically excluding the Big Ridge allotment

22 from NEPA review in September 2006.  See Klamath AR at 00001.

23 F.    The Mendocino CE

24       The Mendocino national forest is home to four contiguous allotments for which a CE

25 was issued: the Pine Mountain, York Cabin, Middle Creek and Elk Mountain allotments.

26 These four allotments range in size from 10,000 acres to more than 30,000 acres each,

27 and are grazed annually throughout the summer and early fall.  Mendocino AR at 00001.

28

7

United States District Court

For the Northern District of California

1   Numerous streams, wet meadows, and other riparian areas can be found within the

2   boundaries of the allotments, including Bucknell Creek, Benmore Creek, Deer Valley, and

3   Long Meadow.  Id. at 00016-23.  The perennial streams flowing through the four allotments

4   provide habitat for certain Threatened and Endangered Species, including Chinook salmon

5   and steelhead, as well as sensitive species such as the Western pond turtle.  Mendocino

6   AR at 00057-58, 00719-20.

7       The Forest Service issued a decision categorically excluding the preceding four

8   allotments from NEPA review on July 5, 2007.  See Mendocino AR at 00001.

9   G.   The Motions for Summary Judgment

10      The parties – including the intervenors – have now filed cross-motions for summary

11  judgment.  As already noted, the CE decisions at issue are limited to only two:  (1) the CE

12  issued by the Forest Service for the Big Ridge allotment on the Klamath National Forest

13  ("Big Ridge CE"); and (2) the CE issued by the Forest Service for the Pine Mountain, York

14  Cabin, Middle Creek and Elk Mountain allotments in the Mendocino National Forest

15  ("Mendocino CE").

16      The issues presented by the parties in their motions are straightforward: (1) whether

17  the Forest Service's decision to approve the Big Ridge CE violates the second prong of the

18  2005 Appropriations Rider; (2) whether the Forest Service's decision to approve the Big

19  Ridge CE was made in violation of the third prong of the 2005 Appropriations Rider; and (3)

20  whether the Forest Service's decision to approve the Mendocino CE was made in violation

21  of the second prong of the 2005 Appropriations Rider.

22                              **DISCUSSION**

23  A.   Legal Standards

24      1.   Summary Judgment

25      Summary judgment is appropriate when there is no genuine issue as to material

26  facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

27  Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

28

1    Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

2    is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

3         2.     Administrative Procedures Act

4         The general review provisions of the APA, 5 U.S.C. §§ 701, et seq., apply in cases

5    asserting violations of NEPA.  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 891

6    (9th Cir. 2002); Hells Canyon Alliance v. U. S. Forest Serv., 227 F.3d 1170, 1176-77 (9th

7    Cir. 2000).  In fact, "[t]here is no right to seek judicial review under the Administrative

8    Procedure Act in the absence of a relevant statute whose violation forms the legal basis of

9    the complaint against the governmental action."  Wright & Miller, 14A Fed. Prac. & Proc.

10   Juris.3d § 3659.  Arbitrary and capricious review cannot be conducted under the APA

11   independent of another statute.  Oregon Natural Res. Council v. Thomas, 92 F.3d 792, 797

12   (9th Cir. 1996).

13        Under the APA, "[a] person suffering a legal wrong because of agency action, or

14   adversely affected or aggrieved by agency action within the meaning of a particular statute,

15   is entitled to judicial review thereof."  5 U.S.C. § 702.  Agency action includes the "whole or

16   part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

17   failure to act." 5 U.S.C. § 551(13).  The APA applies except to the extent that a statute

18   precludes judicial review, or agency action is committed to agency discretion by law.  5

19   U.S.C. § 701(a).

20        An agency action may be set aside under the APA only if it was "arbitrary,

21   capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §

22   706(2)(A)); see Morongo Band of Mission Indians v. Fed. Aviation Admin., 161 F.3d 569,

23   573 (9th Cir. 1998).  The APA limits judicial review to review of "final" agency action.  See 5

24   U.S.C. § 704.  For an action to be "final" under the APA, it should mark the conclusion of an

25   agency's decision-making process, and should also be an action by which rights or

26   obligations have been determined or from which legal conclusions flow.  Bennett v. Spear,

27   520 U.S. 154, 177 (1997).

28
                                            9

1    The arbitrary and capricious standard specifically applies, as is the case here, "to an

2   agency's determination that a particular action falls within [a] categorical exclusion[]."

3   Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1456 (9th Cir. 1996).  To determine

4   whether agency action is arbitrary or capricious, a court must consider whether the decision

5   was based on a consideration of the relevant factors and whether there has been a clear

6   error of judgment.  Alaska Ctr. For Envm't v. U.S. Forest Serv., 189 F.3d 851, 859 (9th Cir.

7   1999).

8    "When an agency decides to proceed with an action in the absence of an EA or EIS,

9   the agency must adequately explain its decision." Id.  It is important that the agency be

10   able to point to "a record of decision invoking a categorical exclusion."  California v. Norton,

11   311 F.3d 1162, 1176 (9th Cir. 2002)(discussing Bicycle Trails, 82 F.3d at 1456-57).  The

12   Ninth Circuit has noted the difficulty in determining whether the agency's determination to

13   invoke a CE is arbitrary and capricious, especially in cases "where there is no

14   contemporaneous documentation to show that the agency considered the environmental

15   consequences of its action and decided to apply a categorical exclusion to the facts of a

16   particular decision."  Id.

17   B.    The Big Ridge CE

18    The parties dispute whether the Forest Service's decision to categorically exclude

19   the Big Ridge allotment from NEPA review violates two separate prongs of the 2005

20   Appropriations Rider.  Specifically, the parties dispute: (1) whether the Forest Service

21   appropriately decided that monitoring of the Big Ridge allotment indicated that current

22   grazing management was meeting, or moving satisfactorily toward, objectives in the

23   applicable LRMP at the time the CE decision was made (i.e., second prong of the 2005

24   Appropriations Rider); and (2) whether the Forest Service appropriately decided that the

25   decision to categorically exclude the Big Ridge allotment was consistent with agency policy

26   concerning "extraordinary circumstances" (i.e., third prong of the 2005 Appropriations

27   Rider).

28

United States District Court
For the Northern District of California

1          1.    <u>Whether Current Grazing Management was 'Meeting' or 'Moving Towards'</u>
2              <u>Applicable Objectives (Second Prong of 2005 Appropriations Rider)</u>

3          The Big Ridge CE, issued in September 2006, concluded that "the management of

4    the [Big Ridge] allotment is shown by monitoring to be meeting or satisfactorily moving

5    toward Forest Plan objectives...".  <u>See</u> Klamath AR at 00003.  The decision memo

6    references various annual and long term monitoring methods for condition of vegetation

7    and watersheds, including photo-point/range allotment inspection, allowable utilization

8    percentage by comparative yield or landscape appearance, stubble height measurements,

9    and rooted frequency vegetative sampling.  <u>Id</u>. at 00006.  The decision memo also notes

10   that long term and short term monitoring data had been collected for 50 years for the Big

11   Ridge allotment, and that long term monitoring data showed that "rangeland condition in the

12   allotment is at, or trending toward, desired conditions."  <u>Id</u>.  The decision memo further

13   notes that "annual monitoring data" showed that "with minor exceptions, key areas are well

14   within allowable use standards."  <u>Id</u>.  Although "high use" was noted in the Bear Lake

15   pasture in 2005, adaptive management actions to "minimize or eliminate conflicts with

16   recreation use in the Bear Lake area" had been developed and incorporated into the

17   allotment's annual operating instructions documents.  Klamath AR at 00006.

18         Plaintiffs here contend that the Big Ridge CE does not comply with the 2005 Rider,

19   because the actual administrative record demonstrates that current grazing management

20   was not meeting or moving towards LRMP objectives on the Big Ridge allotment, in several

21   key areas, including (a) soil/plant diversity/rangeland objectives; (b) riparian/aquatic

22   objectives; and (c) wildlife/sensitive species objectives.  The Forest Service challenges

23   plaintiffs' contention, relying on the Big Ridge CE decision memo, and asserting that its

24   underlying monitoring data demonstrates that all relevant conditions are at or trending

25   towards desired conditions overall.

26         In determining whether the Forest Service adequately relied on evidence showing

27   that current grazing on the Big Ridge allotment was (at the time the Big Ridge CE was

28

1  granted in 2006) meeting or satisfactorily moving toward LRMP objectives, the court's task

2  is to review the record with respect to each area, and determine whether the Big Ridge CE

3  adequately explained the Forest Service's decision, and whether the agency's decision is

4  supported by evidence in the record.[3]  See Alaska Ctr., 189 F.3d at 859 ("When an agency

5  decides to proceed with an action in the absence of an EA or EIS, the agency must

6  adequately explain its decision."); California v. Norton, 311 F.3d 1162, 1176 (9th Cir.

7  2002)(discussing Bicycle Trails, 82 F.3d at 1456-57)(It is important that the agency be able

8  to point to "a record of decision invoking a categorical exclusion").

9                    a.      soil/plant diversity/rangeland objectives

10          Any inquiry into whether current grazing was meeting or satisfactorily moving toward

11  soil, plant diversity and/or rangeland objectives must first take into account what the LRMP

12  objectives were in these areas.  The LRMP for the Klamath National Forest contains a

13  section setting forth the management direction applicable to the national forest.  This

14  section generally defines the forest management goals; projected outputs; the standards

15  and guidelines for management of the forest; and contains a brief description of the

16  management areas and their associated standards and guidelines.  See Klamath AR at

17  04457-4638.  As plaintiffs correctly note, among the many standards and guidelines

18  directed toward different resource areas, the LRMP directs the Forest Service to: determine

19  the current ecological status of the Forest's rangelands and to use management strategies

20  and activities necessary to achieve a satisfactory condition; determine and monitor

21  rangeland vegetation using ecological status, vegetative condition, and apparent trend on

22  _____

23          [3]      The parties have also submitted competing expert testimony in support of their
     motions.  Plaintiffs have submitted the expert declarations of Jon Rhodes and Robert House,
24   and the Forest Service proffers the expert declaration of Dave Weixelman to rebut the
     foregoing.  To the extent plaintiffs' expert declarations address the basis for the Forest
25   Service's CE decisions, and quibble with the data and/or material taken into account by the
     Forest Service in reaching its decision, the court disallows this testimony.  See Asarco, Inc. v.
26   EPA, 616 F.2d 1153, 1160 (9th Cir. 1980)("consideration of the evidence to determine the
     correctness or wisdom of the agency's decision is not permitted, even if the court has also
27   examined the administrative record").  The court considers the expert testimony only insofar
     as the declarations are useful to explain technical terms or complex evidence within the
28   province of the agency's expertise.

United States District Court

For the Northern District of California

1   areas within existing allotment suitable for grazing; and plan and implement land

2   management activities to maintain or enhance soil productivity and stability.  See id. at

3   04514, 04516, 04478.[4]

4        In addition to articulating general forest management direction, the Klamath LRMP

5   also provides monitoring and evaluation requirements to be employed by the Forest

6   Service in determining whether programs and projects are meeting the forest plan direction.

7   Klamath AR at 04641.  According to the monitoring regime set forth in the Klamath LRMP,

8   monitoring techniques for assessing soil objectives include "field investigation of soil cover,

9   soil compaction and organic matter on 5% of activity areas," to be reported every 5 years.

10  Klamath AR at 04650.  Monitoring objectives for range management include "determining

11  vegetative ecological condition and trend," to be reported every 5 years.  The monitoring

12  techniques for range management include field and photo observations; annual grazing

13  reports; and mapping and utilization measurements, among others.  See Klamath AR at

14  04653.

15       The Forest Service contends that the Big Ridge CE is adequately supported by the

16  record, since the record reflects that both long term and short term monitoring of the

17  rangeland/soil/plant diversity resources occurred.  In terms of long-term monitoring, the

18  Forest Service contends that conditions and trends were documented over the decades

19  preceding the 2006 CE decision, and include photographic documentation.  Klamath AR

20  4945-5015.  In terms of short-term monitoring, forage utilization data as well as

21  photographic documentation are included.  Id.  The Forest Service further notes that

22  monitoring reports provide information on ground cover and plant diversity, and note that

23  the incidence of bare ground has decreased since 1964.  Klamath AR 266-67; Klamath AR

24  Sup. 1-33, 5, 28.  To the extent that Bear Lake falls outside of allowable use standards, the

25  ───────────────

26      [4]    Upon the court's request at the hearing on the present motions, the parties jointly
submitted a chart summarizing their respective allegations, contentions, and evidence with
27  respect to the claims and arguments at issue before the court.  The court has relied upon the
parties' characterization of the relevant LRMP objectives and standards and their cited
28  evidence, as stated in their joint submission, in resolving the dispute before the court.

United States District Court

For the Northern District of California

1    Forest Service determined that this area is to be rested every third year.  Klamath AR 271.

2        Plaintiffs, however, assert that the inadequacy of monitoring information in the

3    record is demonstrated by the following deficiencies: most of the long term condition and

4    trend monitoring is outdated; data from 2005 shows that two of three plots have low ground

5    cover, and that other indicators are moderate, and only one of the three plots has prior data

6    to establish any trend; there is no explanation of long term data in the record; and there is

7    no explanation of the photos in the record and what they demonstrate.  See Klamath AR at

8    267-71, 04990-92, 04999-05008, 05022; Supp. AR at 1-25.  While acknowledging that

9    utilization monitoring was in fact conducted on a regular basis, plaintiffs contend that this

10   monitoring did not include any information on percent of bare ground, soil compaction, or

11   plant composition and diversity.  Klamath AR at 04993-95.

12       On balance, however, the court is not persuaded that the Forest Service has failed

13   to adequately support the conclusions reached in the Big Ridge CE with monitoring data.

14   Plaintiffs' objections to the record fall into the following categories:  (1) they assert that the

15   annual use of forage utilization data is inappropriate; (2) they assert that the information is

16   stale, since much of the supporting evidence stems back to earlier decades; and (3) they

17   contend that much of the purportedly relevant data is unexplained.  However, as already

18   noted, the LRMP monitoring plan specifically contemplates the use of utilization data (and

19   photographic documentation) as an aid in assessing range management objectives.  See

20   Klamath AR at 04653.  Moreover, the Forest Service's interpretation of its own LRMP,

21   particularly with regard to technical matters such as the usefulness of utilization data as a

22   general monitoring tool, is entitled to substantial deference.  Forest Guardians v. U.S.

23   Forest Serv., 329 F.3d 1089, 1097, 1099 (9th Cir. 2003).

24       As for plaintiffs' claim that the Forest Service has inappropriately relied on stale

25   information, plaintiffs have correctly noted that an agency's reliance on data that is too stale

26   to carry the weight assigned to it may be arbitrary and capricious.  See N. Plains Res.

27   Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1086 (9th Cir. 2011).  However,

28

United States District Court

For the Northern District of California

1  plaintiffs have given insufficient weight to the fact that, while defendant does rely on *some*

2  monitoring information that might well prove too outdated to support the Big Ridge CE if

3  relied on as the sole proof of current monitoring trends, defendant also relies on other,

4  updated data as proof of current monitoring.  See Klamath AR 4945-5015 (forage utilization

5  data); 00264 (rooted frequency vegetation sampling).

6       Finally, the court's review of the record reveals that there is no fatal failure by the

7  Forest Service to explain the conclusions reached in the Big Ridge CE decision memo:

8  defendant has, at a minimum, supported its conclusions with reliable studies and data, and

9  adequately explained the reasons why it considered the underlying evidence reliable.  See

10  N. Plains Res. Council, 668 F.3d at 1075.

11       In sum, the administrative record provides reasonable support for the Forest

12  Service's decision to conclude that the Big Ridge allotment was trending towards meeting

13  the LRMP objectives for soil/plant diversity/rangeland.  The monitoring methods described

14  in the Big Ridge CE, and the monitoring information and data included in the record,

15  demonstrate that the Forest Service considered monitoring information that was both

16  sanctioned by the Klamath LRMP and thus tailored to meet the objectives set forth therein.

17  See Klamath AR 4650-53.

18              b.      riparian/aquatic objectives

19       Plaintiffs assert that the administrative record does not contain any monitoring

20  information showing that the Big Ridge allotment – which contains several perennial and

21  intermittent streams, and two lakes – is meeting or moving toward the Aquatic

22  Conservation Strategy ("ACS") and other riparian objectives set forth in the Klamath LRMP.

23  The Klamath LRMP contains ACS objectives that require the Forest Service to, among

24  other things, maintain and restore the physical integrity of the aquatic system, including

25  shorelines, banks and bottom configurations; and maintain and restore water quality

26  necessary to support healthy riparian, aquatic, and wetland ecosystems.  Klamath AR at

27  04464.  The ACS objectives also state that the Forest Service is to maintain and restore:

28

15

**United States District Court**
For the Northern District of California

1   the sediment regime under which aquatic ecosystems evolved, the specific composition

2   and structural diversity of plant communities in riparian areas and wetlands, and habitats

3   supportive of native plant and riparian-dependent species.  Id.; see also Klamath AR at

4   04564.

5          The monitoring and evaluation requirements set forth in the Klamath LRMP describe

6   effectiveness monitoring for aquatic ecosystems, in which "variables to be monitored" must

7   include "important habitat requirements identified" by research and watershed analysis, and

8   which must be "quantifiable and measurable in a repeatable [] range of values...".  Klamath

9   AR at 04644.  To that end, monitoring "will include aquatic, riparian and watershed

10  conditions and the processes in a watershed to determine if they achieve [ACS] objectives."

11  Id. at 04645.  Key monitoring items are defined to include: pool frequency and quality;

12  percent fine sediment; CWD (size and quantity); water temperature; width-to-depth ration;

13  and bank stability and lower bank angle.  Id; see also Klamath AR at 04653 (discussing

14  rangeland monitoring and requiring that "riparian objectives are in [annual operating

15  instructions] and [standards and guidelines] are met").

16          Plaintiffs contend that, for the majority of riparian areas on the Big Ridge allotment,

17  the record contains none of the categories of monitoring information necessary to

18  demonstrate that current grazing management is moving or trending towards ACS

19  objectives, and that for the handful of riparian areas that do have monitoring information,

20  the monitoring shows that the riparian conditions in these areas were at risk, or poor.

21  Moreover, plaintiffs argue, the monitoring data is stale.  In response, the Forest Service

22  relies upon forage utilization data as a surrogate for riparian monitoring, as well as on a

23  Watershed Specialist Report that defendant contends relies upon concrete modeling data

24  and takes into account all streams and tributaries in the affected region.  And while

25  conceding that the record does include data results dating to back to the 1990s, defendant

26  notes that the record incorporates non-stale information by way of Cumulative Watershed

27  Effects analyses conducted in 2004 and 2005.

28

16

United States District Court

For the Northern District of California

1          To the extent plaintiffs contend that the record reflects a lack of monitoring

2    information relevant to the ACS objectives or riparian areas, the court is not persuaded that

3    this is so.  The record reflects that the Forest Service relied upon annual forage utilization

4    measures in order to ensure the continued protection of riparian areas within the Big Ridge

5    allotment.  See Klamath AR at 01170-81 (empirical evidence stating the use of stubble

6    height as a measurement tool for riparian areas); id. at 00087 (forage utilization had major

7    bearing on success of protecting riparian areas on Big Ridge allotment and is conducted

8    annually); id. at 00298 ("monitoring annual forage utilization and residual dry matter is a key

9    factor in determining condition of riparian areas and effects to related species and their

10   habitat").  The Forest Service also relied upon a March 2006 Watershed Report that covers

11   the Big Ridge allotment and states, among other things, that there is a "good correlation

12   between residual dry matter/utilization levels in riparian areas and stream banks

13   stability/alteration" and that monitoring of the rangeland shows "satisfactory conditions."

14   See id. at 00289-304.  In addition, defendant relies upon a Watershed Specialist Report

15   that expressly analyzes the effects of cattle grazing upon the riparian areas in the Klamath

16   National Forest – including the Big Ridge allotment – and concludes that no significant

17   effect is present and that the quality of riparian areas is maintained.  See Klamath AR at

18   000289 et seq. (relying upon a watershed model that is set forth at AR 00306-52).  These

19   reports and the analyses contained therein are sufficient to establish an adequate basis for

20   concluding that monitoring on the Big Ridge allotment suggested that it was meeting or

21   trending towards the relevant ACS and LRMP objectives.

22          Plaintiffs have, to be sure, correctly pointed out that for several streams, a

23   designation that water quality is "at risk" can be observed in the record.  See Klamath AR at

24   00191-96.  However, there is no indication that it was grazing itself that was causing this

25   designation.  Moreover, these designations are also accompanied by designations

26   indicating that the effect of the proposed action would be to "maintain" the status quo.  See

27   id.

28

1    To the extent plaintiffs again take issue with the use of forage utilization data as a

2  proxy for riparian monitoring, the Forest Service has decreed that forage utilization is useful

3  as a measurement tool in order to monitor riparian areas, and has submitted empirical

4  studies and analysis to this effect.  Thus, once again, the court defers to defendant's

5  technical knowledge and assessment in suggesting that annual forage utilization

6  measurements are acceptable forms of monitoring riparian areas.

7    Finally, to the extent plaintiffs contend that the underlying data relied upon by the

8  Forest Service is stale, defendant has relied upon analyses from the Cumulative

9  Watershed Effects Specialist Report conducted in 2005; the quantitative model analysis

10  contained in the Cumulative Watershed Effects analysis dated February 2004; and

11  watershed data dated September 2005.  See Klamath AR at 00306-23, 03409-24, 00324-

12  25.  Thus, defendant has relied on annual forage utilization measures and watershed

13  analyses and reports whose temporal scope is sufficiently recent – even if some portion of

14  defendant's remaining data spans back several years.

15    Accordingly, taking the watershed analyses noted above together with the forage

16  utilization data at issue, and comparing them to the LRMP statement of riparian and aquatic

17  objectives, it is not clear that the Big Ridge CE decision was arbitrary in deciding that

18  current grazing was moving towards or meeting LRMP objectives.

19      c.  wildlife/sensitive species objectives

20    Finally, plaintiffs contend that the Big Ridge CE contains no data showing the Forest

21  Service surveyed the Big Ridge allotment for the presence of sensitive species or assessed

22  sensitive species habitat to determine its condition, as required by the LRMP.

23    The Klamath LRMP provides, with respect to sensitive wildlife/species, that the

24  Forest Service is to "manage for a distribution and abundance of plant and animal

25  populations that contribute to healthy, viable populations of all existing native and desirable

26  non-native species..." and to "enhance sensitive plant specific populations and habitat to

27  maintain reproducing, self-sustaining populations."  Klamath AR at 04480, 04485.  To that

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   end, "project areas should be surveyed for the presence of sensitive species before project

2   implementation.  If surveys cannot be conducted, project areas should be assessed for the

3   presence and condition of sensitive species habitat."  Klamath AR at 4480.  The Forest

4   Service is furthermore cautioned that "[d]isturbance to plant populations and occupied

5   habitat should be avoided during critical periods of plant growth," and impacts to sensitive

6   species should be avoided or minimized where possible.  Id. at 4485-87.  Additionally,

7   streams and lakes must be managed to maintain or improve habitat for aquatic species –

8   especially threatened, endangered, and sensitive species – and the Forest Service must

9   also manage rangeland areas to provide appropriate forage and cover for deer, elk, and

10   other rangeland-dependent species.  See Klamath AR at 04517.

11          The evidence in the record here demonstrates that survey information was

12   documented for sensitive wildlife species occurring in the Big Ridge allotment, with a

13   specific eye toward the impact that grazing would have on the Big Ridge allotment's

14   sensitive species.  See Klamath AR 360-404.  Surveys were similarly conducted for

15   sensitive aquatic wildlife, including Chinook salmon and steelhead trout (with neither found

16   in the project area).  AR 33-39.  Survey information for sensitive plants was either

17   gathered, deemed not necessary, or the presence of a particular species was assumed.

18   Klamath AR 33-39, 43.  In addition, the record includes detailed analyses of habitat

19   conditions for fish and wildlife species that are contained within several reports: the

20   Management Indicator Species Assessment, the Survey and Manage Report, the Wildlife

21   Biological Assessment/Evaluation, and the Fisheries Specialist Report, among others.  See

22   Klamath AR at 00052-58, 0211-16, 0220-43, 00360-404.

23          Plaintiffs contend that the foregoing is insufficient to demonstrate that the monitoring

24   information in the record is sufficient with respect to sensitive species and wildlife, because

25   the record contains no monitoring information for certain habitat conditions or sensitive

26   species populations implicated by the Big Ridge allotment, including for Botrychium plants,

27   goshawk, great gray owl, willow flycatcher and Cascade frog.  However, the record

28

United States District Court

For the Northern District of California

1  contains evidence that site observations and/or physical inspection of the Big Ridge

2  allotment in connection with several of the foregoing sensitive species and wildlife was, in

3  fact, considered and/or a determination made with regard to the impact of permitted

4  grazing on the sensitive species and wildlife.  See, e.g., Klamath AR at 30-31 (Botrychium

5  "may" occur in meadows but unlikely to be targeted by grazing); 0371-72 (Big Ridge

6  allotment does not contain goshawk habitat); 0372 (required allotment management

7  sustains suitable prey base for great gray owl); 0392 (cattle generally unable to access

8  Cascade frog habitat).

9      All of which demonstrates that while the proposed permitted grazing might affect

10  individual sensitive species, or might have an indirect affect on habitat of sensitive species,

11  the proposed action was not likely to lead to a loss of viability for the species as a whole.

12  Klamath AR at 00004; see also Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d

13  1233, 1240 (9th Cir. 2005)(effects to individual species, distinct from a species as a whole,

14  do not rise to the level of "significance" under NEPA).  The record is thus adequate to

15  support the Big Ridge CE decision, in which the Forest Service concluded that monitoring

16  information supported a finding that current grazing on the Big Ridge allotment was

17  meeting or moving toward Klamath LRMP objectives regarding sensitive species and

18  wildlife.

19      In sum, therefore, and based on all the foregoing points, the court determines that

20  the Forest Service's decision that the second prong of the 2005 Appropriations Rider was

21  satisfied in connection with sensitive species and wildlife, was not arbitrary and capricious.

22      2.  Whether Forest Service Decision Was Consistent with Agency Policy
           Concerning "Extraordinary Circumstances" (Third Prong of 2005
23         Appropriations Rider)

24

25      Plaintiffs also contend that the Forest Service did not appropriately conclude that the

    Big Ridge CE was consistent with agency policy concerning "extraordinary circumstances."
26
    The Forest Service's Policy on extraordinary circumstances, which is set forth in the Forest
27
    Service Handbook, requires the Forest Service to determine whether certain resource
28

20

**United States District Court**
For the Northern District of California

1   conditions are present in the action area, in order to determine whether extraordinary

2   circumstances exist.  See Forest Service Handbook ("FSH") 1909.15 § 30.4.  If such

3   resource conditions are present (e.g., federally listed threatened or endangered species,

4   congressionally designated wilderness areas), the Forest Service must then assess the

5   degree of potential effect of the proposed action on these resource conditions.  See id.; see

6   also 36 C.F.R. § 220.6(b)(2).  If extraordinary circumstances exist that indicate that a

7   proposed action may have a significant environmental effect on one of the resource

8   conditions, the Forest Service may not categorically exclude the proposed decision from

9   NEPA analysis.

10      Here, the Big Ridge CE decision notice concludes that there "are no conditions that

11  would constitute a significant effect on an extraordinary circumstance related to the

12  proposed project."  Klamath AR at 00003.  Plaintiffs contend, however, that the Big Ridge

13  CE does not comply with the 2005 Appropriations Rider, because two resource conditions

14  did exist, and that grazing permits have a significant environmental effect on these

15  conditions.  The resource conditions present were:  (a) congressionally designated

16  "wilderness" area conditions; and (b) "threatened or endangered species or designated

17  critical habitat" conditions.

18          a.      wilderness area

19      Plaintiffs assert that the Big Ridge allotment is located within the Marble Mountain

20  wilderness, an area protected under the Wilderness Act.  The Wilderness Act aims to

21  provide opportunities for solitude or unconfined recreation, although it does allow for

22  livestock grazing on wilderness land if grazing was established on the land prior to

23  enactment of the Act.  See 16 U.S.C. § 1131(a) (Congress enacted the Wilderness Act to

24  "secure for the American people of present and future generations the benefits of an

25  enduring resource of wilderness"); id. at § 1133 ("Except as specifically provided for in this

26  chapter . . . there shall be no commercial enterprise and no permanent road within any

27  wilderness area."); id. at § 1133(d)(4) ("[T]he grazing of livestock, where established prior

28

21

United States District Court

For the Northern District of California

1    to the effective date of this Act, shall be permitted to continue subject to such reasonable

2    regulations as are deemed necessary by the Secretary of Agriculture"). Wilderness Act

3    protection constitutes an "extraordinary circumstance" resource. See FSH 1909.15 §

4    31.2(3). Thus, if there is substantial evidence of adverse effects to wilderness recreation

5    use in the Big Ridge allotment, the Forest Service must perform a proper EIS or EA.

6         This is the case here, say plaintiffs. They contend that the record is replete with

7    reports of conflicts between cattle crazing and recreation use on the Big Ridge allotment,

8    which establishes the presence of adverse effects to wilderness recreation in the Big Ridge

9    allotment by virtue of the proposed grazing action. See Klamath AR 00014, 00355-57,

10   004258-59.  In the year and a half prior to issuance of the 2006 Big Ridge CE, for

11   example, plaintiffs note that livestock/recreation conflicts were noted at Bear Lake, Turk

12   Lake, Paradise Lake, and hunter camps along Big Ridge. See id.

13        The Forest Service, for its part, notes that the Klamath LRMP expressly

14   acknowledges that some evidence of human influence consistent with the Wilderness Act

15   may be present due to livestock grazing, and recreational use. See Klamath AR at 004528.

16   The Forest Service then notes that here, the Big Ridge allotment represents only about 5%

17   of the total Marble Mountains Wilderness, and wilderness visitors use even a smaller

18   percentage of the allotment area. See id. at 00353. To the extent that conflicts exist within

19   these parameters between users of the forest and permitted grazing, however, the Forest

20   Service has nonetheless addressed these impacts by identifying appropriate mitigation

21   measures, which are an acceptable tool for land management. Klamath AR at 00356-57.

22        As plaintiffs point out and the Forest Service ignores, however, the high elevation

23   meadows and lakes on the Big Ridge allotment are where most of the recreation use takes

24   place, and *also* where most of the permitted grazing occurs. Klamath AR at 03950, 03970-

25   74.  Indeed, plaintiffs point out that the map of livestock use levels for the Big Ridge

26   allotment shows that the main grazing pastures on the allotment are in the headwater

27   basins of Bear Creek, Stones Valley Creek, Grider Creek, Kelsey Creek, and Turk Lake,

28

United States District Court

For the Northern District of California

1   and also adjacent to the Pacific Crest Trail – the same primary areas used by

2   recreationists.  See Klamath AR at 00182; cf. id. at 04309.

3          Thus, the record demonstrates that conflicts between livestock grazing and

4   wilderness recreation use are occurring on the Big Ridge allotment.  Klamath AR at 00355-

5   57, 04355, 04358, 04361.  Notwithstanding, as defendant notes, that Congress has

6   reaffirmed that grazing is an allowable activity in wilderness areas, the foregoing evidence

7   suggests that the Forest Service's proposed action "may" have a significant environment

8   effect on the congressionally protected wilderness area within the Big Ridge allotment (i.e.,

9   that extraordinary circumstances exist).  Based on this evidence in the record, the Forest

10  Service was required to explain why the foregoing conflicts do not adversely affect the

11  wilderness resource.  See California v. Norton, 311 F.3d 1162, 1177 (9th Cir.2002) ("Where

12  there is substantial evidence in the record that exceptions to the categorical exclusion may

13  apply, the agency must at the very least explain why the action does not fall within one of

14  the exceptions.").  Yet no such explanation is found in the record.  Without such reliable

15  explanation, the Forest Service's conclusion that permitted grazing will not have any

16  significant effects on wilderness, must be found to be arbitrary and capricious.

17         To the extent, moreover, that defendant contends that it has nonetheless addressed

18  any potential impacts by identifying appropriate mitigation measures, defendant is generally

19  correct that the use of mitigation measures, or adaptive management, is a well recognized

20  and permissible tool.  Theodore Roosevelt Conserv. P'ship v. Salazar, 616 F. 3d 497, 517

21  (D.C. Cir. 2010).   However, defendant overlooks the corollary principle that such mitigation

22  measures, even if necessary, "are not alone sufficient to meet []NEPA obligations to

23  determine the projected extent of the environmental harm to enumerated resources before

24  a project is approved."  See N. Plains Res. Council, 668 F. 3d at 1084.

25         In sum, therefore, the court concludes that the evidence in the record demonstrates

26  the presence of a "wilderness" resource condition that constitutes an "extraordinary

27  circumstance" with respect to the Big Ridge allotment, and so does not adequately support

28

United States District Court

For the Northern District of California

1   the Forest Service's conclusion that there "are no conditions that would constitute a

2   significant effect on an extraordinary circumstance related to the proposed project."  See

3   Klamath AR at 00003.

4              b.    sensitive species

5        Plaintiffs also contend that the Forest Service's conclusion that permitted grazing

6   would not have a significant effect on sensitive species, is unsupported by the record.  The

7   presence of sensitive species is one of the resource conditions for which an agency must

8   ensure there will be no potentially significant effects from permitted grazing prior to

9   issuance of a CE.  See FSH 1909 § 30.4.  Plaintiffs challenge the Forest Service's

10  conclusions with respect to both sensitive plant species and sensitive wildlife species.  As

11  to the former, plaintiffs note the undisputed presence of suitable habitat for six sensitive

12  plant species from the Botrychium (moonwort) genus on the Big Ridge allotment.  See

13  Klamath AR at 00004.  With respect to the latter, plaintiffs note the documented presence

14  of habitats for goshawks, great gray owls, willow flycatcher and cascade frog on the

15  allotment.  Klamath AR at 00003-04.

16       With regard to sensitive plant species, the administrative record includes reports that

17  explain the potential habitat for the Botrychium (moonwort) genus on the Big Ridge

18  allotment, and that the Botrychium species pertaining to the genus are unlikely to be

19  adversely affected by permitted grazing, given their attributes.  See Klamath AR at 00029-

20  31.  The record also indicates that the Forest Service relied upon a Biological

21  Assessment/Evaluation ("BA") finalized in September 2006.  See Klamath AR 00021.  The

22  BA analyzed potential impacts to species listed as endangered or threatened under the

23  Endangered Species Act, as well as Forest sensitive species, and made detailed findings

24  as to several specific species.  And none of the findings supported the conclusion that the

25  proposed action would *significantly* affect the environment of the species at issue.  In order

26  to preclude reliance on a CE, it is the effect on a species as a whole – not just individual

27  members of that species – that must be significant.  See Envt'l Prot. Info. Ctr. v. U.S.

28

United States District Court

For the Northern District of California

1   Forest Serv., 451 F. 3d 1005, 1010 (9th Cir. 2010).

2         Plaintiffs do not dispute the foregoing, but contend that the Forest Service failed to

3   adequately explain the underlying data and how it was sufficient to assess habitat for

4   sensitive plant and wildlife species, or else failed to include any data at all to assess the

5   impact of grazing on certain habitats.

6         The court, however, is not persuaded.  It finds that the BA and other evidence in the

7   record adequately documents the Forest Service's consideration of the potential impact of

8   livestock grazing on sensitive plant and wildlife species; and further adequately

9   demonstrates that the potential impact of livestock grazing on sensitive plant and wildlife

10  species within the Big Ridge allotment was not sufficiently "significant" so as to constitute

11  an extraordinary circumstance and preclude a CE.

12        In sum, therefore, there is insufficient evidence submitted by plaintiffs to suggest that

13  the Forest Service's decision was arbitrary or capricious, or somehow wholly unsupported

14  by or contradicted by the record.

15  C.    The Mendocino CE

16        The parties also dispute whether the Forest Service's decision to categorically

17  exclude the Elk Mountain, Middle Creek, York Cabin, and Pine Mountain allotments from

18  NEPA review violated the second prong of the 2005 Rider – i.e., whether the Forest

19  Service appropriately decided that monitoring of the Mendocino allotments indicated that

20  current grazing management was meeting, or moving satisfactorily toward, objectives in the

21  applicable LRMP.   Plaintiffs specifically contend that the Mendocino CE does not comply

22  with the 2005 Rider, because the record demonstrates that current grazing management

23  was not meeting or moving towards the following LRMP objectives: (a) objectives for soil,

24  plant diversity, and rangeland; (b) riparian objectives; and (c) fisheries objectives.

25               a.     soil/plant/rangeland

26        The LRMP for the Mendocino National Forest contains a section setting forth the

27  management direction applicable to the national forest, as well as a separate section

28

                                    25

1  setting forth specific monitoring and evaluation requirements to be employed in determining

2  whether management direction objectives are being satisfied.  See Mendocino AR at

3  01272-1536, 01537-01555.  As plaintiffs note, the section on management direction sets

4  forth numerous standards and guidelines for management of the Mendocino National

5  Forest, and directs the Forest Service to, among other things: manage rangeland

6  ecosystems to provide diverse and productive habitats, healthy watersheds and

7  sustainable livestock grazing; manage livestock grazing to comply with forage utilization

8  standards; and manage grazing in order to retain at least 70% effective ground cover.  See

9  Mendocino AR at 01275, 01298.  The Mendocino LRMP also provides the following

10  monitoring and evaluation requirements to be employed by the Forest Service in

11  determining whether rangeland programs and projects are meeting the forest plan

12  direction: annual forage utilization measurements; field inspections; and condition and trend

13  studies.  See id. at AR 01547-48.  Field inspections and condition studies are to be

14  performed on an annual basis, with trend studies to be completed at 5-10 year intervals.

15  Id. at AR 01548.

16      Plaintiffs correctly note here that the administrative record does not reflect the

17  existence of adequate monitoring and evaluation information with respect to LRMP

18  objectives and guidelines.  Specifically, the condition and trend data submitted in

19  connection with the October 2006 report on the existing condition of the Middle Creek, Elk

20  Mountain, Pine Mountain and York Cabin allotments indicates that the most recent

21  condition and trend monitoring for Elk Mountain occurred in 1997 and 1999 – with the most

22  recent report indicating that conditions were "low" (e.g., unsatisfactory).  See Mendocino

23  AR at 00046.  The Pine Mountain allotment has no condition and trend data that post-dates

24  1961, the York Cabin allotment has no condition and trend data that post-dates 1958, and

25  the Middle Creek allotment has no reported condition and trend data at all.  Id. ("[c]ondition

26  and trend data monitoring has been very sporadic throughout the history of all four

27  allotments").

28

United States District Court

For the Northern District of California

1    With respect to forage utilization data, the data is decidedly mixed.[5]  While annual

2  grassland standards were met or exceeded for the Middle Creek and Pine Mountain

3  allotments for those measurements that were recorded from 2000-2006, the data also

4  shows that utilization standards were either not recorded or not met at the Horse Mountain

5  or Rabbit Glade areas of the Elk Mountain allotment from 2004 to 2006.  Mendocino AR at

6  00047.  Similarly, utilization standards on the York Cabin allotment were not met during the

7  last two years of monitoring in 2004 and 2006, and as plaintiffs note, were trending away

8  from forest plan standards.  Id.  Indeed, viewing the forage utilization data in the aggregate

9  with respect to the Elk Mountain and York Cabin allotments, the October 2006 "Existing

10  Condition" report concludes that utilization standards were met 50% of the time or less on

11  several areas over several years of monitoring.  Id. at AR 00047-48.

12    Finally, the Rangeland Resource Report prepared in June 2007 in connection with

13  the Mendocino CE also notes that "photographic monitoring" has occurred in connection

14  with the Elk Mountain, Middle Creek, Pine Mountain and York Cabin allotments, but that

15  such photos exist only for "some allotments and key areas," and have furthermore been

16  collected "only relatively recently."  As a result, the report concludes, "it is difficult to

17  determine long term landscape trends through the use of photos at this time."  Mendocino

18  AR at 00017-18.

19    The Forest Service responds to these noted deficiencies in principal by disputing

20  that condition and trend data provides an appropriate monitoring tool.  Defendant asserts

21  that the Mendocino LRMP specifically directs the Forest Service to assess residual dry

22

_____

23         [5]    At the hearing on the parties' motions, plaintiffs' counsel highlighted certain

24  discrepancies that exist in the underlying forage utilization data relied upon by the Forest
    Service in preparing its Mendocino CE decision memo.  Specifically, the forage utilization data

25  reported in the October 2006 "Existing Condition" report, which appears to have been re-
    submitted in connection with a second Rangeland Resource Report issued in June 2007,

26  contains different data conclusions in connection with the Long Meadow and Horse Mountain
    areas of the Elk Mountain allotment.  See Mendocino AR at 00047-48; cf. id. at 00017-18.  In

27  the absence of any credible explanation for the difference in reported data between both
    reports, the court concludes that it is the first set of reported data contained within the October

28  2006 report that should be credited.

**United States District Court**
For the Northern District of California

1  matter for annual grasslands, rather than condition and trend monitoring that is only

2  relevant or applicable to perennial species.  See Mendocino AR 19-21, 46-47, 1298.

3  However, while defendant is generally correct that the Mendocino LRMP provides forest

4  management direction that provides for rangeland analysis to be assessed by RDM

5  (residual dry matter) measurement, this observation is insufficient by itself to obviate the

6  LRMP's stated monitoring and evaluation requirements – which specifically note the

7  importance of condition and trend studies, in addition to annual forage utilization

8  measurements.  See id. at 01547-48.  Nor does defendant otherwise rely on empirical

9  research or studies in the record that independently establish a scientific basis for the

10  Forest Service's contention that RDM measurements may act as a surrogate for condition

11  and trend studies on the four allotments at issue.  Moreover, however, and significantly, it is

12  not clear that RDM measurements were, in fact, used in order to monitor all four allotments.

13  Rather, and as noted above, defendant's data reflects that RDM measurements were used

14  in conjunction with stubble height measurements, and that not all allotments were even

15  complying with all utilization standards.

16       In sum, the court concludes that the administrative record is devoid of condition and

17  trend studies that the LRMP requires to be completed at 5-10 year intervals; does not

18  reflect that forage utilization standards were satisfactorily being met for all allotments; and

19  does not include sufficient photographic documentation to determine the state of the

20  allotments' rangeland or soil conditions.  See Mendocino AR at 00046-48, 0980-82.  As

21  such, the court concludes that the Forest SERVICE failed to take a sufficiently 'hard look' at

22  the proposed action underlying the Mendocino CE, in violation of NEPA's requirements.

23  See Bering Strait Citizens for Responsible Dev. v. U.S. Army Corp of Eng'rs, 524 F.3d 938,

24  947 (9th Cir. 2008).

25            b.    Riparian objectives

26       Plaintiffs assert that the administrative record does not contain any monitoring

27  information showing that the four Mendocino allotments – which contain a number of wet

28

United States District Court

For the Northern District of California

1    meadows, creeks, streams, and other riparian areas – are meeting or moving toward the

2    aquatic and riparian objectives set forth in the Mendocino LRMP.  The Mendocino LRMP

3    sets forth aquatic and riparian objectives that require the Forest Service to "maintain and

4    improve the ecological health of riparian and aquatic ecosystems."  Mendocino AR at

5    01275.  Among other things, the Mendocino LRMP sets forth standards that mandate that

6    the Forest Service: "adjust grazing practices to eliminate impacts that retard or prevent

7    attainment of aquatic conservation strategy objectives;" maintain and restore the physical

8    integrity of the aquatic system, including shorelines, banks and bottom configurations;

9    maintain and restore the sediment regime under which aquatic ecosystems evolved, and

10   the specific composition and structural diversity of plant communities in riparian areas and

11   wetlands.  See Mendocino AR at 01298, 01302-03.

12        To demonstrate that its reliance on the Mendocino CE is adequately supported by

13   the record insofar as monitoring of LRMP objectives for riparian areas is concerned, the

14   Forest Service primarily relies upon: a Fisheries/Aquatic Prefield Form, and a June 2007

15   Fisheries/Aquatic Specialist Report.  See Mendocino AR at 00057-59, 00061-69.  The

16   Fisheries/Aquatic Specialist Report concludes that grazing and cattle use are "light to

17   nonexistent" along the majority of stream banks, that grazing does not overlap with stream

18   habitat, and that cattle do not and cannot access fish-bearing reaches of streams located in

19   steep terrain.  See id. at 00064-66, 69.  The Fisheries/Aquatic Prefield Form similarly

20   concludes that permitted grazing on the four allotments in question does not overlap with

21   fish or other aquatic species habitat.  Id. at 00057-59.

22        As plaintiffs point out, however, the conclusions reached in the foregoing report and

23   prefield form are just that: conclusions.  While the conclusions themselves appear to be

24   based on quantitative data and/or qualitative observations, no indication or reference is

25   made to such, and the record is thus devoid of any reference to any actual monitoring basis

26   for the conclusions reached by the Forest Service.  Moreover, plaintiffs are further correct

27   that aside from the two documents noted above, the Forest Service points to no other

28

United States District Court

For the Northern District of California

1    independent source of specific monitoring or data in the record that evaluates, as the ACS

2    objectives set forth in the Mendocino LRMP require, the physical integrity of shorelines and

3    streambanks, or sediment regime, within the four Mendocino allotments in question.

4        All of which leaves the court unable to locate any definitive monitoring information or

5    data relied upon by the Forest Service to evaluate the conclusion on which the Mendocino

6    CE relied: that monitoring with respect to the four allotments in question demonstrated that

7    current grazing management on the allotments was meeting or satisfactorily moving toward

8    Mendocino LRMP objectives for riparian areas.  The Forest Service may not rely upon

9    unsupported assertions, but rather must provide the underlying data upon which its

10   underlying experts relied – as well as an explanation for the agency's conclusions.  See

11   Western Watersheds Project v. Kraayenbrink, 632 F.3d 472, 493 (9th Cir. 2011).  Since

12   defendant fails to do so here, the court concludes that the Mendocino CE's conclusion that

13   the second prong of the 2005 Appropriations Rider was satisfied, was arbitrary and

14   capricious.

15           c.    Fisheries objectives

16       Finally, plaintiffs assert that the administrative record does not contain any

17   monitoring information demonstrating that the four Mendocino allotments are meeting or

18   moving toward the Mendocino LRMP objectives for fisheries.  The Mendocino LRMP tasks

19   the Forest Service with, among other things, maintaining or improving "the diversity and

20   quality of habitat needed to support viable populations of all native and desired non-native

21   wildlife and fish species...".  See Mendocino AR at 01276.  The Mendocino LRMP sets forth

22   standards requiring the Forest Service to provide "medium to high quality habitat for

23   resident trout and an adromous fish species," including the maintenance of "high water

24   quality values," retention of stream side vegetation along perennial streams to provide 60%

25   shade during certain times, and provision of favorable habitat for bottom flora and fauna

26   communities that are sources for fish forage....  See id. at 01320.  The Forest Service is

27   also required to "avoid and discourage activities that would disturb summer steelhead

28

30

1   during periods of critical low flow or high water temperatures." Id. at 01321.

2          For proof that the Mendocino CE is adequately supported vis-a-vis the Mendocino

3   LRMP's objectives for fisheries, the Forest Service once again relies on the June 2007

4   Fisheries/Aquatics Specialist Report. See Mendocino AR at 00061-67. The

5   Fisheries/Aquatics Specialist Report notes that the Forest Service consulted with the

6   National Marine Fisheries Service ("NMFS") in 1996 and 1998 regarding the possible

7   impact of grazing on protected salmon, steelhead, and their habitat – and noted the

8   possibility that some adverse effects could occur in the Pine Mountain and York Cabin

9   allotments. See id. at 00062. The report then states that "subsequent monitoring" results

10  have confirmed that the majority of grazing takes place away from these fish and their

11  habitats, and it is unlikely that the fish or their habitats are being harmed. Id. The Forest

12  Service contends that the report was in fact based upon field review, monitoring, and

13  numerous reports and analyses and consultation with other government agencies.

14         As already noted in connection with the foregoing discussion, however, the problem

15  with the Fisheries/Aquatic report is that the conclusions reached therein, although

16  referencing the fact that "subsequent monitoring" was conducted, fails to indicate actual

17  reliance on quantitative data and/or qualitative observations, or reference as much. The

18  record is thus devoid of any reference to any actual monitoring basis for the conclusions

19  reached by the Forest Service. Moreover, as plaintiffs point out, this conclusion is also

20  supported by a 1999 Forest Service study of the Upper Creek watershed that incorporates

21  two of the allotments in question. The 1999 Forest Service study found that "specific

22  information including distribution, habitat condition and trends on resident rainbow trout and

23  other fish that live within the creeks and streams of this watershed is incomplete...". See

24  Mendocino AR at 00790.

25         In sum, for the same reasons already noted in connection with the preceding

26  discussion on riparian objectives, the court concludes that the Mendocino CE's conclusion

27  that the second prong of the 2005 Appropriations Rider was satisfied insofar as monitoring

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   related to the Mendocino LRMP's fisheries objectives was concerned, was arbitrary and

2   capricious.

3   D.      Conclusion

4           For the foregoing reasons, the court hereby GRANTS in part and DENIES in part the

5   parties' cross-motions for summary judgment.  Specifically, summary judgment is

6   GRANTED in plaintiffs' favor with respect to their contention that the record does not

7   support the Forest Service's conclusion that the Big Ridge CE was consistent with agency

8   policy concerning "extraordinary circumstances;" and with respect to whether the Forest

9   Service appropriately decided that monitoring of the Mendocino allotments indicated that

10  current grazing management was meeting, or moving satisfactorily toward, objectives in the

11  Mendocino LRMP.  Defendant's cross-motion for summary judgment on the same grounds

12  is DENIED.  With respect to the remaining issue – whether the record provides adequate

13  support for the Forest Service's conclusion that monitoring on the Big Ridge allotment

14  demonstrated that current grazing management was meeting, or moving satisfactorily

15  toward, objectives in the Klamath LRMP – defendant's motion for summary judgment as to

16  this ground is GRANTED, and plaintiffs' cross-motion on the same ground is DENIED.

17          In view of the court's finding that the conclusions reached by the Forest Service in

18  connection with the Big Ridge CE and Mendocino CE decision memos were arbitrary and

19  capricious in certain respects and failed to take the "hard look" required by NEPA, the

20  question of remedy is appropriate.  In particular, the court questions whether entry of

21  summary judgment consistent with the foregoing ruling is sufficient by itself to dispose of

22  the matters pending before the court, or whether, in the alternative, an order remanding the

23  underlying matters to the Forest Service for further disposition consistent with the

24  foregoing, is the more appropriate course of action.

25          The court therefore instructs the parties to meet and confer, and to submit to the

26  court no later than **April 20, 2012** a stipulated form of judgment or a joint statement

27

28

proposing another form of disposition.

**IT IS SO ORDERED.**

Dated: March 30, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge